# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

JULIE A. JENKINS, KATIE RILEY, ALISON
J.G. BATES, and STEPHANIE L. SMALL, on
behalf of themselves and their patients; FAMILY
PLANNING ASSOCIATION OF MAINE d/b/a
MAINE FAMILY PLANNING AND PRIMARY
CARE SERVICES and PLANNED
PARENTHOOD OF NORTHERN NEW
ENGLAND, on behalf of themselves, their
employees, and their patients,

                  Plaintiffs,

v.

R. CHRISTOPHER ALMY, District Attorney of
Penobscot and Piscataquis Counties; STEPHANIE
P. ANDERSON, District Attorney of Cumberland
County; TODD COLLINS, District Attorney of
Aroostook County; MATTHEW FOSTER, District
Attorney of Hancock and Washington Counties;
JONATHAN LIBERMAN, District Attorney of
Knox, Lincoln, Sagadahoc, and Waldo Counties;
MAEGHAN MALONEY, District Attorney of
Kennebec and Somerset Counties; ANDREW S.
ROBINSON, District Attorney of Androscoggin,
Franklin, and Oxford Counties; KATHRYN
SLATTERY, District Attorney of York County;
and JANET MILLS, Attorney General of the State
of Maine,

                  Defendants.

CIVIL ACTION

Case No. _____

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the

above-named Defendants, their employees, agents, and successors in office, and in support

thereof allege the following:

## PRELIMINARY STATEMENT

1.      Maine law gives advanced practice registered nurses ("APRNs") broad authority to provide a wide range of health care services, including the authority to prescribe medications and perform procedures whose complexity and risks are comparable to, or greater than, those of first-trimester abortion. Yet despite the proven safety of abortion care and the proven ability of APRNs to provide such care safely and effectively, the State of Maine prohibits, under threat of criminal prosecution, anyone other than a licensed physician from providing abortion services. 22 M.R.S. § 1598 (the "Physician-Only Law"). The State does not single out *any other health care service* as beyond an APRN's scope of practice—only abortion. This restriction, which imposes severe burdens on women seeking abortions, violates federal constitutional guarantees of privacy and equal protection.

2.      APRNs are a category of registered professional nurses with advanced education and training. Encompassed within the category of APRNs are certified nurse practitioners ("nurse practitioners") and certified nurse-midwives ("nurse-midwives").[1] APRNs in Maine are authorized to provide "expanded professional health care," 32 M.R.S. § 2102(2-A), reflecting their advanced skills and knowledge, ranging from delivering babies, to inserting intrauterine contraceptive devices ("IUDs"), to performing endometrial biopsies (the removal of tissue from the uterine lining). The complexity of these health care services (among many others provided by APRNs) is equal to or greater than that of first-trimester abortion, and childbirth poses far greater

---

[1] There are two additional categories of APRNs in Maine: certified registered nurse-anesthetists ("CRNAs") and certified clinical nurse specialists ("CCNSs"). Physician assistants ("PAs") also regularly provide a vast array of complex health services and are often classified in medical literature, together with APRNs, as "advanced practice clinicians." Because none of the Plaintiffs are or employ CRNAs, CCNSs, or PAs, Plaintiffs bring this lawsuit only as applied to nurse practitioners and nurse-midwives. Plaintiffs note, however, that the medical literature and leading medical authorities support the provision of early abortion care by other advanced practice clinicians as well. *See infra* paragraphs 72-89.

risks. Indeed, APRNs in Maine, including those at Plaintiffs' clinics, can and do care for a woman experiencing a miscarriage using techniques that are *identical* to early abortion care.

3.     Notwithstanding the fact that the State authorizes APRNs to provide comparable—and, in the case of miscarriage management, identical—health care services, Maine statutes single out abortion as the only form of health care that APRNs are expressly prohibited from providing. *See* 22 M.R.S. § 1598. This restriction is both out of step with the State's treatment of comparable health care services and medically unjustified. Peer-reviewed medical literature uniformly demonstrates that APRNs can safely and effectively provide abortion care in the first trimester of pregnancy, and medical authorities ranging from the American College of Obstetricians and Gynecologists, to the American Public Health Association, to the World Health Organization, have all concluded that laws prohibiting APRNs from providing this care are medically unfounded.

4.     Moreover, because of limited physician availability in the State, the Physician-Only Law significantly constrains where and when abortion services are available in Maine. As a result, many women seeking abortions are faced with significant and costly travel burdens and delayed access to care, preventing some from obtaining an abortion altogether. These onerous burdens far outweigh the law's nonexistent health justification.

5.     To prevent this medically unjustified restriction from inflicting further harm on their patients, Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983 on behalf of themselves, the other APRNs who work at the Plaintiff clinics, and their patients. The Physician-Only Law imposes an undue burden on abortion access in violation of Plaintiffs' patients' constitutional right to privacy and likewise violates the equal protection rights of Plaintiffs and

their patients. It should be declared unlawful and unconstitutional as applied to APRNs who seek to perform first-trimester abortions, and its enforcement should be permanently enjoined.

6.      As with *every single other* health care service, existing scope of practice laws in Maine are more than sufficient to ensure that APRNs (like physicians and all other health care professionals) provide only care for which they are "educationally and clinically prepared and for which competency has been maintained." 02-380 C.M.R. ch. 8, §§ 1(3)(A), 1(3)(B). The Physician-Only Law provides no medical benefit and serves only to harm Maine women and the APRNs who are barred from caring for them.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 and 28 U.S.C. §§ 1343(a)(3).

8.      Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

9.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants, who are sued in their official capacities, carry out their official duties at offices located in this district.

## PARTIES

### A. Plaintiffs

10.     Plaintiff **Julie A. Jenkins,** MSN, WHNP-BC, is a nurse practitioner who primarily works at the Belfast clinic of Family Planning Association of Maine d/b/a Maine Family Planning and Primary Care Services ("Maine Family Planning"). In this capacity, Ms. Jenkins provides a wide range of health care services to Maine Family Planning patients, including procedures that are comparable to first-trimester abortion in risk and complexity. Prior to providing health care services in Maine, Ms. Jenkins worked as a nurse practitioner in

California, where she safely provided medication abortion care. However, she is prohibited from providing abortion care as a result of Maine's Physician-Only Law.

11.     Plaintiff **Katie Riley**, MSN, CNM, is a nurse-midwife who works at Planned Parenthood of Northern New England ("PPNNE"). In this capacity, Ms. Riley travels to all four of PPNNE's Maine clinics, as well as PPNNE's clinic in Manchester, New Hampshire, to provide a wide range of health care services, including procedures that are comparable to first-trimester abortion in risk and complexity. Ms. Riley has also delivered more than 100 babies. In New Hampshire, Ms. Riley safely provides medication abortion care to PPNNE patients. However, she is prohibited from providing the same care 95 miles away in Portland, Maine.

12.     Plaintiff **Alison J.G. Bates**, MSN, WHNP-BC, ANP-BC, is a nurse practitioner based out of PPNNE's Portland clinic and the Clinical Coordinator of Abortion Care at PPNNE. In this capacity, Ms. Bates provides a wide range of health care services to PPNNE patients, including medication and aspiration procedures in the context of miscarriage management—involving skills and techniques identical to those used in abortion care. In addition, as the Clinical Coordinator of Abortion Care, she developed the protocol for abortion services currently used by all PPNNE abortion providers, including APRNs in New Hampshire and Vermont and physicians across all three states. However, she is prohibited from providing abortion care herself as a result of Maine's Physician-Only Law.

13.     Plaintiff **Stephanie L. Small**, PhD, MSN, WHNP-BC, ANP-BC, is a nurse practitioner based out of PPNNE's Topsham clinic and PPNNE's Regional Clinical Director for Maine. In this capacity, Ms. Small provides a wide range of health care services to PPNNE patients, including procedures that are comparable to first-trimester abortion in risk and complexity. In addition, as the Regional Clinical Director of Maine, Ms. Small helps train and

supervise all of the APRNs that work for PPNNE in Maine. However, she is prohibited from providing abortion care as a result of Maine's Physician-Only Law.

14.     Plaintiff **Maine Family Planning** is a non-profit corporation incorporated in Maine with its principal place of business in Augusta, Maine. Its Augusta clinic is staffed by both physicians and APRNs.

15.     In addition to Augusta, Maine Family Planning also has smaller sites located in Bangor, Belfast, Calais, Damariscotta, Dexter, Ellsworth, Farmington, Fort Kent, Houlton, Lewiston, Machias, Norway, Presque Isle, Rockland, Rumford, Skowhegan, and Waterville. Because of the extremely limited availability of its physicians, Maine Family Planning's smaller sites are staffed almost exclusively by APRNs and are never staffed by physicians.

16.     Maine Family Planning provides a range of health care services at its sites, including annual gynecological exams; screening for cervical and breast cancer; family planning counseling; contraceptive services; pregnancy testing and counseling regarding pregnancy options (including carrying to term and raising a child, placing the child up for adoption, or abortion); abortions; miscarriage care; referrals for adoption; prenatal consultation; colposcopy; endometrial and vulvar biopsy; screening, diagnosis, and treatment of urinary, vaginal, and sexually transmitted infections; hormone therapy and other services for transgender clients; and services for mid-life women.

17.     Maine Family Planning provides medication abortions through 10 weeks of pregnancy, as dated from the last day of a woman's menstrual period ("LMP"), and aspiration abortions through the end of the first trimester (*i.e.*, 13.6 weeks LMP).

18.     Plaintiff **PPNNE** is a non-profit corporation incorporated in Vermont with established places of business in Maine in Topsham, Portland, Sanford, and Biddeford.

19.     PPNNE provides reproductive health services throughout Vermont, New Hampshire, and Southern Maine. These services include: annual gynecological exams; screening for cervical and breast cancer; family planning counseling; contraceptive services; pregnancy testing and counseling regarding pregnancy options (including carrying to term and raising a child, placing the child up for adoption, or abortion); abortions; miscarriage care; referrals for adoption; prenatal consultation; colposcopy; endometrial and vulvar biopsy; screening, diagnosis, and treatment of urinary, vaginal, and sexually transmitted infections; and HIV testing.

20.     PPNNE provides first- and second-trimester abortion care, including medication abortions through 10 weeks LMP and aspiration abortions throughout the first trimester.

21.     Because of the extremely limited availability of PPNNE's physicians, PPNNE provides abortion care in Maine only at its Portland health center.

22.     At PPNNE's clinics in Vermont and New Hampshire, APRNs safely provide both medication and aspiration abortion care.

**B.     Defendants**

23.     Defendant **R. Christopher Almy** is the District Attorney of Penobscot and Piscataquis Counties. As such, he is responsible for prosecuting all crimes, including violations of the Physician-Only Law, within the Counties. He is sued in his official capacity.

24.     Defendant **Stephanie Anderson** is the District Attorney of Cumberland County. As such, she is responsible for prosecuting all crimes, including violations of the Physician-Only Law, within the County. She is sued in her official capacity.

25.     Defendant **Todd Collins** is the District Attorney of Aroostook County. As such, he is responsible for prosecuting all crimes, including violations of the Physician-Only Law, within the County. He is sued in his official capacity.

26.     Defendant **Matthew Foster** is the District Attorney of Washington and Hancock Counties. As such, he is responsible for prosecuting all crimes, including violations of the Physician-Only Law, within the Counties. He is sued in his official capacity.

27.     Defendant **Jonathan Liberman** is the District Attorney of Knox, Lincoln, Sagadahoc, and Waldo County. As such, he is responsible for prosecuting all crimes, including violations of the Physician-Only Law, within the Counties. He is sued in his official capacity.

28.     Defendant **Maegan Maloney** is the District Attorney of Kennebec and Somerset Counties. As such, she is responsible for prosecuting all crimes, including violations of the Physician-Only Law, within the Counties. She is sued in her official capacity.

29.     Defendant **Andrew S. Robinson** is the District Attorney of Androscoggin, Franklin, and Oxford Counties. As such, he is responsible for prosecuting all crimes, including violations of the Physician-Only Law, within the Counties. He is sued in his official capacity.

30.     Defendant **Kathryn Slattery** is the District Attorney of York County. As such, she is responsible for prosecuting all crimes, including violations of the Physician-Only Law, within the County. She is sued in her official capacity.

31.     Defendant **Janet Mills** is the Attorney General of the State of Maine. As such, she may, within her discretion, institute and conduct prosecutions for any crime occurring within the State of Maine. She is sued in her official capacity.

## FACTUAL STATEMENT

**A.     Early Abortion Practice and Safety**

32.     Legal abortion is one of the safest services in contemporary health care. Less than one-quarter of one percent of all abortion patients experience a complication that requires hospitalization.

33.     The risk of complications from an abortion in the first trimester of pregnancy, which is when the overwhelming majority of abortions occur, is even lower.

34.     Abortion is far safer than the alternative—carrying a pregnancy to term. The risk of death associated with childbirth is approximately fourteen times higher than that associated with first-trimester abortion, and every pregnancy-related complication is more common among women having live births than among those having abortions. As discussed *infra*, under Maine law, nurse-midwives (including Ms. Riley) can and do deliver babies.

35.     Although abortion is significantly safer than continuing pregnancy through childbirth, the risks associated with abortion increase as pregnancy advances. According to one study, 58 percent of abortion patients in the United States would have liked to have had their abortion earlier in the pregnancy.

36.     Nationwide, roughly one out of every four women will have had an abortion by the time she reaches age 45. Approximately 60% of women having abortions already have at least one child, and most also plan to have children in the future—many when they are older, financially able to provide for them, and/or in a supportive relationship with a partner so their children will have two parents.

37.     In the first trimester of pregnancy, abortions are performed using medication or vacuum aspiration. Both methods are extremely safe and effective.

38.     Medication abortion, which is available only during the first 10 weeks of pregnancy, is typically performed using a regimen of two prescription drugs, mifepristone and misoprostol. Mifepristone, also known as "RU-486" or by its commercial name Mifeprex, works first by temporarily blocking the hormone progesterone, which is necessary to maintain pregnancy, and by increasing the efficacy of the second medication in the regimen, misoprostol. Misoprostol, which the woman generally takes 6-48 hours after the mifepristone, causes the uterus to contract and expel its contents. The woman typically passes the pregnancy at home, in a process similar to a miscarriage.

39.     In a vacuum aspiration abortion (or "aspiration abortion"), the clinician uses a gentle suction to evacuate the contents of the uterus. To do so, the clinician inserts a small sterile tube through the cervix into the uterus. An electric or manual pump attached to the tube creates suction, which empties the uterine contents. The procedure takes between five and ten minutes to complete.

40.     In states across the country, such as California, Oregon, Vermont, and New Hampshire, APRNs are legally permitted to provide both aspiration and medication abortion care, and in numerous additional states they are permitted to provide medication abortion alone. APRNs in New England have been safely and effectively providing abortion care for decades.

**B.     Scope of Practice of Advanced Practice Clinicians in Maine**

<u>**Licensing Requirements**</u>

41.     APRNs are a category of registered professional nurses ("RNs") who have a broader scope of practice than other RNs by virtue of their advanced education and training. The Maine Board of Nursing ("the Board") is responsible for licensing all RNs, including APRNs.

42.     To be licensed as a nurse practitioner in Maine, an applicant must be an RN who has (1) "received post-graduate education designed to prepare the nurse for advanced practice registered nursing in a specialty area in nursing that has a defined scope of practice," such as women's health, family, or psychiatric nursing, and (2) "been certified in the clinical specialty by a national certifying organization acceptable to the Board." 02-380 C.M.R. ch. 8, §§ 1(1)(F), 2(4)(C). Applicants must submit evidence that they have completed a nurse practitioner program "approved by the appropriate national accrediting body for that specific area of practice." *Id.* § 2(1)(A). If they have not completed such a program within the five years preceding their application, they must submit evidence of a minimum of 1500 hours of practice in an expanded specialty nursing role within the previous five years; or, if more than five years have elapsed since the completion of the APRN program and the applicant does not meet the minimum-hour requirement, the applicant must complete 500 hours of clinical practice supervised by either a physician or a nurse practitioner in the same specialty area of practice. *Id.* § 2(1)(C).

43.     To be licensed as a nurse-midwife in Maine, the applicant must be an RN who has (1) "received post-graduate education in a nurse-midwifery program approved by the American College of Nurse-Midwives," and (2) passed a national certification examination administered by an approved certification body. *Id.* § 1(1)(E).

### Scope of Practice Statutes & Rules

44.     Maine law gives all RNs broad authority to engage in the "[d]iagnosis and treatment of human responses to actual or potential physical and emotional health problems." 32 M.R.S. § 2102(2)(A).

45.     In light of APRNs' advanced education and training, the Legislature empowers them to provide "expanded professional health care" beyond the care that the Legislature

authorizes for other RNs. *Id.* § 2102(2-A). The Legislature does not delineate the scope of this expanded practice in the statute, but instead defers to the Board to define APRNs' scope of practice. The statute regulating the nursing profession provides that (1) "[t]he [B]oard shall adopt rules necessary to effectuate the purposes of this chapter relating to advanced practice registered nursing," *id.* § (2-A)(C); (2) APRNs may deliver "expanded professional health care . . . that is . . . . [w]ithin the advanced practice registered nurse's scope of practice as specified by the [B]oard by rulemaking," *id.* § (2-A)(B); and (3) APRNs "may prescribe and dispense drugs or devices, or both, in accordance with rules adopted by the [B]oard," *id.* § (2-A)(C).

46.     With respect to an APRN's authority to prescribe medications, the Board's scope of practice rules grant APRNs extremely broad authority. APRNs may "prescribe[], administer[] dispense[], or distribute[]" any drug that is in the Maine formulary and that is "related to the[ir] specialty area of certification," 02-380 C.M.R. ch. 8, §§ 6(4)(C)–(D), 6(5)(B)(3), 7(1)(A), and the formulary is expansively defined as "those non-scheduled drugs which are [FDA] approved and those listed on Schedules II/IIn, III/IIIn, IV, and V," *id.* § 1(1)(M).

47.     Thus, in addition to all FDA-approved medications, APRNs in Maine are authorized to prescribe potentially dangerous and addictive controlled substances such as oxycodone, methadone, morphine, and codeine. To do so, they—like physicians—must register with the U.S. Drug Enforcement Agency ("DEA") and obtain an identification number. *Id.* § 7(1)(A)(4)(B)).

48.     With respect to an APRN's capacity to perform health care procedures, the Board does not specifically enumerate which procedures an APRN may perform. Rather, the Board authorizes APRNs to provide "only those health services for which [they are] educationally and clinically prepared, and for which competency has been maintained." *Id.* §§ 1(3)(A), 1(3)(B).

Nurse practitioners may be "independently responsible and accountable" for, *inter alia*, "diagnosing and treating common diseases and human responses to actual and potential health problems." *Id.* § 1(3)(A)(3). Nurse-midwives may be "independently responsible and accountable" for, *inter alia*, the "primary health care . . . for women from adolescence to beyond menopause," "primary maternity care, including preconception care, and care during pregnancy," and "provision of gynecological and family planning services." *Id.* § 1(3)(B)(3).

49.     To assist APRNs in determining whether they are prepared to perform a particular procedure, the Board has published a Scope of Practice Decision Tree, available at http://www.maine.gov/boardofnursing/docs/scopeofpracticedecisiontree.pdf. The Decision Tree encourages APRNs who are assessing whether a particular service is within their scope of practice to consider factors such as whether the service is consistent with "[n]ursing literature and research" and "[r]easonable, prudent nursing in similar circumstances." *Id.* If the Board receives a complaint relating to an APRN's competence, it evaluates on a case-by-case basis whether the individual was acting within their scope of practice, based on their specific educational and clinical preparation and competency. *See* 02-380 C.M.R. ch. 8, §§ 1(3)(A), 1(3)(B).

50.     The Legislature does not single out *any* health care service as being beyond an APRN's scope of practice—except abortion.

51.     Consistent with the Board's guidelines, APRNs in Maine can and do provide a vast array of health care services.

52.     For example, APRNs can perform bone marrow biopsy and aspiration, which involves the insertion of a hollow needle into a patient's bone to extract a sample of bone marrow tissue for testing.

13

53.   APRNs can similarly perform an excisional biopsy, which entails making an incision in the skin and removing an entire tumor or area of abnormal tissue to test for cancer.

54.   APRNs can use cryotherapy (such as liquid nitrogen) to freeze and remove skin lesions or warts.

55.   APRNs can provide a wide range of care to treat injuries, including repairing lacerations; removing foreign bodies in the ear, nose, or eye; and providing upper or lower extremity splints.

56.   Nurse-midwives in Maine can deliver babies and perform cardiac and hematological stabilization and emergency management for newborns.

57.   Moreover, APRNs in Maine, including at Maine Family Planning and PPNNE, already perform procedures that are equivalent to, or more complex than, medication or aspiration abortion care.

58.   For instance, they perform endometrial biopsy, which involves inserting a sterile tube through a patient's cervix into the uterus and suctioning a small piece of tissue from the uterine lining.

59.   Similarly, APRNs perform colposcopies—the use of instruments to magnify the cervix and, when appropriate, to remove tissue for biopsy.

60.   APRNs insert and remove IUDs, which are long-acting reversible contraceptive devices. APRNs also perform intrauterine insemination, a form of assisted reproductive technology that involves injecting sperm into a patient's uterus.

61.   For each of these procedures, APRNs also often provide lidocaine cervical blocks, a type of local analgesic (painkiller).

62.    Most significantly, if a patient is experiencing a miscarriage, APRNs in Maine, including at PPNNE, can and do safely use vacuum aspiration to complete the miscarriage by fully evacuating the uterus (which reduces bleeding as well as the risk of infections and other complications). APRNs in Maine, including at PPNNE, also use this technique to remove any retained tissue in a patient's uterus following an abortion. This procedure is *identical* to an aspiration abortion. Indeed, a patient experiencing a miscarriage, who may already be bleeding when she presents at the health center, faces a greater risk of complications than a patient receiving care in the controlled context of an abortion.

63.    Similarly, if a patient is experiencing a miscarriage, or if a patient has retained tissue in her uterus following an abortion, APRNs in Maine—including at PPNNE—can and do safely provide misoprostol and/or mifepristone to facilitate the evacuation of the uterus.

64.    There is no medical justification for prohibiting APRNS from performing aspiration procedures and prescribing medication for abortion while allowing them to use the very same procedures and medications in the riskier context of miscarriage care.

## C.    Maine's Physician-Only Law

65.    In Maine, abortion is defined as "the intentional interruption of a pregnancy by the application of external agents, whether chemical or physical or by the ingestion of chemical agents with an intention other than to produce a live birth or to remove a dead fetus." 22 M.R.S. § 1598(2)(A). This definition encompasses both aspiration and medication abortion.

66.    Although "[i]t is the public policy of the State that the State not restrict a woman's exercise of her private decision to terminate a pregnancy before viability . . . . [i]t is also the public policy of the State that all abortions may be performed only by a physician." *Id.* § 1598(1).

15

67.     Accordingly, under Maine law, "[o]nly a person licensed . . . to practice medicine in Maine as a medical or osteopathic physician, may perform an abortion on another person." *Id.* § 1598(3)(A).

68.     The law imposes a criminal penalty on non-physicians who perform abortions. *Id.* § 1598(3)(B).

69.     There are several other abortion-related statutes that necessitate or assume physician involvement. First, every abortion performed in the state must be reported to the Department of Health and Human Services using a designated form that "shall be prepared and signed by the attending physician." *Id.* § 1596(2). Second, "[a] physician may not perform an abortion unless, prior to the performance, the attending physician certifies in writing that the woman gave her informed written consent, freely and without coercion." *Id.* § 1599-A(1). Finally, while APRNs may counsel minors seeking abortions, *id.* § 1597-A(1)(B)(6), "the attending physician" must receive the written verification of informed consent and make it part of the minor's medical record, *id.* § 1597-A(2)(C).

70.     Maine law generally provides for "[g]lobal signature authority of a certified nurse practitioner or certified nurse-midwife," under which any legal requirement for a "signature, certification, stamp, verification, affidavit or endorsement by a physician . . . may be fulfilled by a [nurse practitioner] or a [nurse-midwife]." 32 M.R.S. § 2205-B(5). However, there is some ambiguity as to whether this provision applies to the abortion-related signature requirements described above, because abortion is the only health care service that APRNs are banned from providing under threat of criminal prosecution.

**D.**     **APRNs in Maine Can Provide Safe, Effective First-Trimester Abortion Care**

71.     Peer-reviewed studies uniformly conclude that APRNs can safely and effectively provide first-trimester abortion care, and leading medical and public health authorities agree. Given the highly relevant experience and strong safety record of APRNs at Plaintiffs' clinics in Maine and neighboring states, as well as the rigorous training and credentialing programs at Plaintiffs' clinics, the Physician-Only Law lacks any medical justification.

### Studies Consistently Establish that APRNs Can Safely and Effectively Provide First-Trimester Abortion Care

72.     Researchers have repeatedly studied the provision of first-trimester abortions by APRNs to evaluate the comparative safety of abortion care provided by APRNs versus the care provided by physicians. The peer-reviewed medical literature has unanimously concluded that APRNs can safely and effectively provide both aspiration and medication abortions.

73.     For example, a 2013 study of first-trimester aspiration abortion services compared 5,812 procedures performed by physicians with 5,675 procedures performed by APRNs and physician assistants. *See* Tracy A. Weitz et al., *Safety of Aspiration Abortion Performed by Nurse Practitioners, Certified Nurse Midwives, and Physician Assistants Under a California Legal Waiver*, 103 Am. J. Pub. Health 454, 457 (2013). The study found that "complications were rare" among both groups of practitioners and that such "complications were clinically equivalent between newly trained [nurse practitioners, nurse-midwives, and physician assistants] and physicians." *Id.* at 454, 457. The results of the study "confirm existing evidence from smaller studies that the provision of abortion by [advanced practice clinicians] is safe and from larger international and national reviews that have found these clinicians to be safe and qualified health care providers." *Id.* at 459 (footnotes omitted).

17

74.     Other studies addressing the safety of advanced practice clinicians' provision of aspiration abortion in the first trimester of pregnancy similarly conclude that such clinicians "provided abortion services comparable in safety and efficacy to those of a physician service." Marlene B. Goldman et al., *Physician Assistants as Providers of Surgically Induced Abortion Services*, 94 Am. J. Pub. Health 1352, 1356 (2004) (examining data on abortion care in Vermont); *see also* Shireen J. Jejeebhoy et al., *Can Nurses Perform Manual Vacuum Aspiration (MVA) as Safely and Effectively as Physicians? Evidence from India*, 84 Contraception 615, 620 (2011) (finding that aspiration abortion "can be provided with equal safety and effectiveness . . . by nurses as by physicians"); I.K. Warriner et al., *Rates of Complication in First-Trimester Manual Vacuum Aspiration Abortion Done by Doctors and Mid-Level Providers in South Africa and Vietnam: A Randomised Controlled Equivalence Trial*, 368 Lancet 1965, 1970 (2006) ("[F]irst-trimester abortions with manual vacuum aspiration are done equally safely by doctors and trained government-certified MLPs [mid-level practitioners]"); Mary Anne Freedman et al., *Comparison of Complication Rates in First Trimester Abortions Performed by Physician Assistants and Physicians*, 76 Am. J. Pub. Health 550, 553 (1986) (evidence from Vermont demonstrated that "there are no difference in complication rates between those women who had abortions performed by a physician assistant and those who had the procedure performed by a physician").

75.     Studies focused on medication abortion have similarly found that APRNs provide medication abortion services as safely as—or more safely than—physicians.

76.     For example, a 2014 study on the safety and efficacy of medication abortion provided by nurse-midwives as compared to physicians "showed the superior efficacy of nurse-midwife provision of early medical [termination of pregnancy] in healthy women, when

compared with standard doctor provision." H. Kopp Kallner et al., *The Efficacy, Safety and Acceptability of Medical Termination of Pregnancy Provided By Standard Care by Doctors or By Nurse-Midwives: A Randomized Controlled Equivalence Trial*, 122 Brit. J. Obstetrics & Gynecology 510, 515 (2014).

77.     Other studies addressing APRN provision of medication abortion care found that APRNs and physicians provide medication abortion with comparable safety and effectiveness. *See* Shireen J. Jejeebhoy et al., *Feasibility of Expanding the Medication Abortion Provider Base in India to Include Ayurvedic Physicians and Nurses*, 38 Int'l Persp. on Sexual & Reprod. Health 133, 139 (2012); I.K. Warriner et al., *Can Midlevel Health-Care Providers Administer Early Medical Abortion As Safely and Effectively As Doctors?*, 377 Lancet 1155, 1159–60 (2011).

### Leading Medical and Public Health Authorities Support APRN Provision of First-Trimester Abortion Care

78.     Consistent with the unanimous findings from this research, a significant array of leading medical authorities and professional associations support the provision of first-trimester abortion services by APRNs.

79.     The American College of Obstetricians and Gynecologists ("ACOG"), a professional association of more than 58,000 obstetrician-gynecologists, is the nation's leading organization of women's health care providers.

80.     ACOG expressly "oppos[es] restrictions [like the Physician-Only Law] that limit abortion provision to physicians only or obstetrician–gynecologists only." ACOG, *Committee Opinion on Health Care for Underserved Women*, No. 612 (Nov. 2014, reaffirmed 2017), https://www.acog.org/Resources-And-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Abortion-Training-and-Education.

81.     In setting forth its opposition to physician-only laws, ACOG invoked the above-cited studies "show[ing] no difference in outcomes in first-trimester medical and aspiration abortion by provider type and indicat[ing] that trained [advanced practice clinicians] can provide abortion services safely." *Id.*

82.     The American Public Health Association ("APHA") is the nation's leading public health organization.

83.     The APHA recognizes that physician-only requirements like the Act are "[o]utdated" and expressly recommends that APRNs be permitted to provide both aspiration and medication abortion care. APHA, *Provision of Abortion Care by Advanced Practice Nurses and Physician Assistants* (Nov. 2011), https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/07/28/16/00/provision-of-abortion-care-by-advanced-practice-nurses-and-physician-assistants.

84.     The APHA has further explained that "[e]mpirical evidence . . . demonstrates the competency of [nurse practitioners, nurse-midwives, and physician assistants] in providing all aspects of medication abortion" and that "research findings indicate the ability of primary care clinicians—including [nurse practitioners, nurse-midwives, and physician assistants]—to provide first trimester aspiration abortions with complication rates comparable to those of physician abortion providers." *Id.*

85.     The World Health Organization ("WHO") has likewise recognized that medication and aspiration abortion "can be safely provided" by APRNs. WHO, *Safe Abortion: Technical and Policy Guidance for Health Systems* 65 (2nd ed. 2012). The WHO explained that health care providers—including APRNs—"with the skills to perform a bimanual pelvic examination to diagnose and date a pregnancy, and to perform a transcervical procedure such as

20

intrauterine device (IUD) insertion, can be trained to perform vacuum aspiration" and that

"midlevel health-care providers [*i.e.*, APRNs] can also administer and supervise abortion

services." *Id.* at 67.

86.     The Maine Nurse Practitioners Association is the professional association for

nurse practitioners in the state.

87.     In a May 2002 position paper on *Abortion As An Expanded Practice Procedure*,

the Maine Nurse Practitioners Association recognized the ability of properly trained APRNs to

provide abortion care.  Its position paper explained that "[s]cientific studies show no difference

in complication rates for abortions performed by advanced practice clinicians and those

performed by physicians"; that "NPs in Vermont have several year history of providing safe

abortion care"; and that NPs in Maine "already perform many intrauterine procedures such as

endometrial biopsy, IUD insertion and intrauterine insemination," which require skills and

techniques comparable to those required for aspiration abortion.

88.     The United States Food and Drug Administration ("FDA") recognizes that

qualified health care providers acting within their scope of practice may dispense medication

abortion as allowed under state law. *See* FDA, *Questions and Answers on Mifeprex* (2016),

http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProvider

s/ucm492705.htm.

89.     In 2016, the FDA amended the label for Mifeprex (the first drug in the medication

abortion regimen) to make clear that health care providers other than physicians can safely

prescribe this medication. In explaining this clarification, the FDA's Center for Drug Evaluation

and Research concluded that published research establishes that "healthcare providers other than

physicians can effectively and safely provide abortion services." FDA Ctr. for Drug Evaluation

& Res., Summary Review of Application No. 020687Orig1s020, 17 (Mar. 29, 2016),

https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/ 020687Orig1s020SumR.pdf.

### The Experience, Training, and Safety Record of APRNs at Plaintiffs' Clinics Underscore Their Ability to Safely Provide First-Trimester Abortion Care

90.     Maine Family Planning employs or contracts with 19 APRNs across its 18

locations in Maine, and PPNNE employs or contracts with 11 APRNs across its four locations in

Maine. All specialize in women's health or family nursing, both of which encompass

reproductive health care.

91.     The APRNs who work at Maine Family Planning and PPNNE, including Ms.

Jenkins, Ms. Riley, Ms. Bates, and Ms. Small, are highly qualified clinicians.

92.     Like other APRNs in Maine, they provide a broad range of health care services,

have extremely broad prescriptive authority, and regularly prescribe both FDA-approved and

Scheduled medications.

93.     APRNs at Maine Family Planning and PPNNE also have specific experience in

medication and aspiration abortion care or comparable services.

94.     For instance, Ms. Riley safely provides medication abortion care at PPNNE's

clinic in Manchester, New Hampshire. She has been doing so for four years. However, because

of the Physician-Only Law, she is prohibited from providing identical care at PPNNE's Maine

clinics.

95.     Ms. Jenkins safely provided medication abortion care while living in California.

However, because of the Physician-Only Law, she is prohibited from providing the same care in

Maine.

96.     PPNNE APRNs, including Ms. Bates, safely prescribe medication in the context

of miscarriage management, or to evacuate any retained tissue in a patient's uterus following an

abortion. However, because of the Physician-Only Law, they are prohibited from prescribing the same medication to induce an abortion.

97.     PPNNE APRNs, including Ms. Bates, safely perform aspiration procedures in the context of miscarriage management, or to evacuate any retained tissue in a patient's uterus following an abortion. However, because of the Physician-Only Law, they are prohibited from performing the identical procedure to induce an abortion.

98.     APRNs at Maine Family Planning and PPNNE also regularly provide *all* elements of patient care before and after an abortion, including diagnosing and dating the pregnancy (typically by ultrasound), assessing any contraindications (*e.g.*, if the patient has an allergy, or the pregnancy is ectopic—located outside of the uterus), providing options counseling, developing a contraceptive plan, and providing follow-up care to ensure that the abortion was complete.

99.     For instance, since 2015, Ms. Jenkins has participated in Maine Family Planning's telemedicine program for abortions, through which a physician located at Maine Family Planning's Augusta office interacts with a patient at one of Maine Family Planning's other sites via videoconference.

100.     Medication abortion is provided through the telemedicine program as follows: The patient is first evaluated by an APRN trained in abortion care to ensure that her pregnancy is intrauterine (rather than ectopic) and to determine whether she is within the gestational limit for a medication abortion, and whether she otherwise is an appropriate candidate for medication abortion. As a component of this evaluation, the APRN performs an ultrasound on the patient. If the ultrasound and medical history show that she is a suitable candidate for medication abortion, the patient consults by video with a physician located in Augusta. After confirming that a

medication abortion is medically appropriate for the patient, that the patient has given informed consent to the abortion, and that the APRN has worked with the patient to establish a contraception plan, the physician instructs the patient to take the first pill (mifepristone), and then the APRN schedules a follow-up visit for 4–14 days later. The patient uses the additional pills (misoprostol) as instructed at home 6–48 hours later, just as she would have if she obtained the first pill from the doctor in-person at the Augusta clinic. At the follow-up visit, the APRN confirms that the abortion was complete. As discussed *infra*, Maine Family Planning's telemedicine abortion program only slightly mitigates the harm caused by the Physician-Only Law because it is still severely limited by Maine Family Planning's physicians' availability.

101.    No Maine Family Planning physician has *ever* disagreed with a Maine Family Planning APRN's determination that a medication abortion was medically appropriate.

102.    APRNs at Maine Family Planning and PPNNE also regularly perform procedures that are comparable in risk and complexity to aspiration abortion, such as IUD insertions and removals, endometrial biopsies, and colposcopies.

103.    APRNs at Maine Family Planning and PPNNE, including Ms. Riley, also have experience delivering babies, assisting with caesarean sections, and providing newborn care—all of which is far more complex than first-trimester abortion care. Indeed, Ms. Riley has delivered more than 100 babies.

104.    To the extent necessary, APRNs at Maine Family Planning and PPNNE have the ability to obtain additional training to achieve competency in medication and aspiration abortion.

105.    Indeed, PPNNE regularly trains APRNs at its New Hampshire and Vermont clinics in medication and aspiration abortion care, and APRNs have been safely providing both medication and aspiration abortion at those clinics for years.

24

106.     Maine Family Planning and PPNNE regularly train and credential APRNs in Maine in procedures that are comparable in skill and complexity to aspiration abortion care.

107.     Both providers maintain detailed protocols for training and credentialing clinicians in new skills. These typically involve a combination of didactic requirements, clinical observation, a period of proctored care, and review of relevant patient records.

108.     This mirrors the training and credentialing process that Maine Family Planning and PPNNE use for physicians.

109.     If not for the Physician-Only Law, six APRNs at Maine Family Planning (including Ms. Jenkins) and four APRNs at PPNNE (including Ms. Bates and Ms. Riley) could immediately begin providing medication abortions, and two APRNs at PPNNE (including Ms. Bates) could immediately begin providing aspiration abortion care. Other APRNs at Maine Family Planning and PPNNE would immediately pursue training to expand their scope of practice to encompass both medication and aspiration services.

**E.     The Impact of Maine's Physician-Only Law on Plaintiffs and Their Patients**

110.     The Physician-Only Law significantly impedes access to abortion and is causing medical, emotional, and financial harm to Maine women every day.

**Because of the Physician-Only Law, Maine Women Often Have to Travel
Extremely Long Distances to Access Abortion Care, Which Many Cannot Afford**

111.     Maine is the most rural state in the country, with more than 60% of the population living outside of urban areas.[2]

---

[2] U.S. Census Bureau, *Maine: 2010 Population and Housing Unit Counts* 2 (2010), https://www2.census.gov/library/publications/cen2010/cph-2-21.pdf; Press Release, U.S. Census Bureau, *Growth in Urban Population Outpaces Rest of Nation*, Census Bureau Reports (Mar. 26, 2012), http://www.census.gov/newsroom/releases/archives/2010_census/cb12-50.html.

112.     Today, Maine has only three publicly accessible health centers (*i.e.*, clinics that are open to women who are not already established patients) where a woman can obtain an aspiration abortion or *any* abortion care after 10 weeks LMP: Maine Family Planning in Augusta, PPNNE in Portland, and Mabel Wadsworth Center in Bangor.

113.     More than half of Maine women live in counties without a provider of abortion beyond 10 weeks of pregnancy. This includes Washington, Somerset and Franklin counties, the poorest counties in the State.

114.     Today, a woman who lives in Fort Kent who seeks an aspiration abortion during the first 10 weeks of pregnancy, or any abortion care after 10 weeks of pregnancy, must travel more than six hours round-trip to Bangor in order to obtain that care.

115.     A woman who lives on Vinalhaven faces a full-day commute, or more, to obtain an aspiration abortion or any abortion care after 10 weeks of pregnancy. She must first take a ferry to Rockland (which runs only six times daily), and then find and pay for transportation for the one-hour drive to Augusta. After her aspiration procedure, she must find and pay for transportation to return to Rockland, and then take a return ferry, the last of which departs at 4:30 pm. If she is unable to make the return ferry, she must find and pay for overnight lodging.

116.     A woman who lives on one of Maine's more remote islands will have an even more difficult and expensive commute to obtain abortion care. For instance, a woman on Matinicus has only two travel options: an air taxi to Knox County Regional Airport (which flies only twice daily; typically has only three seats available; and costs $60 each way) or a ferry (which runs only two to four days in any given month and takes more than two hours each way). She must then find and pay for transportation to and from Augusta, and she will almost certainly have to find and pay for overnight lodging before she can return to the island.

117.    A woman who lives in Skowhegan, Farmington, or Belfast must travel up to two hours round-trip to Augusta to obtain an aspiration abortion or an abortion after 10 weeks LMP. If she lives in Calais, Machias, or Presque Isle, she must travel up to four or five hours round-trip to Bangor.

118.    Depending on the weather conditions, these journeys may take far longer, or simply be impossible.

119.    A woman facing these long travel distances to obtain an abortion typically must arrange and pay for transportation and arrange to take time off work. Low-wage workers often have no access to paid time off or sick days, and even if she is able to get time off work, she is likely to forgo wages. These costs can be prohibitive for poor and low-income women.

120.    A woman facing long-distance travel to access an abortion must also arrange and pay for child care. Most abortion patients in the United States already have at least one child.

121.    Poverty is a significant problem in Maine. Nearly 14% of Maine residents,[3] and 42.1% of single mothers in the State,[4] have incomes at or below the federal poverty level ($12,060 for a single person and $20,420 for a family of three). The poverty rate is disproportionately high among women of color: 51.3% of African-American women, 27.8% of Latina women, and 35.5% of Native American women in Maine were living in poverty in 2011-13.[5]

---

[3] American Fact Finder, U.S. Census Bureau, *2011-2015 American Community Survey 5-Year Estimates, Maine*, https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml?src=bkmk.

[4] Inst. for Women's Pol'y Res., *The Status of Women in the States, 2015* 158 (2015), https://iwpr.org/wp-content/uploads/wpallimport/files/iwpr-export/publications/R400-FINAL%208.25.2015.pdf.

[5] Inst. for Women's Pol'y Res., *The Status of Women in Maine, 2015: Highlights* (2015), http://statusofwomendata.org/app/uploads/2015/08/Maine-Fact-Sheet.pdf.

122.    Because the federal poverty level is widely considered to be an inadequate measure of poverty that does not take into account the cost of child care, medical expenses, utilities, or taxes, these statistics undercount the number of Maine residents who are struggling to make ends meet.

123.    Due to a combination of factors, including relative lack of access to medical services and difficulty accessing and affording contraceptives, low-income women have more unintended pregnancies, and higher abortion rates, than women with higher incomes. Consequently, a disproportionately high percentage of women who seek abortions nationwide have poverty-level incomes. The same is true at Plaintiffs' clinics.

124.    Plaintiffs' poor and low-income patients routinely tell them that they do not have, and will not be able to find, the money they need to travel to a clinic in a different city for abortion care. Although Maine's Medicaid program covers the cost of transportation to receive Medicaid-covered health services, because Maine's Medicaid program excludes coverage for abortion in almost all cases, Plaintiffs' poor and low-income patients who are enrolled in or eligible for Medicaid cannot receive state assistance either with the cost of their abortions or with the cost of travel to their appointments. In any event, transportation costs are but one of multiple barriers to a low-income woman's ability to travel to obtain abortion care.

125.    As a result of the lengthy travel distances the Physician-Only Law imposes, some women are simply unable to obtain an abortion and are instead forced to carry a pregnancy to term against their will.

126.    If not for the Physician-Only Law, the number of Maine communities where aspiration abortion care is available would increase from three to eighteen, including Belfast, Calais, Ellsworth, Farmington, Fort Kent, Lewiston, Machias, Norway, Presque Isle, Rockland,

Rumford, Sanford, Skowhegan, Topsham, and Waterville. Maine Family Planning and/or PPNNE have clinics in each of these cities that are staffed by APRNs who are either already trained in aspiration abortion care, or would shortly be trained in aspiration abortion care if not for the Physician-Only Law.

127. While these are Plaintiffs' priority locations, aspiration abortion may be available at even more locations once additional APRNs are trained. In addition, Maine Family Planning may be able to send a trained APRN who works at one of the sites above to its clinics in Damariscotta, Dexter, and Houlton when there is patient need.

128. Thus, many more women in Maine would be able to receive care in or near their own communities without the expense and logistical challenges of traveling long distances.

129. Women who would otherwise find it impossible to obtain abortion care at a distant location will instead be able to access that care locally.

130. In addition, many more Maine women would be able to obtain abortion care from the same APRN in their community from whom they receive other primary, gynecological, and/or prenatal care.

**Because of the Physician-Only Law, Maine Women Can Access Abortion Care Only on a Limited Number of Days, Causing Delays and Other Forms of Harm, and Preventing Some Women from Accessing Abortion Care at All**

131. Because of the Physician-Only Law, there are generally only three days per week when a woman can obtain an abortion in Maine: (1) on Tuesday, she can obtain a medication or aspiration abortion in Bangor; (2) on Thursday, she can obtain a medication or aspiration abortion in Augusta, a medication abortion in Bangor, or a medication abortion via telemedicine at up to five of Maine Family Planning's clinics; and (3) on Friday, she can obtain a medication or aspiration abortion in Portland.

132.     In addition, due to limited physician availability, abortion care is only offered on Tuesdays, Thursdays, and Fridays during narrow windows. For instance, medication abortion is only available by telemedicine on Thursdays in between Maine Family Planning's physician's in-person appointments at the Augusta clinic.

133.     Because of the Physician-Only Law, there are *no* publicly accessible clinics in Maine regularly offering evening or weekend appointments for abortion care.

134.     This presents significant logistical challenges for the many patients who need to take time off work and/or arrange for child care for their abortion appointment.

135.     The lack of evening or weekend options for abortion care also makes it more difficult for patients to maintain the confidentiality of their pregnancy and abortion decision from employers, colleagues, neighbors, and those family members they decide not to inform. For women in abusive relationships who need to keep their pregnancy and abortion decision secret, this can endanger their safety.

136.     Plaintiffs' patients frequently implore them for an appointment on a different day of the week. Unfortunately, because of the Physician-Only Law, Plaintiffs are almost never able to accommodate these requests.

137.     Because of the Physician-Only Law, PPNNE is able to offer abortion services only one day per week at only one location in Maine. As a result, patients sometimes have to wait up to 2-3 weeks to schedule an abortion visit at the Portland clinic.

138.     While Maine Family Planning's telemedicine program has slightly mitigated some of the burdens of travel and delay by increasing the availability of medication abortion in rural communities in Maine, the program is severely limited because it cannot operate without a physician available. The physicians with whom Maine Family Planning contracts to provide

abortions all work full-time outside Maine Family Planning, either in their own private practices or both practicing and teaching as part of a residency program. As a result, Maine Family Planning generally only has a physician available on Thursdays.

139.   In addition, as previously noted, that physician typically can provide telemedicine consultations for medication abortion only in between in-person appointments for abortion care at the Augusta clinic. There are usually only a few slots available to serve multiple telemedicine locations in Maine, and it can be very difficult to get an appointment.

140.   Scheduling these telemedicine appointments is complicated and time-consuming, primarily because of the need to coordinate with the schedule of a physician in Augusta. In addition to costing Maine Family Planning a significant amount in staff resources, these scheduling challenges delay patients' appointments, typically by at least one week.

141.   These delays can mean the difference between obtaining a medication abortion and an aspiration abortion, with meaningful repercussions for women's health and well-being. Medication abortion is medically indicated for certain women (*e.g.*, women with uterine fibroids), and strongly preferred by others (*e.g.*, sexual assault survivors for whom the insertion of instruments into the vagina may cause emotional and psychological trauma, or minors who have never had a pelvic exam performed).

142.   In addition, although abortion is extremely safe, the risks associated with the procedure increase with each additional week of pregnancy.

143.   Moreover, a woman who is delayed past 10 weeks LMP will no longer have the option of a telemedicine abortion and will often have to travel lengthy distances to obtain care.

144.   Approximately 1-2 times each month, a patient estimated to be at 9 weeks of pregnancy or more contacts Maine Family Planning seeking a medication abortion, and lives

over an hour from the nearest provider of aspiration abortion care. Because of scheduling delays caused primarily by the Physician-Only Law, these patients are often pushed past the limit for medication abortion and have to travel to Bangor or Augusta to obtain an aspiration abortion instead—or forego abortion care all together.

145.    For instance, Maine Family Planning was contacted by a patient in Presque Isle recently who needed a medication abortion and was approaching the point in pregnancy at which that method of abortion would no longer be available. Ms. Jenkins was at the Presque Isle clinic that day and ready to assist with a telemedicine abortion, but Maine Family Planning was unable to find a physician to confer with the patient by videoconference. As a result, the patient's abortion care was delayed by fourteen days; she was unable to obtain an abortion with pills, which she strongly preferred; and she instead had to make a five-hour round-trip to Bangor for an aspiration abortion.

146.    In Fort Kent, because of patient demand, the telemedicine abortion slots are very scarce and women are frequently forced to wait at least a week to obtain care. If, as sometimes occurs, they are pushed past 10 weeks LMP (the limit for medication abortion), they must travel approximately seven hours round-trip (or more, depending on weather conditions) to obtain an aspiration abortion in Bangor—if they are able to do so.

147.    In addition, because the cost of an abortion increases as gestational age advances, patients may face additional costs as a result of these delays—which is a serious burden for many patients, especially low-income patients.

148.    At both Maine Family Planning and PPNNE, the delays resulting from the Physician-Only Law are often exacerbated by the time it takes patients to raise money for the procedure (which, because of delays caused by the Physician-Only Law, may be more

expensive) and for travel to the procedure (which, because of the Physician-Only Law, may be far longer and more expensive). As a result of these factors, some patients are pushed past the point in pregnancy when they can obtain abortion care in Maine.

149.    If the Physician-Only Law were invalidated, abortion care would be available in Maine six days of the week, for longer hours (including evenings), and typically in five or more locations on any given day.

150.    This expanded access would dramatically reduce delays and the associated medical, emotional, and financial harm that women in Maine are experiencing as a result of the Physician-Only Law.

## CLAIMS FOR RELIEF

### COUNT I

**(Substantive Due Process – Patients' Right to Privacy)**

151.    The allegations of paragraphs 1 through 150 are incorporated as though fully set forth herein.

152.    The Act violates Plaintiffs' patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution by imposing significant burdens on abortion access that are not justified by the law's purported benefits, thereby imposing an undue burden on a woman's right to decide to have an abortion.

### COUNT II

**(Equal Protection – Plaintiffs and Their Patients)**

153.    The allegations of paragraphs 1 through 152 are incorporated as though fully set forth herein.

154.    The Act violates the equal protection rights of Plaintiffs, as guaranteed by the Fourteenth Amendment to the U.S. Constitution, by treating APRNs who seek to provide abortion services differently than APRNs who seek to provide comparable health services, without adequate justification.

155.    The Act violates the equal protection rights of Plaintiffs' patients, as guaranteed by the Fourteenth Amendment to the U.S. Constitution, by treating patients who seek medication and aspiration abortion services differently than patients who seek comparable health care services, without adequate justification.

WHEREFORE, Plaintiffs respectfully request that the Court:

1.    declare that the following statutes are unconstitutional:

    a.    22 M.R.S. § 1598(3) as applied to certified nurse practitioners and certified nurse-midwives who seek to provide first-trimester abortions;

    b.    22 M.R.S. § 1598(1) as applied to certified nurse practitioners and certified nurse-midwives who seek to provide first-trimester abortions;

    c.    22 M.R.S. § 1596(2) to the extent that it requires the signature of the "attending physician" and thereby prohibits certified nurse practitioners and certified nurse-midwives from providing first-trimester abortions;

    d.    22 M.R.S. § 1597–A to the extent that its requirements are confined to physicians and thereby prohibit certified nurse practitioners and certified nurse-midwives from providing first-trimester abortions;

    e.  22 M.R.S. § 1599–A to the extent that its requirements are confined to physicians and thereby prohibit certified nurse practitioners and certified nurse-midwives from providing first-trimester abortions;

2.    enjoin Defendants, their employees, agents, and successors in office from enforcing the statutory provisions set forth in points (1)(a)–(e), *supra*, without bond;

3.    award Plaintiffs costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

4.    grant Plaintiffs such other, further, and different relief as the Court may deem just and proper.


Date:  September 20, 2017

                          Respectfully submitted,

/s/ Zachary L. Heiden
Zachary L. Heiden
American Civil Liberties Union of Maine
Foundation
121 Middle Street, Suite 200
Portland, ME 04103
Telephone: (207) 619-6224
Email: zheiden@aclumaine.org

*Counsel for Plaintiffs*


Jennifer Sandman*
Planned Parenthood Federation of America
123 William St., 9th Floor
New York, NY 10038
Telephone: (212) 261-4749
Email: jennifer.sandman@ppfa.org

*Counsel for Katie Riley, Alison J.G. Bates,*
*Stephanie L. Small, and Planned Parenthood of*
*Northern New England*

/s/ Julia Kaye
Julia Kaye*
Andrew D. Beck*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2633
Email: jkaye@aclu.org
           abeck@aclu.org

*Counsel for Julie A. Jenkins and Family*
*Planning Associates of Maine d/b/a Maine*
*Family Planning and Primary Care Services*


*\* Application for Pro Hac Vice pending*