# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MAINE

JULIE A. JENKINS, *et al.*,

      Plaintiff,

      v.

R. CHRISTOPHER ALMY, District Attorney
of Penobscot and Piscataquis Counties, *et al.*,

      Defendants.

CIVIL NO.: 2:17-cv-00366-NT

## PLAINTIFFS' OPPOSING STATEMENT OF MATERIAL FACTS

Pursuant to Local Rules 56(c) and (e), Plaintiffs Julie Jenkins, *et al.*, respond as follows to

the proposed statement of material fact filed by Defendants R. Christopher Almy, *et al.*:

1. Abortion is the termination of a potential human life. Jenkins Dep., p. 49, lines 7 to 12

   (ECF Doc. 38-4, PageID # 244).

**RESPONSE: Qualified. Abortion causes the termination of a pregnancy, as do certain
other medical procedures and medications. (*See* Deposition of Julie A. Jenkins ("Jenkins
Dep. Tr."), 49:19-50:20; Doc. 38-4, #244).**

2. Abortion is a controversial issue in the United States. Jenkins Dep., p. 47, lines 8 to 23

   (ECF Doc. 38-4, PageID # 243).

**RESPONSE: Admitted.**

3. In the United States, abortion is a very politicized and volatile issue. Kieltyka Depo., at

   45 lines 12-20 (ECF Doc. 38-5, PageID # 267).

**RESPONSE: Admitted.**

4. The Guttmacher Institute was founded in 1968 and was originally affiliated with the Planned Parenthood Federation of America. https://www.guttmacher.org/about/history (last visited on Sept. 18, 2018).

**RESPONSE: Qualified. Denied to the extent "affiliated" indicates that Planned Parenthood Federation of America ("PPFA") exercised control over the Guttmacher Institute at the time of its founding. Plaintiffs admit that the Guttmacher Institute was originally housed within PPFA's corporate structure, but note that its program was independently developed and overseen by a National Advisory Council separate from the PPFA Board of Directors. *See The History of the Guttmacher Institute,* Guttmacher Inst., https://www.guttmacher.org/about/history (last visited Oct. 24, 2018).**

5. The Guttmacher Institute bills itself as a "leading research and policy organization committed to advancing sexual and reproductive health and rights in the United States and globally." https://www.guttmacher.org/about (last visited on Sept. 18, 2018).

**RESPONSE: Admitted.**

6. According to the Guttmacher Institute, nineteen states require that abortions be performed in a hospital after a specified point in the pregnancy. https://www.guttmacher.org/state-policy/explore/overview-abortion-laws (last visited on Sept. 18, 2018).

**RESPONSE: Admitted.**

7. According to the Guttmacher Institute, nineteen states require participation by a second physician after a specified point in the pregnancy. *Id.*

**RESPONSE: Admitted.**

8. According to the Guttmacher Institute, eighteen states require that before receiving abortions, women must be given specific information on issues like the purported link between abortion and breast cancer, the ability of a fetus to feel pain, and the long-term mental health consequences of abortions for women. *Id.*

**RESPONSE: Qualified. According to the Guttmacher Institute, 18 states require pre-abortion counseling "on at least one of the following: the purported link between abortion**

and breast cancer (5 states), the ability of a fetus to feel pain (13 states) or long-term mental health consequences for the woman (8 states).” *An Overview of Abortion Laws*, Guttmacher Inst., https://www.guttmacher.org/state-policy/explore/overview-abortion-laws (last visited Oct. 24, 2018).

9. According to the Guttmacher Institute, 27 states require women to wait a specified period of time (usually 24 hours) between receiving counseling and the performance of an abortion, and 37 states require parental involvement in a minor's decision to have an abortion. *Id.*

**RESPONSE: Admitted.**

10. According to the Guttmacher Institute, many states require facilities where abortions are performed to meet licensing standards comparable to those applicable to ambulatory surgical centers. https://www.guttmacher.org/state-policy/explore/targeted-regulation-abortion-providers (last visited on Sept. 19, 2018).

**RESPONSE: Qualified. According to the Guttmacher Institute, 17 states impose structural standards for abortion clinics that are comparable to those for ambulatory surgical centers. *Targeted Regulation of Abortion Providers*, Guttmacher Inst., https://www .guttmacher.org/state-policy/explore/targeted-regulation-abortion-providers (last visited Oct. 24, 2018).**

11. According to the Guttmacher Institute, some states require physicians who perform abortions to have admitting privileges at a local hospital. *Id.*

**RESPONSE: Qualified. According to the Guttmacher Institute, “3 states require that providers have admitting privileges.” *Targeted Regulation of Abortion Providers*, Guttmacher Inst., https://www.guttmacher.org/state-policy/explore/targeted-regulation -abortion-providers (last visited Oct. 24, 2018).**

12. When asked, the Rule 30(b)(6) designee for Maine Family Planning could not think of any other medical procedure in the United States that is as volatile and politicized as abortion. Kieltyka Dep., p. 45 lines 21-24 (ECF Doc. 38-5, PageID # 267).

**RESPONSE: Admitted.**

13. Some physicians who perform abortions for MFP will not perform abortions as part of their private practice because they do not want to be known as providers of that procedure and because their staff would not support providing abortions. Kieltyka Dep., p. 44 line 16 to p. 45 line 11 (ECF Doc. 38-5, PageID # 266-67).

**RESPONSE: Admitted.**

14. At its Augusta clinic, MFP provides abortions primarily on Thursdays. Kieltyka Depo., p. 42, lines 20-25 (ECF Doc. 38-5, PageID # 266).

**RESPONSE: Admitted.**

15. In 2017, 48 of the 507 abortions performed at MFP's Augusta clinic were performed on a day other than Thursday. MFP Ans. to Int. 5 (ECF Doc. 38-2, PageID # 179).

**RESPONSE: Admitted.**

16. Not all MFP nurses are trained in ultrasound or in providing counseling and other care for medication abortion services. Jenkins Dep., p. 78, lines 6 to 14 (ECF Doc. 38-4, PageID # 251).

**RESPONSE: Qualified. Plaintiffs admit that not all advanced practice registered nurses ("APRNs") who work for Maine Family Planning ("MFP") are currently trained in ultrasound or in providing the counseling and other care for medication abortion, (Jenkins Dep. Tr., 78:6-14; Doc. 38-4, #251), but clarify that APRNs could be trained to expand their scope of practice to those areas, (*see, e.g.*, Declaration of Nancy Fishwick, Ph.D. ("Fishwick Decl."), ¶¶ 49–51; Doc. 41-5, #446-47), and that MFP would invest in additional training for APRNs if the Physician-Only Law were eliminated, (Declaration of Evelyn Kieltyka, FNP, MSN, MS ("Kieltyka Decl."), ¶ 26; Doc. 41-9, #507-08).**

17. Five physicians perform abortions at MFP's Augusta clinic on a regular basis. Kieltyka Dep., p. 43, lines 12 to 22 (ECF Doc. 38-5, PageID # 266).

**RESPONSE: Qualified: Five physicians perform abortions at MFP's Augusta clinic, "[g]enerally" "once a month or so." (Deposition of Evelyn Kieltyka ("Kieltyka Dep. Tr."), 43:21-22, 44:8-15; Doc. 38-5, #266).**

18. The physicians who provide abortion services at MFP's Augusta clinic are independent

contractors. Kieltyka Dep., p. 43, lines 1 to 8 (ECF Doc. 38-5, PageID # 266).

**RESPONSE: Admitted.**

19. MFP pays physicians $90 for each medication abortion and each aspiration abortion the

physician performs. Kieltyka Dep., p. 46, lines 18-20 (ECF Doc. 38-5, PageID # 267); p.

49, line 11 to p. 50, line 1 (ECF Doc. 38-5, PageID # 268).

**RESPONSE: Admitted.**

20. MFP has never asked any of the physicians it has under contract to provide abortion

services whether he or she would be willing to work one day a week at MFP's Belfast

clinic. Kieltyka Dep., p. 68, lines 7 to 20 (ECF Doc. 38-5, PageID # 272).

**RESPONSE: Denied. At the time of her deposition, Ms. Kieltyka explained that the
physicians who are contracted to provide abortion services to MFP have "jobs in other
practices so they have career paths and other responsibilities," and she had not asked them
whether they would be willing to work one day per week in Belfast because she was "pretty
confident that the answer would be no." (Kieltyka Dep. Tr., 68:12-17; Doc. 38-5, #272).
Since then, Ms. Kieltyka has asked all of MFP's physicians, none of whom live north of
Augusta, whether it would be feasible for them to regularly travel to MFP's other sites,
such as Belfast, to perform abortions. (Kieltyka Decl., ¶¶ 12-13; Doc. 41-9, #502). One of
MFP's physicians indicated that they *might* be willing to consider traveling one day per
*month* to Belfast or another less remote clinic, but that doctor could only consider doing so
for adequate compensation—which likely is not financially feasible for MFP—and would
not consider going to the more remote sites. (*Id.* ¶ 13; Doc. 41-9, #502-03).**

21. MFP has never asked any of the physicians it has under contract to provide abortion

services whether he or she would be willing to work one day a month at MFP's Fort Kent

clinic. Kieltyka Dep., p. 68, line 21 to p. 69, line 9 (ECF Doc. 38-5, PageID # 272-73).

**RESPONSE: Denied. At the time of her deposition, Ms. Kieltyka explained that the
physicians who are contracted to provide abortion services to MFP have "jobs in other
practices so they have career paths and responsibilities," and she had not asked them
whether they would be willing to work one day per month in Fort Kent because she was
"pretty confident that the answer would be no." (Kieltyka Dep. Tr., 68:12-17; Doc. 38-5,
#272). She explained that Fort Kent "would be a five-hour commute one way," (*id.* at 69:9-
11; Doc. 38-5, #273), and would therefore "require two days realistically," (*id.* at 71:19-21;**

**Doc. 38-5, #273). She explained that the State's estimate that an MFP physician would earn approximately $1,260 for "a day's work" in Fort Kent, (*id.* at 70:17-20; Doc. 38-5, #273), was "unrealistic and unlikely" because it assumes that there would be "14 women in Fort Kent . . . on the same day being interested in an abortion," (*id.* at 72:4-6; Doc. 38-5, #273). Since then, Ms. Kieltyka has asked all of MFP's physicians, none of whom live north of Augusta, whether it would be feasible for them to regularly travel to MFP's distant rural sites to perform abortions. (Kieltyka Decl., ¶¶ 12-13; Doc. 41-9, #502). All have since confirmed that such extensive travel, and the time off work that it would require, would not be logistically feasible. (*Id.* ¶¶ 13-15; Doc. 41-9, #502-03). Even if it were logistically feasible for MFP's physicians to take time off from their full-time jobs every month to drive hundreds of miles to Fort Kent, stay overnight at a hotel, provide one day of abortion services, potentially spend a second night at a hotel, and then drive hundreds of miles home, MFP would have to compensate them adequately for their work and their time, which is not financially feasible for MFP. (*Id.* ¶ 16; Doc. 41-9, #504).**

22. MFP has never asked any of the physicians it has under contract to provide abortion

   services whether he or she would be willing to travel to one of MFP clinics other than in

   Augusta. Kieltyka Dep., p. 72, lines 7 to 12 (ECF Doc. 38-5, PageID # 273).

**RESPONSE: Denied. At the time of her deposition, Ms. Kieltyka explained that the physicians who are contracted to provide abortion services to MFP have "jobs in other practices so they have career paths and other responsibilities," and she had not asked them whether they would be willing to regularly travel to one of MFP's other sites to perform abortions because she was "pretty confident that the answer would be no." (Kieltyka Dep. Tr., 68:12-17; Doc. 38-5, #272). Since then, Ms. Kieltyka has asked all of MFP's physicians, none of whom live north of Augusta, whether it would be feasible for them to regularly travel to MFP's distant rural sites, such as Presque Isle or Machias, to perform abortions. (Kieltyka Decl., ¶¶ 12-13; Doc. 41-9, #502). All have since confirmed that such extensive travel, and the time off work that it would require, would not be logistically feasible. (*Id.* ¶¶ 13-15; Doc. 41-9, #502-03). One of MFPs physicians indicated that they *might* be willing to consider traveling one day per *month* to Belfast or another less remote clinic, but that doctor could only consider doing so for adequate compensation—which likely is not financially feasible for MFP—and would not consider going to the more remote sites. (*Id.* ¶ 13; Doc. 41-9, #502).**

23. At MFP, it is rare that a woman has to wait more than two weeks to be scheduled for an

   aspiration abortion. Kieltyka Dep., p. 48, lines 7 to 14 (ECF Doc. 38-5, PageID # 267).

**RESPONSE: Qualified. Although it is "probably rare" for a woman to have to wait more than two weeks to be scheduled for an aspiration abortion, "[i]t does occur." (Kieltyka Dep. Tr. 48:7-14; Doc. 38-5, #267).**

24. Maine is one of only a few states in which abortion services are provided through telemedicine. Jenkins Dep., p. 92, lines 13 to 20 (ECF Doc. 38-4, PageID # 254).

**RESPONSE: Admitted.**

25. MFP has the ability to perform medication abortions through its telemedicine program at all 18 of its clinics in Maine. Kieltyka Dep. p. 97, lines 16 to 20 (ECF Doc. 38-5, PageID # 280).

**Response: Qualified. Denied to the extent it indicates that MFP has the ability to regularly perform medication abortions through its telehealth program on a day other than Thursday. (Kieltyka Decl., ¶¶ 9, 25; Doc. 41-9, #501, 507). Admitted that each of the 18 MFP clinics in Maine have the capability to provide medication abortions through the telehealth program "as long as the woman is available to get there on a Thursday." (Kieltyka Dep. Tr., 97:16-20; Doc. 38-5, #280).**

26. Physicians have provided abortions through MFP's telemedicine program without being physically located at MFP's Augusta clinic. Jenkins Dep., p. 64, lines 11 to 17 (ECF Doc. 38-4, PageID # 247).

**RESPONSE: Qualified. While physicians may perform telehealth medication abortion services without being physically located at the clinic in Augusta, this is a rarity: physicians are "constrain[ed]" by the "demands on them in their practices," and though they are supportive and committed to MFP, "there's just [in] reality some days where it just can't work." (Kieltyka Dep. Tr., 99:15-100:25; Doc. 38-5; #99; *see also* MFP Doc. Production – Public ("MFP Doc. Produc."), MFP_EMAILS_000421, 001007-1009, 001742-43; MFP_DOCS_001404-05; Doc. 41-17, #667, 673-75, 683-84, 686-87 (illustrating difficulty in scheduling physician appointments)).**

27. Assuming that there is health care facility on Vinalhaven with the ability to perform ultrasound examinations, a woman, through the Meds by Mail program, could obtain a medication abortion without ever leaving the island. Kieltyka Depo., p. 88, lines 1 to 12 (ECF Doc. 38-5, PageID # 277).

**RESPONSE: Plaintiffs request that this statement of fact be stricken because it is a hypothetical that is contradicted by the evidence; Ms. Kieltyka does not believe there is any health care facility on Vinalhaven with the ability to perform ultrasound examinations. (Kieltyka Dep. Tr., 87:17-25; Doc. 38-5, #277). Without prejudice thereto: Qualified. For**

**some women, medication abortion is not clinically indicated, (Declaration of Sierra Washington, M.D., M.Sc., FACOG ("Washington Decl."), ¶ 12; Doc. 41-12, #609-10), so it would not be possible to obtain an abortion without leaving the island. Even a woman who is eligible for medication abortion may not be eligible for and willing to participate in the meds-by-mail study, in which case it would not be possible to obtain an abortion without leaving the island. (*See* Kieltyka Decl., ¶ 9; Doc. 41-9, #501; Kieltyka Dep. Tr., 80:22-25; Doc. 38-5, #275 (acknowledging that the physician has to "decid[e] that this patient at least based on her lab work is a suitable candidate for a Medication by Mail abortion"); MFP Doc. Produc., MFP_DOCS_000040; Doc. 41-17, #685 (detailing multiple steps in the meds-by-mail study protocol, including phone calls with MFP staff to, *inter alia*, review study procedures and perform an "exit interview with study staff")).**

28. Three physicians perform abortions at PPNNE's Portland facility. Bates Dep., p. 37, lines 8 to 11 (ECF Doc. 38-3, PageID # 215).

**RESPONSE: Admitted.**

29. At its Portland clinic, PPNNE provides abortion procedures primarily on Fridays. Bates Dep., p. 36, lines 14 to 19 (ECF Doc. 38-3, PageID # 214).

**RESPONSE: Admitted.**

30. In 2017, PPNNE performed 11 abortions at its Portland clinic on a day other than Friday. PPNNE Ans. to Int. 5 (ECF Doc. 38-1, PageID # 153).

**RESPONSE: Admitted.**

31. On a single Friday, a physician at PPNNE's Portland clinic can provide up to 32 abortions, with appointments scheduled from 8:00 a.m. until 1:30 or 2:00 p.m. Bates Dep., p. 51 line 19 to p. 54 line 25 (ECF Doc. 38-3, PageID # 218-19); p. 80, lines 3 to 6 (ECF Doc. 38-3, PageID # 225).

**RESPONSE: Qualified. While Planned Parenthood of Northern New England ("PPNNE") schedules up to 32 appointments on a Friday, this is based in part on the anticipated no-show rate; typically PPNNE provides 20 to 25 abortions. (Declaration of Alison Bates, MSN, WHNP-BC, ANP-BC ("Bates Decl."), ¶ 9; Doc. 41-2, #367). Moreover, these 32 appointments are "routinely" fully booked, and patients often must be scheduled for a different week. (Deposition of Alison. J.G. Bates ("Bates Dep. Tr."), 55:1-6; Doc. 38-3, #219).**

32. In New Hampshire, APRNs are allowed to perform aspiration abortions. Riley Dep., p. 30, lines 4 to 9 (ECF Doc. 38-6, PageID # 296).

**RESPONSE: Admitted.**

33. At PPNNE's clinic in Manchester, New Hampshire, aspiration abortions are currently provided only on Wednesdays. Riley Dep., p. 31, lines 4 to 9 (ECF Doc. 38-6, PageID # 296).

**RESPONSE: Admitted.**

34. In addition to obtaining abortion services through MFP and PPNNE, women may obtain abortion services through the Mabel Wadsworth Center in Bangor, Maine Medical Center in Portland, and Central Maine Medical Center in Lewiston. MFP Ans. to Int. 9 (ECF Doc. 38-2, PageID # 185); PPNNE Ans. to Int. 9 (ECF Doc. 38-1, PageID # 157).

**RESPONSE: Qualified. Other than MFP and PPNNE, the only abortion provider in Maine generally available to the public is the Mabel Wadsworth Center in Bangor. (Kieltyka Decl., ¶ 10; Doc. 41-9, #501-02). Admitted that abortion services are available to some patients at the Maine Medical Center in Portland and Central Maine Medical Center in Lewiston; however, these are private facilities that do not advertise their abortion services on their websites and generally only treat pre-existing patients, and where abortion services are otherwise available under only limited circumstances. (*Id.* ¶¶ 10 & n.2, 24, 26; Doc. 41-9, #502, 506-07; Jenkins Dep. Tr., 54:2-13; Doc. 38-4, #245; Kieltyka Dep. Tr., 23:11-24:6; 26:3-5, 27:20-28:4, 32:7-10, 34:8-11; Doc. 38-5, #261-64).**

35. One of the barriers to obtaining an abortion in Maine is the cost of the procedure. Kieltyka Dep., p. 122, line 20 to p. 123, line 2 (ECF Doc. 38-5, PageID # 286); Jenkins Dep., p. 87, lines 12-15 (ECF Doc. 38-4, PageID # 253); p. 89, line 23 to p. 90, line 6 (ECF Doc. 38-4, PageID # 254).

**RESPONSE: Admitted.**

36. Neither MFP nor PPNNE is aware of any specific woman in Maine who was unable to

obtain an abortion because of the Physician-Only Law. MFP Ans. to Int. 10 (ECF Doc.

38-2, PageID # 193); PPNNE Ans. to Int. 10 (ECF Doc. 38-1, PageID # 164).

**RESPONSE: Qualified. While Plaintiffs do not possess information regarding *specific* Maine women who were unable to obtain an abortion because of the Physician-Only Law, given Plaintiffs' frequent communications with patients about the challenges they face in trying to access abortion care, Plaintiffs are certain that a significant percentage of patients who do not come to scheduled abortion appointments are ultimately unable to get a desired abortion because of financial, logistical, and/or confidentiality issues created or exacerbated by the Physician-Only Law. (*See* Plaintiff Maine Family Planning's Amended Responses to Defendants' First Set of Interrogatories, Nos. 10-13 ("MFP Am. Interrog. Resp."), No. 10, at 3-5; Doc. 38-2, #192-94; Plaintiff Planned Parenthood Northern New England's Amended Responses to Defendants' First Set of Interrogatories, Nos. 10-13 ("PPNNE Am. Interrog. Resp."), No. 10, at 3-4; Doc. 38-1, #164-65).**

37. Neither MFP nor PPNNE is aware of any specific woman in Maine who desired an

abortion but was unable to obtain one for any reason and was instead forced to carry her

pregnancy to term. MFP Ans. to Int. 11 (ECF Doc. 38-2, PageID # 196); PPNNE Ans. to

Int. 11 (ECF Doc. 38-1, PageID # 166).

**RESPONSE: Qualified. While Plaintiffs do not possess information regarding *specific* Maine women who were unable to obtain an abortion, given frequent communications with patients about the challenges they face in trying to access abortion care, Plaintiffs are certain that a significant percentage of patients who do not come to scheduled abortion appointments are ultimately unable to get a desired abortion and instead forced to carry a pregnancy to term. (*See* MFP Am. Interrog. Resp., No. 11, at 7-9; Doc. 38-2, #196-98; PPNNE Am. Interrog. Resp., No. 11, at 5; Doc. 38-1, #166).**

38. In 2016, a survey was conducted of 31 women who obtained a telehealth abortion

through MFP. Kieltyka Dep., p. 114, lines 5 to 8 (ECF Doc. 38-5, PageID # 284).

**RESPONSE: Qualified. Denied as to the number of participants in the study; in 2016, a study was conducted of 44 women who received a telehealth abortion through MFP. (Declaration of Stanley K. Henshaw, Ph.D. ("Henshaw Decl."), ¶ 24; Doc. 41-7, #478).**

39. The 31 women were asked what they would have done had abortions via telehealth not

been available. Kieltyka Dep., p. 114, lines 9 to 13 (ECF Doc. 38-5, PageID # 284).

**RESPONSE: Qualified. The survey asked 44 women what they would have done had abortions via telehealth not been available, although only 31 of the 44 responded. (Henshaw Decl., ¶ 24; Doc. 41-7, #478).**

40. In response to the question, 29 percent of the women said that they would have gone to another abortion provider and 71 percent said that they would have gone to the MFP clinic in Augusta. Not one woman said that that the lack of a telehealth option would have resulted in her not having an abortion. Kieltyka Dep., p. 114, lines 14 to 24 (ECF Doc. 38-5, PageID # 284).

**RESPONSE: Qualified. The study did not compare the 31 women who responded to this question with the 13 non-respondents; the characteristics of the non-respondents and their reasons for not answering the question (or not completing the survey) are unknown and/or unreported. (Henshaw Decl., ¶ 24; Doc. 41-7, #478). Admitted that, of the 31 women who responded to this question, 29 percent said that they would have gone to another abortion provider and 71 percent said that they would have gone to the MFP clinic in Augusta. (Kieltyka Dep. Tr., 114:14-24; Doc. 38-5, #284).**

41. When asked if she had an opinion regarding the reason for the decreasing number of abortions on the national level, the Rule 30(b)(6) designee for Planned Parenthood of Northern New England stated that it was because "the scope of preventative care has expanded to include things like long-active contraceptives" and "that access and opportunity for patients to choose and utilize those methods has significantly reduced the amount of unintended pregnancy." Bates Dep., p. 49, lines 13-21 (ECF Doc. 38-3, PageID # 218).

**RESPONSE: Admitted.**

42.     There is no safety or other medical justification for the Physician-Only Law, which prohibits APRNs from performing first-trimester abortions. (Washington Decl., ¶¶ 6-8, 47; Doc. 41-12, #607-08, 622; Fishwick Decl., ¶¶ 9-10; Doc. 41-5, #432; Defendants' Responses to Plaintiffs' First Set of Requests for Admission, Interrogatories, and Requests for Production of Documents ("Defs.' Resp."), RFA Nos. 1-4, at 1-3; Defs.' Resp., Interrog. Nos. 3-4, at 7-8, No. 19, at 14; Doc. 41-1, #345-47, 351-52, 358 ("[D]efendants are not presently aware of any medical justification for prohibiting certified nurse practitioners and certified nurse-midwives with appropriate training from performing aspiration procedures and prescribing medications for abortion while allowing them to use similar procedures in the context of a miscarriage.")).

43.     APRNs are a category of registered professional nurses with advanced education and training and enhanced practice authority. (Fishwick Decl., ¶ 10; Doc. 41-5, #432).

44.     There are four types of APRNs in Maine—certified nurse practitioners ("nurse practitioners"), certified nurse-midwives, certified registered nurse anesthetists, and certified nurse specialists—but of those categories, Plaintiffs MFP and PPNNE employ only nurse practitioners and certified nurse-midwives. (02-380 Me. Code R. ch. 8 § 1 (2018); Bates Decl., ¶ 1; Doc. 41-2, #365-66; Kieltyka Decl., ¶ 11; Doc. 41-9, #502.)

45.     Nurse practitioners and certified nurse-midwives can, with appropriate training, safely provide medication abortion and first-trimester aspiration abortion. (Defs.' Resp., RFA Nos. 1-2, at 1-2; Doc. 41-1, #345-46; Washington Decl., ¶¶ 6-8, 16-47; Doc. 41-12, #607-08, 622).

46.     APRNs in Maine are subject to the national gold standard of educational, certification, accreditation, and licensing requirements: the "Consensus Model for APRN Regulation," a national model of APRN regulation developed in 2008 and adopted by the Maine State Board of Nursing ("Board of Nursing"). (Fishwick Decl., ¶ 13; Doc. 41-5, #433-34; Declaration of Joanne Spetz, Ph.D. ("Spetz Decl."), ¶ 25; Doc. 41-10, #520-21).

47.     Consistent with the Consensus Model for APRN Regulation, Maine law requires that ARPNs hold a current license to practice as a registered professional nurse in Maine, have successfully completed a post-graduate education designed to prepare the nurse for advanced practice registered nursing in a specialty area in nursing that has a defined scope of practice, and have been certified in the clinical specialty by a national certifying organization acceptable to the Board of Nursing. (Fishwick Decl., ¶¶ 16, 19; Doc. 41-5, #435-36).

48.     It is only since the turn of the twenty-first century that certification bodies and state legislatures have uniformly required a graduate degree (*i.e.*, a Master's or Ph.D.) for new nurse practitioners; a graduate degree has been required for new applicants for certification by

the American Midwifery Certification Board only since 2010. (Spetz Decl., ¶¶ 21-24; Doc. 41-10, #519-20).

49.     "Scope of practice" rules define which professional services an APRN is authorized to provide; which patients an APRN may treat; and the services for which the APRN is independently responsible and accountable. (Fishwick Decl., ¶¶ 10, 40 ,63; Doc. 41-5, #432, 442-43, 450-51; Spetz Decl., ¶¶ 17-19; Doc. 41-10, #518-19).

50.     In Maine, the Board of Nursing is responsible for enforcing the statutory and regulatory requirements for APRNs and investigating any complaints brought against an APRN; if a violation is found, the Board of Nursing may take a range of professional disciplinary actions, including license revocation. (Fishwick Decl., ¶ 18; Doc. 41-5, #435-36).

51.     The education, accreditation, certification, and licensing requirements for APRNs in Maine, combined with the ongoing oversight by the Board of Nursing, ensure that nurse practitioners and certified nurse-midwives in Maine provide safe, quality care within their scope of practice. (Fishwick Decl., ¶¶ 10, 12, 16, 18-19, 29, 30-32, 38, 46; Doc. 41-5, #432-33, 435-36, 439-40, 442, 445).

52.     Once certified and licensed, APRNs in Maine have authority to evaluate, diagnose, treat, and prescribe within their scope of practice under the authority of the Board of Nursing. (Fishwick Decl., ¶¶ 33, 39; Doc. 41-5, #440-42).

53.     The Physician-Only Law is the only law in Maine prohibiting APRNs from performing a certain health care act regardless of whether it is within their scope of practice. (Defs.' Resp., RFA No. 15, at 6; Doc. 41-1, #350; Defs.' Resp., Interrog. No. 16-17, at 12-13; Doc. 41-1, #356-57 ("Defendants are aware of no such health care service" that "Maine law expressly prohibits certified nurse practitioners and certified nurse-midwives from performing regardless of whether it is within their scope of practice"); Fishwick Decl., ¶¶ 10, 33, 62-65; Doc. 41-5, #432, 440-41, 450-51; Jenkins Dep. Tr., 21:3-12, 21:16-23; Doc. 38-4, #237; Defs.' Document Production ("Defs.' Doc. Produc."), DEFS_EMAILS_0006-07; Doc. 41-16, #661-62 (Special Assistant to Defendant Attorney General stating in emails to Maine legislators seeking co-sponsorship of a bill to repeal the Physician-Only Law: "Abortion is the only medical procedure so stipulated in Maine statute. Otherwise all medical procedures are covered by laws disallowing practicing medicine without a license and the professional licensing boards decide which medical professionals can perform which procedures."); *id.*, DEFS_EMAILS_0002; Doc. 41-16, #657 (Email from Assistant Attorney General Christopher Taub to Edward Charbonneau, stating: "My take, though, is that there are no other statutes dictating who can perform a specific medical procedure . . . . So, I don't see the need to have a law specifically saying that only health care professionals can perform abortions.")).

54.     For every health care service other than abortion, the Legislature sets APRNs' broad authority by statute, the Board of Nursing promulgates regulations and guidance expanding upon the skills and functions that are within APRNs' competencies, and then individual APRNs are responsible for evaluating whether a particular health care service is within their scope of practice and appropriate for their patients' needs. (Fishwick Decl., ¶¶ 10, 18, 63; Doc. 41-5, #432, 435-36, 450-51; Defs.' Doc. Produc., DEFS_EMAILS_0006-07; Doc. 41-16, #661-62 (Special Assistant to Defendant Attorney General stating in emails to Maine legislators seeking co-sponsorship of a bill to repeal the Physician-Only Law: "Abortion is the only medical procedure so stipulated in Maine statute. Otherwise all medical procedures are covered by laws disallowing practicing medicine without a license and the professional licensing boards decide which medical professionals can perform which procedures.")).


55.     Maine has adopted the National Council of State Boards of Nursing's "Scope of Practice Decision Tree," containing six steps to guide nurses in interpreting their scope of practice in a specific situation, which include considerations such as national standards of practice and the specific APRN's knowledge and clinical skills. (Fishwick Decl., ¶¶ 44-45; Doc. 41-5, #444-45).


56.     Maine law allows nurse practitioners and certified nurse-midwives to independently prescribe and dispense drugs, including Schedule II and III controlled substances such as oxycodone, methadone, and fentanyl, and allows nurse practitioners to provide a certificate of medical need that enables a patient to obtain medical marijuana in Maine. (Defs.' Resp., RFA. No. 11, at 5; Doc. 41-1, #349; Fishwick Decl., ¶¶ 10, 17, 43; Doc. 41-5, #432, 435, 444; Spetz Decl. ¶ 32; Doc. 41-10, #523; Jenkins Dep. Tr., 18:25-19:6, 19:24-20:7, 20:24-21:2; Doc. 38-4, #236-37; Deposition of Kathleen Riley ("Riley Dep. Tr."), 13:3-14:1; Doc. 38-6, #292).


57.     Maine law affords APRNs full practice independence without any physician oversight, even when prescribing controlled substances. (Spetz Decl., ¶¶ 18-19; Doc. 41-10, #519).


58.     APRNs in Maine did not have independent practice and prescribing authority at the time the Physician-Only Law was enacted. (Defs.' Resp., RFA No. 13, at 5; Doc. 41-1, #349).


59.     APRNs can (and regularly do) extend their training even beyond their advanced educational degree, including through continuing education and supervised practice, which allows them to take on new clinical responsibilities once they have documented their competency to do so. (Fishwick Decl., ¶¶ 10, 49-51; Doc. 41-5, #432, 446-47; Jenkins Dep. Tr., 12:13-17, 13:6-8, 29:16-30:4, 30:13-20, 35:1-11, 56:18-22; Doc. 38-4, #234-35, 239-40, 245).

60.     Certified nurse-midwives may expand their practice over the course of their careers to include, for instance, management of perinatal emergencies and abnormal uterine bleeding, and new techniques for labor and delivery. (Fishwick Decl., ¶¶ 49-50; Doc. 41-5, #446).

61.     Nurse practitioners may expand their practice over the course of their careers to include, for instance: advanced wound evaluation and wound care; skin procedures such as lesion biopsy and excision; injection of anti-inflammatory medications into shoulders, knees, hips; advanced interpretation of EKGs; advanced understanding of X-rays and other diagnostic imaging; use of ultrasound imaging; bone marrow aspiration; performance of colposcopy for evaluation and treatment of abnormal lesions of the uterine cervix; intrauterine insemination; and insertion and removal of IUDs ("intrauterine devices"), a form of contraception. (Fishwick Decl., ¶¶ 51-57; Doc. 41-5, #447-49).

62.     Nurse practitioners and certified nurse-midwives in Maine are allowed to, and do, use medication(s) and/or vacuum aspiration to evacuate the contents of a patient's uterus in the context of a miscarriage—also known as a "spontaneous abortion"—consistent with scope of practice requirements. (Defs.' Resp., RFA No. 10, at 4-5; Doc. 41-1, #348-49; Bates Decl., ¶ 1; Doc. 41-2, #365; Fishwick Decl., ¶¶ 58, 65; Doc. 41-5, #449, 451; Washington Decl., ¶ 45; Doc. 41-12, #621; Bates Dep. Tr., 89:19-90:9; Doc. 38-3, #228; Riley Dep. Tr., 15:6-16:15; Doc. 38-6, #292).

63.     In a first-trimester vacuum aspiration abortion ("aspiration abortion"), which takes approximately five minutes to complete, the clinician inserts a small tube through the patient's cervix into the uterus, and a manual or electric pump attached to the tube creates a gentle vacuum that evacuates the contents of the uterus. (Stipulated Facts, ¶ 3; Doc. 37, #133; Washington Decl., ¶ 10; Doc. 41-12, #608-09).

64.     In a medication abortion, which is only available up to ten weeks of pregnancy, the patient swallows the first of two-FDA approved medications (Mifepristone), which blocks a hormone necessary to maintain pregnancy, and then takes the second medication (Misoprostol) approximately six to 48 hours later at home; the misoprostol causes the uterus to contract, leading the pregnancy to pass in a process similar to a miscarriage. (Stipulated Facts, ¶ 2; Doc. 37, #132-33; Washington Decl., ¶ 11; Doc. 41-12, #609).

65.     Medication abortion was approved by the U.S. Food and Drug Administration for use in the United States in 2000. (Kieltya Decl., ¶ 9 n.1; Doc. 41-9, #501).

66.     The skills and techniques used to evacuate a patient's uterus in the context of a first-trimester miscarriage are identical to those used in the context of a first-trimester abortion. (Bates Decl., ¶ 1; Doc. 41-2, #365; Fishwick Decl., ¶¶ 58, 65; Doc. 41-5, #449, 451; Washington Decl., ¶ 45; Doc. 41-12, #621).

67. A large body of medical literature confirms the safety of, and patient satisfaction with, APRN provision of health care services within their education and training. (Spetz Decl., ¶¶ 57-63; Doc. 41-10, #532-35; Washington Decl., ¶¶ 16-33; Doc. 41-12, #611-18).

68. Multiple systematic reviews have found consistent evidence that NPs provide comparable or better care within their scope of practice than do physicians, with comparable or better outcomes. (Spetz Decl., ¶ 59; Doc. 41-10, #533).

69. Nationwide, only 1.9% of nurse practitioners have been named as a primary defendant in a malpractice case; the overall rate of claims against nurse practitioners registered in the Healthcare Integrity and Protection Data Bank is one for every 166 nurse practitioners in the nation, compared with one for every four physicians. (Spetz Decl., ¶ 62; Doc. 41-10, #534).

70. The Institute of Medicine's *Future of Nursing* report's top recommendation for the future of nursing is: "Remove scope-of-practice barriers. Advanced practice registered nurses should be able to practice to the full extent of their education and training" and should not be subject to laws that "could greatly limit the ability of APRNs to fully utilize their education and training," including laws prohibiting an APRN from performing first-trimester aspiration abortions. (Spetz Decl., ¶ 48; Doc. 41-10, #529).

71. Numerous studies confirm that APRNs perform first-trimester aspiration abortions as safely and effectively as physicians. (Washington Decl., ¶¶ 16-23; Doc. 41-12, #611-14; *see also* Spetz Decl., ¶ 48; Doc. 41-10, #529).

72. Numerous studies confirm that APRNs provide medication abortions as safely and effectively as, and in some cases more effectively than, physicians. (Washington Decl., ¶¶ 24-28; Doc. 41-12, #614-16).

73. Leading medical and public health authorities, including the American College of Obstetricians and Gynecologists, the American Public Health Association, and the World Health Organization, endorse the provision of first-trimester aspiration and medication abortion care by APRNs. (Washington Decl., ¶¶ 30-33; Doc. 41-12, #616-18).

74. According to the U.S. Food and Drug Administration, it is safe for APRNs to administer medication abortion. (Washington Decl., ¶ 32; Doc. 41-12, #617).

75. APRNs safely provide both medication and aspiration abortion care in other states, including but not limited to California, New Hampshire, and Vermont. (Bates Decl., ¶¶ 1, 12; Doc. 41-2, #265-66, 368-69; Washington Decl., ¶¶ 19, 34-35; Doc. 41-12, #612, 618; Riley Dep. Tr., 17:17-22, 21:15-18, 30:23-31:3; Doc. 38-6, #293-94, 296; Defs.' Doc. Produc., DEFS_EMAILS_0009; Doc. 41-16, #664 (email from Defendant Attorney General Janet Mills

to the Portland Press Herald regarding her bill to repeal the Physician-Only Law, stating: "Other states recognize that it is within the scope of practice of advanced nurse practitioners and physician assistants to perform medical abortions, particularly in the first trimester.")).

76.     Some APRNs who work for PPNNE in Maine independently perform abortions at PPNNE health centers in Vermont and/or New Hampshire. (Stipulated Facts, ¶ 29; Doc. 37, #138-39; Bates Decl., ¶¶ 1, 12; Doc. 41-2, #365-66, 368-69; Riley Dep. Tr., 17:17-22, 21:15-18, 30:23-31:3; Doc. 38-6, #293-94, 296).

77.     APRNs in Maine currently perform procedures of comparable or greater complexity and risk as first-trimester aspiration abortion care, including managing childbirth, inserting IUDs into a patient's uterus, using medications and/or vacuum aspiration to evacuate a patient's uterus in the context of a miscarriage, and performing endometrial biopsies and colposcopies. (Bates Decl., ¶ 1; Doc. 41-2, #365; Fishwick Decl. ¶¶ 51, 54-58, 65; Doc. 41-5, #447-49, 451; Washington Decl., ¶¶ 14, 43-46; Doc. 41-12, #610, 620-22; Bates Dep. Tr., 14:16-23, 89:19-90:9; Doc. 38-3, #209, 228; Jenkins Dep. Tr., 15:20-16:5; Doc. 38-4, #235, Riley Dep. Tr., 15:6-17, 15:25-16:15; Doc. 38-6, #292).

78.     Childbirth carries a risk of death approximately 14 times higher than that associated with abortion. (Washington Decl., ¶¶ 14, 44; Doc. 41-12, #610, 621).

79.     In the past legislative session, Defendant Attorney General Janet Mills proposed a bill that would include physician assistants and APRNs as persons who may perform abortions. (Defs.' Resp., RFA No. 12, at 5; Doc. 41-1, #349).

80.     APRNs are no less qualified than physicians to provide care that is dignified and solemn. (Bates Decl., ¶¶ 16-17; Doc. 41-2, #370-71; Fishwick Decl., ¶¶ 59-61; Doc. 41-5, #449-50; Kieltyka Decl., ¶¶ 36-38; Doc. 41-9, #511; Spetz Decl., ¶ 63; Doc. 41-10, #534-35).

81.     The core competencies and ethical obligations of the nurse practitioner require commitment to the dignity, worth, and individuality of every patient. (Fishwick Decl., ¶¶ 60-61; Doc. 41-5, #449-50).

82.     The core competencies for nurse practitioners require nurse practitioners to "[w]ork[] to establish a relationship with the patient characterized by mutual respect, empathy, and collaboration," and to "create[] a climate of patient-centered care to include confidentiality, privacy, comfort, emotional support, mutual trust, and respect." (Fishwick Decl., ¶ 27; Doc. 41-5, #439).

83.     APRN educational curricula in Maine include learning how to engage in clear, compassionate communication with patients and caregivers, and strategies for creating a patient-

care environment that protects the safety, privacy, and dignity of the patient. (Fishwick Decl., ¶ 26; Doc. 41-5, #438).

84. Patients in Maine trust APRNs to provide deeply personal and serious health services, such as childbirth, miscarriage care, and end-of-life care. (Bates Decl., ¶ 1 Doc. 41-2, #365-66; Fishwick Decl., ¶¶ 10-11, 22, 42, 58-59, 61, 65; Doc. 41-5, #432-33, 437, 443-44, 449-51; Kieltyka Decl., ¶¶ 36-37; Doc. 41-9, #511).

85. For 16 consecutive years, Americans have rated nurses as the single most ethical and honest profession—above all other professions, including physicians, military officers, grade school teachers, physicians, pharmacists, police officers, judges, and clergy. (Fishwick Decl., ¶ 61; Doc. 41-5, #450; Spetz Decl., ¶ 63; Doc. 41-10, #535).

86. Maine law authorizes APRNs to carry out solemn medical functions such as completing a miscarriage or issuing a death certificate. (Fishwick Decl., ¶¶ 10-11, 22, 42, 58-59, 65; Doc. 41-5, #432-33, 437, 443-44, 449, 451).

87. MFP and PPNNE patients often have long-standing relationships with their APRNs, to whom they return time and again for family planning and gynecological services during their reproductive years. (Bates Decl., ¶¶ 11, 16; Doc. 41-2, #368, 371; Kieltyka Decl., ¶ 37; Doc. 41-9, #511).

88. In a telehealth abortion at MFP, the APRN provides all services both before and after the physician videoconferences with the patient for approximately two to ten minutes, and conducts the abortion follow-up visit without any physician involvement. (Kieltyka Decl., ¶ 37; Doc. 41-9, #511; Jenkins Dep. Tr,. 65:3-25, 74:2-16, 77:1-5 ("[W]e just couldn't find a doctor to watch the patient swallow the pill"); Doc. 38-4, #248, 250; Kieltyka Dep. Tr., 51:10-56:4; Doc. 38-5, #268-69).

89. Some MFP patients prefer telehealth medication abortions in part because it allows them to receive the bulk of the care from a familiar, trusted APRN from their own community. (Kieltyka Decl., ¶ 37; Doc. 41-9, #511).

90. PPNNE patients often prefer receiving services from APRNs, who are able to take more time with them and provide them with a holistic model of care. (Bates Decl., ¶ 16; Doc. 41-2, #370).

91. In October 2018, Plaintiffs Alison Bates and Katie Riley received scores in the 99th percentile on a nationally-recognized measure of patient satisfaction, as compared with all other Planned Parenthood clinicians including physicians. (Bates Decl., ¶ 17; Doc. 41-2, #371).

92.     The individual plaintiffs are already qualified to provide, or could be trained to provide, first-trimester abortion care. (Bates Decl., ¶ 1; Doc. 41-2, #365 (Alison Bates currently uses vacuum aspiration in the context of miscarriage and abortion complications); Bates Dep. Tr., 89:19-90:9; Doc. 38-3, #228 (same); Jenkins Dep. Tr., 13:1-8, 59:3-61:20; Doc. 38-4, #235, 246-47 (Julie Jenkins previously provided medication abortion care in California); Riley Dep. Tr., 17:17-22, 21:15-18; Doc. 38-6, #293-94 (Katie Riley currently provides medication abortion care at PPNNE's clinic in Manchester, New Hampshire); *see also* Fishwick Decl., ¶¶ 47, 49, 58, 65; Doc. 41-5, #446, 449, 451; Washington Decl., ¶¶ 14, 34, 36-38, 41, 43-46; Doc. 41-12, #610, 618-22).

93.     MFP and PPNNE are able to provide training to APRNs in first-trimester abortion care, either directly or through an outside training program. (Responses to Defendants' First Set of Interrogatories to Maine Family Planning, Nos. 1-9 ("MFP Interrog. Resp."), No. 8, at 12; Doc. 38-2, #184; Partial Responses to Defendants' First Set of Interrogatories to Planned Parenthood of Northern New England ("PPNNE Interrog. Resp."), No. 8, at 8; Doc. 38-1, #157; Bates Decl., ¶ 10; Doc. 41-2, #368; Kieltyka Decl., ¶ 26; Doc. 41-9, #507-08; Bates Dep. Tr., 86:16-88:7; Doc. 38-3, #227, Doc. 41-14, #650-51; Jenkins Dep. Tr., 35:1-11, 38:7-14; Doc. 38-4, #240-41; MFP Doc. Produc,. MFP_EMAILS_000188; Doc. 41-17, #666).

94.     As the Clinical Coordinator of Abortion Care for all of PPNNE's clinics—including those in New Hampshire, Vermont, and Maine—Plaintiff Alison Bates currently oversees a protocol for abortion services used by all PPNNE abortion providers, including APRNs in New Hampshire and Vermont and physicians across all three states. (Bates Decl., ¶ 1; Doc. 41-2, #365-66).

95.     APRNs have taken on an increasingly significant role in the U.S. health care system in the past several decades, and particularly since the turn of the twenty-first century. (Spetz Decl., ¶ 20; Doc. 41-10, #519).

96.     The United States faces a crisis of physician shortages, particularly in the area of primary care. (Spetz Decl., ¶ 43; Doc. 41-10, #527).

97.     The practice authority of APRNs has expanded significantly as a growing body of research has confirmed the safety and efficacy of APRN provision of care and the nation's physician shortage crisis has worsened. (Spetz Decl., ¶¶ 44, 57-62; Doc. 41-10, #519, 532-34).

98.     "Medically underserved areas" and "medically underserved populations" are federal designations identifying areas and populations with a lack of access to primary care services. (Fishwick Decl., ¶ 72; Doc. 41-5, #453).

99.     Nationwide and in Maine, APRNs play a critical role in expanding access to health care in medically underserved, rural, and lower income areas, as they are significantly more likely than physicians to practice in such areas and they serve a higher proportion of uninsured patients and other vulnerable populations. (Fishwick Decl., ¶¶ 67, 70-72; Doc. 41-5, #451-53; Spetz Decl., ¶¶ 44-45, 54; Doc. 41-10, #527-28, 531).

100.    Leading authorities, such as the Institute of Medicine and the Federal Trade Commission, recommend allowing APRNs to practice to their full scope of practice in part to meet health care needs in medically underserved and rural areas. (Spetz Decl., ¶¶ 47-54; Doc. 41-10, #529-31).

101.    Maine is the most rural state in the nation, with more than 60% of its population living outside urban areas. (Declaration of Luisa S. Deprez, Ph.D. ("Deprez Decl."), ¶ 18; Doc. 41-3, #378; Henshaw Decl., ¶ 21; Doc. 41-7, #376-77).

102.    The following map depicts the medically underserved areas and populations in Maine, including Governor-designated shortage areas, with added labels for the county names and borders. According to these federal data, medically underserved areas appear in many counties in Maine, including Aroostook, Franklin, Hancock, Oxford, Penobscot, Piscataquis, Somerset, Waldo, and Washington Counties. (Fishwick Decl., ¶ 73; Doc. 41-5, #453-54; for an online version of the identical map that allows the viewer to zoom in, see https://www.maine.gov/dhhs/mecdc/public-health-systems/rhpc/documents/mua-mup-a.pdf (last visited Nov. 9, 2018)):



Federally Designated Medically Underserved Areas and Populations

**Maine - 2016**

Medically Underserved Area
Medically Underserved Population - Standard
Medically Underserved Population - Governor's Designation

Source:
HRSA/Division of Policy & Shortage Designation
Rural Health & Primary Care

103.    The U.S. Department of Health and Human Services has recognized the importance of expanding APRN care in medically underserved areas in Maine. For instance, in 2014, the Department awarded a $600,000 grant to students pursuing a master's degree through the University of Maine's Family Nurse Practitioner Program, with the goal of enabling more health care professionals to provide care in medically underserved areas as soon as possible. (Fishwick Decl., ¶¶ 70-71; Doc. 41-5, #452-53).

104.    As of October 9, 2018, there were 1,522 nurse practitioners licensed in Maine with a Maine address and 83 certified nurse-midwives licensed in Maine with a Maine address. (Fishwick Decl., ¶ 69; Doc. 41-5, #452).

105.    As of October 9, 2018, there were 466 licensed nurse practitioners and certified nurse-midwives living in Maine counties with federally designated medically underserved areas and populations. (Fishwick Decl., ¶ 74; Doc. 41-5, #455).

106.    MFP and PPNNE have health centers staffed by APRNs located in federally designated medically underserved areas and areas serving federally designated medically underserved populations. (Stipulated Facts, ¶ 4 & Ex. A; Doc. 37, #133 & Doc. 37-1, #145 (map of MFP clinics); Kieltyka Decl., ¶¶ 6, 11; Doc. 41-9, #500, 502; Fishwick Decl., ¶ 73; Doc. 41-5, #453-54; Bates Decl., ¶ 4; Doc. 41-2, #366).

107.    The Physician-Only Law undermines APRNs' ability to expand access to health care in rural and medically underserved areas of Maine. (Fishwick Decl., ¶¶ 11, 76; Doc. 41-5, #433, 455; Kieltyka Decl., ¶¶ 21-22, 26-28; Doc. 41-9, #505-09; Defs.' Doc. Produc., DEFS_EMAILS_0009; Doc. 41-16, #664 (email from Defendant Attorney General Janet Mills to the Portland Press Herald regarding her bill to repeal the Physician-Only Law, stating: "It's about access, especially in rural areas.")).

108.    Because of the Physician-Only Law, MFP offers aspiration abortion only at its Augusta location, not at any of its 17 other locations throughout central and northern Maine. (Stipulated Facts, ¶¶ 4-6 & Ex. A; Doc. 37, #133 & Doc. 37-1, #145; MFP Interrog. Resp., No. 6, at 9; Doc. 38-2, #181; Kieltyka Decl., ¶ 8; Doc. 41-9, #501; Kieltyka Dep. Tr., 9:23-25, 10:5-17, 10:10-20; Doc. 38-5, #258).

109.    Because of the Physician-Only Law, MFP offers aspiration abortion services only on Thursdays. (Kieltyka Decl., ¶¶ 8, 26; Doc. 41-9, #501, 507-08; Kieltyka Dep. Tr., 42:20-25, 95:13-19, 99:7-23; Doc. 38-5, #266, 279).

110.    Because of the Physician-Only Law, MFP offers medication abortions services, whether at its Augusta clinic or at other health centers via telehealth, generally only on Thursdays. (Kieltyka Decl., ¶¶ 9, 25-26; Doc. 41-9, #501, 507-08; Kieltyka Dep. Tr., 92:19-22; Doc. 38-5, #278; MFP Doc. Produc., MFP_EMAILS_001542-43; Doc. 41-17, #681-82 ("[F]or any [telehealth abortion] that is not on Thursday, we just have to find a doctor who is available at that time. Most of the doctors do not have much availability outside of the time they are scheduled to work with us, so when we have a request for [a telehealth abortion] on a non-Thursday, we just e-mail all the docs and see if anyone happens to be free at that time, or between patients, etc.")).

111.    MFP's "meds-by-mail" study requires the patient to have multiple interactions by telephone and videoconference with MFP's staff and physicians, and to travel in-person to obtain an ultrasound and lab work at a health care center (operated by MFP or otherwise). (Kieltyka Decl., ¶ 9; Doc. 41-9, #501; MFP Doc. Produc., MFP_DOCS_000040; Doc. 41-17, #685

(detailing multiple steps in the meds-by-mail study protocol, including phone calls with MFP staff to, *inter alia*, review study procedures and perform an "exit interview with study staff")).

112.    Only a small number of patients have chosen to participate in MFP's meds-by-mail study. (MFP Interrog. Resp., No. 1, at 3; Doc. 38-2, #175 (only six "meds-by-mail" abortions performed as of Dec. 31, 2017); Kieltyka Decl., ¶ 9; Doc. 41-9, #501).

113.    MFP currently has eight ultrasound machines, including two at the Augusta location and six portable ultrasound machines that rotate among MFP clinics throughout the state. (Kieltyka Decl., ¶ 26 (updating number of portable ultrasound machines MFP possesses); Doc. 41-9, #507; Kieltyka Dep. Tr., 10:10-20, 12:2-16, 17:13-15, 35:23-36:10; Doc. 38-5, #258, 260, 264).

114.    PPNNE offers medication and aspiration abortions only in its Portland location and generally only on Fridays, with the last appointment at 1:40 pm. (PPNNE Interrog. Resp., No. 5, at 4-5; Doc. 38-1, #153-54; Bates Decl., ¶ 9; Doc. 41-2, #367; Bates Dep. Tr., 26:9-20, 36:14-25, 47:12-15; Doc. 38-3, #212, 215, 217).

115.    Same-week appointment availability is frequently not an option for patients seeking abortions at PPNNE, and patients sometimes have to wait up to two to three weeks to schedule an abortion visit at the Portland clinic. (Bates Decl., ¶ 8; Doc. 41-2, #367).

116.    The Mabel Wadsworth Center offers abortion services only in Bangor, and generally only on Wednesdays. (PPNNE Interrog. Resp., No. 9, at 8; Doc. 38-1, #157; Kieltyka Decl., ¶ 10; Bates Dep. Tr., 39:19-25; Doc. 41-14, #635; Kieltyka Dep. Tr., 25:14-16; Doc. 38-5, #262).

117.    The other providers of abortion care in Maine besides MFP, the Mabel Wadsworth Center, and PPNNE, generally only treat pre-existing patients. (MFP Interrog. Resp., No. 9, at 13; Doc. 38-2, #185; Kieltyka Decl., ¶ 10 n.2; Doc. 41-9, #502; Jenkins Dep. Tr., 54:2-17; Doc. 38-4, #245; Kieltyka Dep. Tr., 23:11-24:6; 26:3-5, 27:20-28:4, 32:7-10, 34:8-11; Doc. 38-5, #261-64).

118.    The only publicly available (*i.e.*, generally open to new patients) providers of aspiration abortion care, or any abortion care past ten weeks of pregnancy, are in Augusta (Kennebec County), Portland (Cumberland County), and Bangor (Penobscot County). (MFP Interrog. Resp., No. 9, at 13; Doc. 38-2, #185; Kieltyka Decl., ¶¶ 10 & n.2, 24, 26; Doc. 41-9, #501-02, 506-07).

119.    There are no publicly available providers of aspiration abortion care, or any abortion care past ten weeks of pregnancy, in some of Maine's poorest counties: Aroostook,

Franklin, Oxford, Piscataquis, Somerset, and Washington Counties. (Deprez Decl., ¶¶ 19-23; Doc. 41-3, #378-80; Kieltyka Decl., ¶ 26; Doc. 41-9, #507-08 (explaining that "aspiration services . . . are now publicly available only in Portland, Augusta, and Bangor," which are in Cumberland, Kennebec, and Penobscot counties, respectively); Kieltyka Dep. Tr., 23:11-28:4; Doc. 38-5, #261-62).

120.    Nearly 60% of women in Maine live in a county without a provider of abortion services after the tenth week of pregnancy. (Henshaw Decl., ¶ 21; Doc. 41-7, #476-77).

121.    Some Maine residents have to travel more than 100 miles in order to obtain an abortion. (Defs.' Resp., RFA No. 8, at 4; Doc. 41-1, #348; Deprez Decl., ¶ 60; Doc. 41-3, #393; Henshaw Decl., ¶ 22; Doc. 41-7, #477).

122.    For example, a woman in Presque Isle who needs an aspiration abortion must travel approximately 310 miles round-trip to Bangor; a woman in Machias who needs an aspiration abortion must travel approximately 174 miles round-trip to Bangor; and a woman in Fort Kent who needs an aspiration abortion must travel approximately 366 miles round-trip to Bangor. (Henshaw Decl., ¶ 22; Doc. 41-7, #477).

123.    There are no abortion services available on any of the islands off the coast of Maine. (MFP Interrog. Resp., No. 9, at 13; Doc. 38-2, #185; *see also* Kieltyka Dep. Tr., 23:11-28:4; Doc. 38-5, #261-62).

124.    APRNs, with support from medical assistants, provide virtually all health care services other than abortion at PPNNE and MFP. (Stipulated Facts, ¶¶ 13, 24; Doc. 37, #135, 137; PPNNE Am. Interrog. Resp., No. 12, at 6-7; Doc. 38-1, #167-68; MFP Am. Interrog. Resp., No. 12, at 10; Doc. 38-2, #199; Bates Decl., ¶¶ 7, 16; Doc. 41-2, #367, 370; Kieltyka Decl., ¶ 11; Doc. 41-9, #502; Bates Dep. Tr., 14:16-24, 89:19-90:9; Doc. 38-3, #209, 228; Riley Dep. Tr., 15:2-9, 42:2-11; Doc. 38-6, #292, 299).

125.    Many of MFP's health centers are staffed by APRNs who are trained in, or wish to become trained in, medication and aspiration abortion care. (MFP Am. Interrog. Resp., No. 12, at 10; Doc. 38-2, #199; Kieltyka Decl., ¶ 26; Doc. 41-9, #507).

126.    Many of PPNNE's health centers are staffed by APRNs who are trained in, or wish to become trained in, medication and aspiration abortion care. (PPNNE Am. Interrog. Resp., No. 12, at 6-7; Doc. 38-1, #167-68; Bates Decl., ¶ 10; Doc. 41-2, #368; Bates Dep. Tr., 88:17-25, 89:1-3; Doc. 38-3, #228, Doc. 41-14, #651; Riley Dep. Tr., 35:2-8, 35:23-36:1; Doc. 38-6, #297, Doc. 41-15, #653).

127.     PPNNE has four APRNs on staff who are already trained in medication abortion and two APRNs on staff who are already trained in aspiration abortion; MFP has six APRNs on staff who are already trained in medication abortion. (Bates Decl., ¶ 10; Doc. 41-2, #368; Kieltyka Decl., ¶ 26; Doc. 41-9, #507).

128.     If MFP's APRNs who are already trained in medication abortion could offer that service without physician involvement, MFP could quickly offer medication abortion services on a significantly increased number of days and times and in a significantly increased number of locations, including on a walk-in basis. (Kieltyka Decl., ¶ 26; Doc. 41-9, #507 ("[I]f our six APRNs who are already trained in medication abortion care could offer that service without a physician involved, medication abortion services would be immediately available multiple days per week at multiple health centers across the state—more than just six, since several of our abortion-trained APRNs 'float' to different locations depending on patient need—and on a walk-in basis. Eventually, our APRNs would be able to provide medication abortion services at *all* sites . . . ."); *id.* ¶¶ 27-28; Doc. 41-9, #508-09; *see also* MFP Am. Interrog. Resp., No. 12, at 10; Doc. 38-2, #199).

129.     If not for the Physician-Only Law, first-trimester aspiration abortion would be available at additional MFP clinics, including in Aroostook County, and on additional days beyond Thursdays. (Kieltyka Decl., ¶ 26; Doc. 41-9, #507-08 ("We would also immediately begin investing in training and equipment to expand aspiration services across the state . . . . For instance, we would prioritize quickly making aspiration abortion services available in at least one of our health centers in Aroostook County (among other locations), giving patients multiple options per week to obtain an aspiration abortion in the County, rather than having to travel to Bangor or Augusta (and only on a Thursday) for care."); Kieltyka Dep. Tr., 96:12-97:15; Doc. 38-5, #279-80; *see also* MFP Am. Interrog. Resp., No. 12, at 10; Doc. 38-2, #199).

130.     If not for the Physician-Only Law, first-trimester abortion care would be available at additional PPNNE clinics. (Bates Decl., ¶¶ 10-11; Doc. 41-2, #368; *see also* PPNNE Am. Interrog. Resp., No. 12, at 6-7; Doc. 38-1, #167-68).

131.     If not for the Physician-Only Law, first-trimester abortion care would be available six days per week at PPNNE's Portland clinic, for longer hours including evenings. (Bates Decl., ¶¶ 10-12; Doc. 41-2, #368-69).

132.     If not for the Physician-Only Law, Plaintiff Alison Bates would promptly be able to begin offering aspiration abortion services on all three days when she is in PPNNE's Portland clinic. (Bates Decl., ¶ 12; Doc. 41-2, #369).

133.     If not for the Physician-Only Law, MFP and PPNNE patients would have the option to have their abortion performed by the same trusted APRN they regularly see for other

primary, family planning, and/or gynecological services. (Bates Decl., ¶¶ 11, 16; Doc. 41-2, #368, 370-71; Kieltyka Decl., ¶ 37; Doc. 41-9, #511).

134.    Aside from its Medical Director, PPNNE contracts with physicians mainly for the purpose of abortion care. (Stipulated Facts, ¶ 24; Doc. 37, #137; PPNNE Am. Interrog. Resp., No. 12, at 6-7; Doc. 38-1, #167-68).

135.    Aside from its Medical Director, MFP contracts with physicians solely for the purpose of abortion care. (Stipulated Facts, ¶ 13; Doc. 37, #135; MFP Am. Interrog. Resp., No. 12, at 10; Doc. 38-2, #199; Kieltyka Decl., ¶ 11; Doc. 41-9, #502).

136.    MFP and PPNNE use APRNs instead of physicians for all non-abortion services they provide, because APRNs are equally qualified to provide those services and less costly than physicians. (Bates Decl., ¶ 7; Doc. 41-2, #367; Fishwick Decl., ¶¶ 51, 55; Doc. 41-5, #447-48; Kieltyka Decl., ¶ 11; Doc. 41-9, #502; Spetz Decl., ¶¶ 57-62; Doc. 41-10, #532-34; Washington Decl., ¶ 45; Doc. 41-12, #621).

137.    If not for the Physician-Only Law, MFP and PPNNE would use APRNs rather than physicians to perform first-trimester abortions. (Stipulated Facts, ¶¶ 13, 24; Doc. 37, #135, 137; MFP Am. Interrog. Resp., No. 12, at 10; Doc. 38-2, #199; PPNNE Am. Interrog. Resp., No. 12, at 6-7; Doc. 38-1, #167-68; Kieltyka Decl., ¶ 11; Doc. 41-9, #502).

138.    Because of the Physician-Only Law, MFP's telehealth abortion services require aligning the schedules of (1) a physician, (2) an APRN, and (3) the patient. (MFP Am. Interrog. Resp., No. 12, at 10; Doc. 38-2, #199; Kieltyka Decl., ¶¶ 19, 25; Doc. 41-9, #505, 507; Kieltyka Dep. Tr., 50:18-54:2, 54:10-55:1, 56:2-4; Doc. 38-5, #268-69; Jenkins Dep. Tr., 64:7-10, 65:3-25, 68:9-70:10; Doc. 38-4, #247-49; *see also, e.g.*, MFP Doc. Produc., MFP_EMAILS_000792, 000844-46, 001007-09; Doc. 41-17, #669-75 (illustrating challenges of aligning the schedules of the physician, APRN, and patient for a telehealth abortion)).

139.    The requirement that a physician be involved in every telehealth abortion appointment reduces the availability of medication abortion care in Maine. (MFP Am. Interrog. Resp., No. 12, at 10; Doc. 38-2, #199; Kieltyka Decl., ¶ 25; Doc. 41-9, #507; Kieltyka Dep. Tr., 100:1-25; Doc. 38-5, #280; MFP Doc. Produc., MFP_EMAILS_001542-43; Doc. 41-17, #681-82 ("[F]or any [telehealth abortion] that is not on Thursday, we just have to find a doctor who is available at that time. Most of the doctors do not have much availability outside of the time they are scheduled to work with us, so when we have a request for [a telehealth abortion] on a non-Thursday, we just e-mail all the docs and see if anyone happens to be free at that time, or between patients, etc."); *see also, e.g.*, *id.* at MFP_EMAILS_000676, 000792, 001515-16; Doc. 41-17, #668-69, 679-80).

140.     MFP and PPNNE do not advertise for additional physician positions via newspapers or online because, in their experience, that is not an effective way of identifying abortion providers; rather, word-of-mouth is the best way to recruit for such positions. (Stipulated Facts, ¶¶ 14-18, 25-28; Doc. 37, #135-38; Kieltyka Decl., ¶¶ 29-35; Doc. 41-9, #509-11; Bates Dep. Tr., 63:11-24, 78:7-21; Doc. 38-3, #221, 225; Kieltyka Dep. Tr., 58:21-59:15, 64:24-65:15, 66:14-67:1; Doc. 38-5, #270-72).

141.     MFP and PPNNE are very prominent in Maine's reproductive health care community. For instance, both organizations are heavy involved in lobbying, advocacy, and public education efforts relating to abortion and other reproductive health services; staff are often featured in stories relating to abortion in Maine newspapers; MFP frequently brings Maine medical residents to its Augusta clinic to observe abortion services; three of MFP's physician contractors serve as faculty for a Maine residency program; MFP staff regularly travel to conferences relating to abortion and family planning; MFP's Vice-President of Program Services is the immediate past President of the Maine Nurse Practitioners Association; and MFP's medical director co-leads the Maine "cluster" of the Reproductive Health Access Project ("RHAP"), which is dedicated to building connections between pro-choice clinicians in a particular region to provide support, training, and opportunities for clinical discussion. (Stipulated Facts, ¶ 15; Doc. 37, #135; Kieltyka Decl., ¶¶ 31-33; Doc. 41-9, #509-10).

142.     MFP's and PPNNE's strong ties to Maine's small reproductive health community make it very likely that the organizations would be aware of any physicians in the state interested in providing abortion care. (Stipulated Facts, ¶¶ 14-16, 25-26; Doc. 37, #135-38; Kieltyka Decl., ¶¶ 30-34; Doc. 41-9, #509-10; Bates Dep. Tr., 61:16-19, 75:15-24; Doc. 38-3, #221, 224; Kieltyka Dep. Tr., 24:8-13, 32:12-22; Doc. 38-5, #261, 263).

143.     None of the physicians with whom MFP contracts for abortion care live north of Augusta. (Kieltyka Decl., ¶ 12; Doc. 41-9, #502).

144.     In order for an MFP physician to travel from Augusta to Presque Isle (in Aroostook County) one day per month to provide abortion services, the physician would have to make a seven- to nine-hour round-trip drive, which may be longer in bad weather; likely stay overnight for one or two nights, away from their homes and families; and take time off from their full-time jobs. (Kieltyka Decl., ¶¶ 14, 15; Doc. 41-9, #503).

145.     In order for an MFP physician to travel from Augusta to Machias (in Washington County) one day per month to provide abortion services, the physician would have to make a six-hour round-trip drive, which may be longer in bad weather; likely stay overnight for one or two nights, away from their homes and families; and take time off from their full-time jobs. (Kieltyka Decl., ¶¶ 14, 15; Doc. 41-9, #503).

146.     None of MFP's physicians are willing and able to travel one day per month to provide abortion care at one of MFP's more remote health centers, such as in Aroostook or Washington Counties. (Kieltyka Decl., ¶ 13; Doc. 41-9, #502; Kieltyka Dep. Tr., 68:7-17, 71:15-25; Doc. 38-5, #272-73).


147.     Even if it were logistically feasible for one or two of MFP's physicians to travel to one or two of MFP's remote health centers one or two days per month to provide abortion services, MFP could not afford to compensate them adequately for their time, travel, and work. (Kieltyka Decl., ¶¶ 16-20; Doc. 41-9, #504-05).


148.     One MFP physician indicated that they *might* be willing to consider traveling one day per month to one of MFP's less remote clinics, such as in Belfast, but that doctor could only consider doing so for adequate compensation. (Kieltyka Decl., ¶ 13; Doc. 41-9, #502).


149.     MFP provides abortion services at a financial loss, in part because of the Physician-Only Law. (MFP Am. Interrog. Resp., No. 12, at 10; Doc. 38-2, #199; Kieltyka Decl., ¶¶ 18-19; Doc. 41-9, #505).


150.     The Physician-Only Law contributes to the budget shortfall in MFP's abortion program because MFP compensates physicians for each procedure, whereas virtually all of MFP's APRNs are salaried employees paid per day who, if not for the Law, could provide abortions in between other services without any additional compensation. (MFP Am. Interrog. Resp., No. 12, at 10; Doc. 38-2, #199 ("[A] telehealth abortion, which involves both a physician and an APRN simultaneously[,] . . . is thus more than double the cost of having an APRN employee provide such care independently."); Kieltyka Decl., ¶¶ 11, 19; Doc. 41-9, #502, 505).


151.     It would not be financially feasible for MFP to adequately compensate its physicians to travel to health centers outside Augusta on a monthly basis to perform abortions. (Kieltyka Decl., ¶¶ 13, 16-20; Doc. 41-9, #502-05).


152.     Even if it were logistically and financially feasible to send one or two of MFP's physicians to one (or even a few) of MFP's remote sites, one (or even several) days per month, this would do little to reduce the burdens of the Physician-Only Law. (Kieltyka Decl., ¶¶ 21-28; Doc. 41-9, #505-11 ("[A]t best, [this would] increase access to abortion care at *one or two* of our health centers for *one or two* days each month. If, for instance, we could find (and afford) one physician to travel up to Presque Isle in a particular month, that does nothing that month for the patients in Washington County, or the patients taking the ferry to Rockland from Maine's coastal islands, or the patients in rural western Maine. Nor would it do anything for the patients who come on a day other than the one when the physician happens to be there . . . . [And] scheduling challenges would be compounded: the physicians' travel dates would have to be set long in advance . . . ." (emphasis in original))).

153.    Even if it were logistically and financially feasible to send one or two of MFP's physicians to one (or even a few) of MFP's remote sites, one (or even several) days per month, this would have an exponentially smaller impact on patient access than eliminating the Physician-Only Law, which would allow MFP's APRNs to provide abortion services to patients in their communities, multiple days each week at health centers across the state, including on a walk-in basis. (Kieltyka Decl., ¶¶ 21-28; Doc. 41-9, #505-11).

154.    There are no physicians at MFP willing and able to provide abortions in-person in Aroostook or Washington Counties, whereas there are APRNs willing and—if not for the Physician-Only Law—able to provide abortions in-person at MFP's health centers in Aroostook and Washington Counties. (Kieltyka Decl., ¶¶ 13-20, 26; Doc. 41-9, #507-08).

155.    The physicians with whom MFP contracts for abortion care all hold at least one other full-time position, in private practice and/or as faculty. (Kieltyka Decl., ¶ 15; Doc. 41-9, #503; Kieltyka Dep. Tr., 44:16-19, 68:12-15, 93:14-94:19; Doc. 38-5, #266, 272, 279).

156.    None of the physicians with whom PPNNE contracts for abortion care is able to add any additional days per month to perform abortions at PPNNE's clinics in Maine. (Bates Decl., ¶ 13; Doc. 41-2, #369).

157.    It is not financially feasible for PPNNE to increase the number of days for which it contracts physicians to perform abortions in Maine. (Bates Decl., ¶ 15; Doc. 41-2, #370).

158.    Unlike PPNNE's physicians, who are typically compensated per procedure, PPNNE's APRNs' compensation does not depend on the number or type of procedures or services they provide. (Bates Decl., ¶ 15; Doc. 41-2, #370).

159.    If one of the physicians with whom PPNNE contracts for abortion care performed abortions at one of PPNNE's other clinics in Maine instead of at PPNNE's Portland clinic, this could actually decrease access to abortion care in Maine because demand for services is higher in Portland than in Biddeford, Sanford, or Topsham. (Bates Decl., ¶ 14; Doc. 41-2, #369-70).

160.    Most women seeking abortions are poor or low-income, with nearly half of all abortion patients living below the poverty line. (Henshaw Decl., ¶¶ 14, 26; Doc. 41-7, #473, 479).

161.    The majority of Plaintiffs' abortion patients are poor or low-income. (Bates Decl., ¶ 11; Doc. 41-2, #368; Kieltyka Decl., ¶ 24; Doc. 41-9, #506; *see also, e.g.*, MFP Doc. Production – Sealed ("MFP Sealed Doc. Produc."), MFP_DOCS_001414; Doc. 42-1, #PageID Unavailable (contemporaneous notes in chart of patient 85437); MFP_DOCS_001422; Doc. 42-1, #PageID Unavailable (contemporaneous notes in chart of patient 87925);

MFP_DOCS_001426; Doc. 42-1, #PageID Unavailable (contemporaneous notes in chart of patient 70509); MFP_DOCS_001427; Doc. 42-1, #PageID Unavailable (contemporaneous notes in chart of patient 89484)).

162.    In 2016, 13.5% of Maine residents were living in poverty (*i.e.*, with household earnings below 100% of the federal poverty level) and 31% were "low-income" (*i.e.*, with household earnings below 200% of the federal poverty level). (Deprez Decl., ¶¶ 8, 16; Doc. 41-3, #375, 377-78).

163.    The statistics on Maine residents living in poverty actually undercount the number of Mainers struggling to make ends meet, because the federal poverty level is widely considered an inadequate and outdated measure of poverty; the federal poverty level reflects a family's annual cash income, rather than its annual consumption or its own assessment of well-being; it is based on a formula from the 1960s that assumed that families spent approximately one-third of their budget on food; and it does not take into account other costs families typically pay, such as for childcare, medical expenses, utilities, and taxes. (Deprez Decl., ¶¶ 15-16; Doc. 41-3, #377-78).

164.    Maine *women* are disproportionately poor, with 14.9% of women living below the federal poverty level compared to 12.6% of Maine men. (Deprez Decl., ¶ 10; Doc. 41-3, #375-76).

165.    Poverty rates are even higher among women of color in Maine: in 2015, 51.3% of African-American women, 27.8% of Latina women, and 35.5% of Native American women in Maine were living in poverty. (Deprez Decl., ¶ 11; Doc. 41-3, #376).

166.    Women living in rural areas in Maine face even more severe poverty than women in other parts of the state, with economic conditions especially dire in the "Rim Counties" (Aroostook, Franklin, Oxford, Piscataquis, Somerset, and Washington), where the poverty rate in 2015 was 17.8%. (Deprez Decl., ¶¶ 19-23; Doc. 41-3, #378-80).

167.    The U.S. Federal Reserve found that 44% of Americans could not cover an emergency expense of $400 that might arise at some point in their lives; the percentage of Mainers in that position is slightly higher, at 45%. (Deprez Decl., ¶¶ 43-44; Doc. 41-3, #388-89).

168.    Many low-income Mainers, especially women, face food insecurity and housing insecurity, with households headed by single mothers showing the highest rates of child food insecurity. (Deprez Decl., ¶¶ 24-26; Doc. 41-3, #381-83).

169.    Poor and low-income women in Maine are frequently unable to cover basic necessities for themselves and their families, like food, utilities, or housing. For instance, 60% of

people who rely on the Good Shepherd Food Bank in Auburn, Maine, reported having to choose between eating and heating their homes during the winter. (Deprez Decl., ¶¶ 24, 27-30, 43-44; Doc. 41-3, #381-84, 388-89).

170.     Data from the Massachusetts Institute of Technology, the Economic Policy Institute, and the Vermont Joint Fiscal Office all show that a single mother with one child in Maine must earn approximately $50,000 to $61,000 per year before taxes to cover her expenses. (Deprez Decl., ¶¶ 31-37; Doc. 41-3, #385-87).

171.     The median annual earnings for a woman in Maine in 2015 was only $36,000. (Deprez Decl., ¶ 38; Doc. 41-3, #387).

172.     Most women seeking an abortion have at least one child and are unmarried. (Deprez Decl., ¶ 32; Doc. 41-3, #385).

173.     Although some single mothers may be entitled to child support payments, data show that most women do not in fact receive that money; in 2015, only 40% of Maine women actually received child support payments to which they were entitled. (Deprez Decl., ¶ 42; Doc. 41-3, #388).

174.      Many abortion patients in Maine and nationwide work in low-wage jobs. (Bates Decl., ¶ 11; Doc. 41-2, #368; Deprez Decl., ¶¶ 39, 48-51; Doc. 41-3, #387, 390-91; Kieltyka Decl., ¶ 24; Doc. 41-9, #506-07).

175.     Low-wage jobs typically have less flexibility and predictability and provide fewer non-monetary benefits than higher-wage jobs, and low-wage workers are also more likely to be "underemployed" —*i.e.*, to work part-time involuntarily, resulting in decreased employment stability and fewer accumulated monetary resources over time. (Bates Decl., ¶ 11; Doc. 41-2, #368; Deprez Decl., ¶¶ 41, 49; Doc. 41-3, #388, 390; Kieltyka Decl., ¶ 24; Doc. 41-9, #506-07).

176.     According to the Institute for Women's Policy Research, nationally, 41% of working parents at or below 200% of the federal poverty line have no access to paid sick leave, vacation days, personal days, or any other form of compensated leave. (Deprez Decl., ¶ 49; Doc. 41-3, #390).

177.     Even if a low-income woman is able to get time off work in order to travel to obtain abortion care, she is likely to forgo wages, thus further undermining her economic stability. (Deprez Decl., ¶¶ 48-51; Doc. 41-3, #390-91).

178.    When women are able to obtain health care in their local communities, it minimizes the time they need to be away from work. (Deprez Decl., ¶ 51; Doc. 41-3, #391).

179.    When emergencies or unanticipated expenses—like an abortion—arise in the lives of low-income and poor women, they attempt to meet those expenses in ways that have consequences for other aspects of their lives: for instance, not paying rent or utilities; skipping car payments; reducing food budgets; not buying other essentials for the family, like shoes for their kids; or borrowing money using costly "payday" loans at high interest. (Deprez Decl., ¶ 76; Doc. 41-3, #399).

180.    Many abortion patients in Maine and nationwide do not have access to a reliable car; for example, one study of Maine Temporary Assistance for Needy Families recipients found that nearly 46% of all respondents did not own a vehicle, and 80% of these said that it was hard to get a ride or find transportation when they needed it. (Deprez Decl., ¶ 53; Doc. 41-3, #391).

181.    Most cars owned by low-income families are on average ten years old and may not be sufficiently safe and reliable for a long road trip, so even those low-income women who do own a car may have to travel by public transportation (if available) or by private bus service to obtain an abortion. (Deprez Decl., ¶ 54; Doc. 41-3, #391-92).

182.    Maine does not have an interconnected transportation system, and, outside the major cities, public transportation does not exist; for instance, there is no bus service between Fort Kent and Bangor. (Deprez Decl., ¶¶ 55-56, 60; Doc. 41-3, #392-93).

183.    Even for a woman with a car that is safe and reliable enough for a long road trip, the cost of gasoline may exceed her means. (Deprez Decl., ¶ 57; Doc. 41-3, #392).

184.    Traveling from Fort Kent to Bangor is approximately 370 miles round trip, and would take more than six hours round-trip and cost approximately $46.50 in gas alone, and significantly more ($199.47) if calculated according to the federal rate for mileage reimbursement. (Deprez Decl., ¶ 60; Doc. 41-3, #393; Henshaw Decl., ¶ 27; Doc. 41-7, #480).

185.    A trip from Vinalhaven to Augusta would require travel by both ferry and either bus or car. The ferry-plus-car option would cost approximately $40.66 round-trip and take more than four hours, and the ferry-plus-bus option would cost $73 round-trip and take at least three days, *not* including food, lodging, or childcare expenses. (Deprez Decl., ¶¶ 61-62; Doc. 41-3, #393-94).

186.    Traveling long distances to an abortion clinic (or making any other unexpected, time-sensitive, and long-distance trip) is extremely difficult or impossible for many women in Maine, particularly during Maine winters when certain roads may be entirely impassable.

(Deprez Decl., ¶¶ 63-68; Doc. 41-3, #395-96 (explaining that, for instance, a journey from Matinicus to Augusta and back would take at least four days, and would be longer or impossible during a Maine winter); Kieltyka Decl., ¶ 14; Doc. 41-9, #503).

187.    Forcing women to travel long distances to access abortion services imposes not only the direct travel costs, but often also childcare costs and lost wages for time off work. (Deprez Decl., ¶¶ 46, 68-69, 75; Doc. 41-3, #389, 396-98; Henshaw Decl., ¶ 27; Doc. 41-7, #480; Jenkins Dep. Tr., 89:23-90:6; Doc. 38-4, #254; Kieltyka Dep. Tr., 75:9-18, 119:1-22, 120:12-16; Doc. 38-5, #274, 285; Riley Dep. Tr., 50:12-23; Doc. 38-6, #301; *see also, e.g.*, MFP Sealed Doc. Produc., MFP_DOCS_001423; Doc. 42-1, #PageID Unavailable (contemporaneous notes in chart for patient 88478)).

188.    Arranging additional childcare can be prohibitively expensive. For instance, a 2016 analysis found that a single parent in Maine with two young children living at the federal poverty level pays between 65.3% and 73.2% of their income towards childcare. (Deprez Decl., ¶¶ 69-70; Doc. 41-3, #397).

189.    Many parts of Maine are experiencing acute shortages of day care facilities. (Deprez Decl., ¶¶ 71-73; Doc. 41-3, #397-98).

190.    Securing childcare for an unexpected trip is particularly challenging because few, if any, locales have open or drop-in slots for childcare. (Deprez Decl., ¶ 74; Doc. 41-3, #398).

191.    Studies show that factors increasing the cost associated with obtaining an abortion have a major negative impact on the ability of low-income women to access abortion services. (Henshaw Decl., ¶ 15; Doc. 41-7, #473-74).

192.    Studies show that when women are forced to travel longer distances to access abortion services, fewer women are able to do so. (Henshaw Decl., ¶¶ 7-9; Doc. 41-7, #468-70).

193.    A study published last year in the Journal of the American Medical Association on the impact of abortion facility closures in Texas concluded that "[c]ounties with . . . no change in distance to a facility between 2012 and 2014 had a 1.3% . . . decline in abortions," but "[w]hen the change in distance was 100 miles or more, the number of abortions decreased 50.3%," and when the change in distance was 50-99 miles, the number of abortions decreased by 35.7%. (Henshaw Decl., ¶ 7; Doc. 41-7, #468-69).

194.    One study found that an increased travel burden of 219 miles was associated with a 69% decrease in the number of Texas women who obtained abortions after 15 weeks, notwithstanding a fourfold increase in the number of Texas women who went out of state for such abortions. (Henshaw Decl., ¶¶ 8-9; Doc. 41-7, #469-70).

195.    One study that examined abortion rates in Georgia counties at various distances from Atlanta (where all of the major abortion providers in Georgia were located at that time) found that for every ten miles of distance from Atlanta, there was a decline of 6.7 abortions per 1,000 live births. (Henshaw Decl., ¶¶ 10-11; Doc. 41-7, #470-71).

196.    The same Georgia study found that, after two new abortion clinics opened in two Georgia counties located more than 100 miles from Atlanta (where all of the major abortion providers in Georgia had previously been located), counties near the two new clinics saw an increase in abortion rates of 18-29%. (Henshaw Decl., ¶ 11; Doc. 41-7, #471).

197.    Another study found that a doubling of the travel distance to a county with an abortion provider was associated with a 23% decline in the abortion rate for white women, a 27% decline for African American women, and a 50% decline for Hispanic women. (Henshaw Decl., ¶ 12; Doc. 41-7, #471-72).

198.    A study in Washington State examined a period when, due to a decline in the number of providers in rural areas, the distance traveled by rural women for an abortion increased by 12 miles; the 12-mile increase in distance was associated with a 10% greater decrease in abortions among rural women as compared with urban women. (Henshaw Decl., ¶ 12; Doc. 41-7, #472).

199.    Patients' responses to a hypothetical question regarding what they would have done had they not been able to receive an abortion that they in fact received are far less reliable than studies measuring actual patient behavior. (Henshaw Decl., ¶ 24; Doc. 41-7, #478).

200.    MFP's 2016 internal survey asking telehealth recipients what they would have done had they not been able to receive a medication abortion via telehealth did not contain data on the distance from patients' homes to Augusta, Bangor, or Portland. (Henshaw Decl., ¶ 24; Doc. 41-7, #478-79).

201.    Approximately one in five of MFP's patients, and a similar proportion of PPNNE's patients, cancel or do not show up for their scheduled abortion appointments. (MFP Am. Interrog. Resp., No. 13, at 11; Doc. 38-2, #200; Bates Decl., ¶ 9; Doc. 41-2, #367 (PPNNE schedules up to 32 appointments on a given Friday, but typically sees around 20 to 25 patients in light of cancellations and no-shows)).

202.    Patients who do not present for their scheduled appointments have often previously communicated to MFP or PPNNE staff that they are unsure of their ability to travel to the clinic, find transportation, arrange for childcare, keep their pregnancy and/or abortion confidential, miss school or work, and/or lose wages. (MFP Am. Interrog. Resp., No. 13, at 11;

Doc. 38-2, #200; PPNNE Am. Interrog. Resp., No. 10, at 3; Doc. 38-1, #164; Kieltyka Dep. Tr., 117:21-118:25; Doc. 38-5, #285).

203.    MFP typically has to refer one patient per month to another abortion provider because the patient's abortion care has been delayed past MFP's gestational age limit. (MFP Am. Interrog. Resp., No. 10, at 4; Doc. 38-2, #193).

204.    PPNNE regularly sees patients who discover at the time of their abortion appointment that they are past the gestational age limit for abortion services at PPNNE. (PPNNE Am. Interrog. Resp., No. 10, at 4; Doc. 38-1, #165).

205.    PPNNE is the only publicly available (*i.e.*, generally available to new patients) abortion provider in Maine that performs abortions beyond the first trimester. (Kieltyka Decl., ¶¶ 10 & n.2, 24; Doc. 41-9, #501-02, 506).

206.    PPNNE offers services only through 19 weeks of pregnancy. (Kieltyka Decl., ¶ 24; Doc. 41-9, #506; Bates Dep. Tr., 30:5-6; Doc. 38-3, #213; Riley Dep. Tr., 41:11-12; Doc. 38-6, #299).

207.    MFP and PPNNE do not regularly follow up with patients who exceed the clinics' respective gestational age limits and so are referred elsewhere for abortion care, and thus do not know whether these patients were ultimately able to obtain the desired abortion. (MFP Am. Interrog. Resp., No. 10, at 3-5; Doc. 38-2, #192-94; PPNNE Am. Interrog. Resp., No. 10, at 3-4; Doc. 38-1, #164-65; Bates Dep. Tr., 70:19-71:5, 72:11-73:1; Doc. 41-14, #645-48).

208.    MFP and PPNNE often cannot follow up with patients whom they refer elsewhere for abortion care when those patients are homeless and/or lack a working phone. (MFP Am. Interrog. Resp., No. 10, at 3-4; Doc. 38-2, #192-93; PPNNE Am. Interrog. Resp., No. 10, at 3-4; Doc. 38-1, #164-65; MFP Sealed Doc. Produc., MFP_DOCS_001423; Doc. 42-1, #PageID Unavailable (contemporaneous notes in chart of patient 88612); *id.* at MFP_DOCS_001426; Doc. 42-1, #PageID Unavailable (contemporaneous notes in chart of patient 70509); *id.* at MFP_DOCS_001427; Doc. 42-1, #PageID Unavailable (contemporaneous notes in chart of patient 89484)).

209.    In at least one documented instance in the past five years, a physician contacted MFP seeking medical records for purposes of prenatal care for a patient who sought an abortion at MFP but had been delayed past the clinic's gestational age limit. (MFP Am. Interrog. Resp., No. 10, at 4-5; Doc. 38-2, #193-94).

210.    If not for the Physician-Only Law, many more women seeking abortions in Maine would be able to access abortion in or near their own communities, thus significantly reducing

the travel and childcare costs, lost wages, and other expenses and burdens associated with traveling lengthy distances to obtain an abortion. (PPNNE Am. Interrog. Resp., Nos. 10-12, at 3-7; Doc. 38-1, #164-68; MFP Am. Interrog. Resp., Nos. 10-12, at 3-10; Doc. 38-2, #192-99; Bates Decl., ¶¶ 10-12; Doc. 41-2, #368-69; Deprez Decl., ¶¶ 6-7, 86; Doc. 41-3, #374-75, 401-02; Henshaw Decl., ¶¶ 22, 25-28; Doc. 41-7, #477, 479-80; Kieltyka Decl. ¶¶ 24, 26, 28; Doc. 41-9, #506-09; Bates Dep. Tr., 84:7-12, 96:10-97:7; Doc. 38-3, #226, 229-30; Riley Dep. Tr., 51:21-52:4, Doc. 38-6, #301-02; Defs.' Doc. Produc., DEFS_EMAILS_0009; Doc. 41-16, #664 (email from Defendant Attorney General Janet Mills to the Portland Press Herald regarding her bill to repeal the Physician-Only Law, stating: "It's about access, especially in rural areas.")).

211.    Because eliminating the Physician-Only Law would reduce the costs and burdens associated with traveling lengthy distances to obtain an abortion, it would make it more likely that women in Maine would be able to obtain desired abortions. (PPNNE Am. Interrog. Resp., Nos. 10-12, at 3-7; Doc. 38-1, #164-68; MFP Am. Interrog. Resp., Nos. 10-12, at 3-10; Doc. 38-2, #192-99; Bates Decl., ¶¶ 10-12; Doc. 41-2, #368-69; Deprez Decl., ¶ 86; Doc. 41-3, #401-02; Henshaw Decl., ¶¶ 22, 25-28; Doc. 41-7, #477, 479-80; Kieltyka Decl., ¶¶ 24, 26, 28; Doc. 41-9, #506-09; Bates Dep. Tr., 84:7-12, 96:10-97:7; Doc. 38-3, #226, 229-30; Riley Dep. Tr., 51:21-52:4, Doc. 38-6, #301-02; Defs.' Doc. Produc., DEFS_EMAILS_0009; Doc. 41-16, #664 (email from Defendant Attorney General Janet Mills to the Portland Press Herald regarding her bill to repeal the Physician-Only Law, stating: "It's about access, especially in rural areas.")).

212.    If the restrictions on abortion access imposed by the Physician-Only Law were lifted, some women who are presently unable to obtain abortions would be able to do so. (Deprez Decl., ¶ 86; Doc. 41-3, #401-02; Henshaw Decl., ¶¶ 22, 28; Doc. 41-7, #477, 480).

213.    Studies show that increased travel distances to obtain an abortion delays some patients' abortions. (Deprez Decl., ¶ 81; Doc. 41-3, #400; Henshaw Decl., ¶¶ 16-19; Doc. 41-7, #474-76).

214.    The "Turnaway Study," which studied women who were turned away from abortion clinics because they were beyond the clinic's gestational age limit, found that the most common reason for delay was travel and procedure costs, with 58.3% of "turnaway" patients attributing their delay to such costs and 29.8% citing "not knowing how to get to a provider" as a cause for the delay. (Deprez Decl., ¶¶ 83-85; Doc. 41-3, #400-01; Henshaw Decl., ¶ 16; Doc. 41-7, #474-75).

215.    Multiple studies have shown that women who experience delays in obtaining abortions frequently cite among the factors that caused the delay (1) acquiring the funds to pay for the procedure and (2) overcoming transportation-related hurdles. (Henshaw Decl., ¶ 17; Doc. 41-7, #475).

216.     Studies show that for women who seek abortions in the second trimester but who would have preferred to have had earlier abortions, the burdens of raising money and making travel arrangements played especially significant roles in causing the delay. (Henshaw Decl., ¶ 19; Doc. 41-7, #475-76).

217.     MFP and PPNNE patients report being delayed in obtaining abortion care because of the need to make arrangements and raise funds for transportation, childcare, and time off work to allow them to travel to Augusta or Portland. (PPNNE Am. Interrog. Resp., No. 10, at 3-4; Doc. 38-1, #164-65; MFP Am. Interrog. Resp., No. 13, at 11-12; Doc. 38-2, #200-01; Jenkins Dep. Tr., 79:20-80:1, 81:17-82:5; Doc. 38-4, #251-52; *see also* Kieltyka Dep. Tr., 92:3-22; Doc. 38-5, #278).

218.     Because the cost of an abortion increases as pregnancy advances, a patient who is delayed in obtaining care because of travel-related logistics and financial challenges may, in turn, be further delayed by the need to raise increased money for the procedure. (Henshaw Decl., ¶ 25; Doc. 41-7, #479; *see also* MFP Am. Interrog. Resp., Nos. 10, 13, at 4, 12; Doc. 38-2, #193, 201; PPNNE Am. Interrog. Resp., No. 10, at 4; Doc. 38-1, #165).

219.     While abortion is an extremely safe procedure, the risks increase as pregnancy advances. (Washington Decl., ¶¶ 13, 15; Doc. 41-12, #610-11).

220.     If not for the Physician-Only Law, the distances that patients have to travel for abortion care, and, accordingly, the costs and burdens of obtaining such care, would be reduced, thus reducing the likelihood that patients are delayed in obtaining abortion care. (Bates Decl., ¶¶ 10-11; Doc. 41-2, #368; Deprez Decl., ¶ 86; Doc. 41-3, #401-02; Kieltyka Decl., ¶¶ 26, 28; Doc. 41-9, #507-09; Bates Dep. Tr., 84:7-12, 96:10-97:7; Doc. 38-3, #226, 229-30; Riley Dep. Tr., 51:21-52:4, Doc. 38-6, #301-02)

221.     Shortly before Plaintiffs filed this lawsuit, Plaintiff Julie Jenkins was willing and able to provide medication abortion care via telehealth to a patient in Presque Isle, but was unable to provide that care—despite having the medication on hand—because no physician was available for the videoconference on that day. As a result, the patient had to travel hundreds of miles round-trip to Bangor and her abortion was delayed by two weeks, past the point in pregnancy when she could obtain a medication abortion, which was her preferred method. (Jenkins Dep. Tr., 76:10-77:8, 78:1-24, 84:3-24, 85:6-11; Doc. 38-4, #250-53; MFP Sealed Doc. Produc., MFP_DOCS_001390; Doc. 42-1, #PageID Unavailable (contemporaneous notes in chart for patient 82648)).

222.     There are certain circumstances in which either medication or aspiration abortion is more appropriate and/or medically indicated for a particular patient. (Kieltyka Decl., ¶ 26; Doc. 41-9, #508; Washington Decl., ¶ 12; Doc. 41-12, #609-10).

223.    For example, a woman with imminent travel plans or a single mother caring for young children at home may not be well-positioned to manage a medication abortion, which is similar to a miscarriage and generally involves bleeding and cramping at home; she would very likely be a better candidate for aspiration abortion, which can be completed in five minutes at a clinic. (Washington Decl., ¶ 12; Doc. 41-12, #609-10; MFP Sealed Doc. Produc., MFP_DOCS_001421; Doc. 42-1, #PageID Unavailable (contemporaneous notes in chart for patient 87979)).

224.    Because of delays caused by the Physician-Only Law, some women who prefer a medication abortion, or for whom a medication abortion is clinically indicated, are delayed past the point in pregnancy (10 weeks) when they can utilize that method. (Kieltyka Decl. ¶ 26; Doc. 41-9, #508 (describing patient who has experienced trauma that would be exacerbated by having instruments inserted into her vagina); Bates Dep. Tr., 99:12-22; Doc. 38-3, #230; Jenkins Dep. Tr., 76:10-77:8, 78:1-24, 84:3-24, 85:6-11; Doc. 38-4, #250-53; MFP Sealed Doc. Produc., MFP_DOCS_001390; Doc. 42-1, #PageID Unavailable (contemporaneous notes in chart for patient 82648; patient was ultimately unable to obtain medication abortion, *see supra* ¶ 221), *id.* at MFP_DOCS_001426; Doc. 42-1, #PageID Unavailable (contemporaneous notes in chart of patient 73919); *see also* Kieltyka Dep. Tr., 47:6-9, 47:20-48:12; Doc. 38-5, #267 (some MFP patients have to wait more than two weeks to be scheduled for an aspiration abortion)).

225.    Because of the Physician-Only Law, some women who prefer an aspiration abortion, or for whom an aspiration abortion is clinically indicated, are unable to obtain the abortion method that is more appropriate for them. (Kieltyka Decl., ¶ 26; Doc. 41-9, #508; *see also* Deprez Decl., ¶¶ 52-68; Doc. 41-3, #391-96 (explaining why some patients would not be able to make the trip to Augusta, Bangor, or Portland)).

226.    Some women seeking abortions must keep the fact of their pregnancy and/or abortion confidential from an abusive partner or parent. (Deprez Decl., ¶¶ 78-79; Doc. 41-3, #399-400; *see also* Riley Dep. Tr., 50:21-22; Doc. 38-6, #301; MFP Doc. Produc., MFP_EMAILS_001367-1369; Doc. 41-17, #666-68 (patient "was in a hurry to get a borrowed car home and was trying not to let anyone at home know what was going on"); MFP Sealed Doc. Produc., MFP_DOCS_001419; Doc. 42-1, #PageID Unavailable (contemporaneous notes in chart of patient 87195); *id.* at MFP_DOCS_001422; Doc. 42-1, #PageID Unavailable (contemporaneous notes in chart of patient 88116); *id.* at MFP_DOCS_001426; Doc. 42-01, #PageID Unavailable (contemporaneous notes in chart of patient 83852)).

227.    The travel, childcare, and other burdens associated with the Physician-Only Law increase the likelihood that a woman will be required to seek the help of friends, family, or others in accessing abortion, which can jeopardize the confidentiality of her pregnancy and/or abortion decision. (PPNNE Am. Interrog. Resp., No. 10, at 3-4; Doc. 38-1, #164-65; MFP Am. Interrog. Resp., No. 13, at 11-12; Doc. 38-2, #200-01; Deprez Decl., ¶¶ 78-80; Doc. 41-3, #399-400).

228.     Because the friends and family of low-income women in Maine are often similarly low-income, and because many low-income Mainers are unable to save any money at all, a low-income woman seeking an abortion in Maine is unlikely to have friends and family who would be able to lend her money for the abortion. (Deprez Decl., ¶ 77; Doc. 41-3, #399).

229.     To raise funds for increased travel distances caused by the Physician-Only Law, some women will borrow money from an abusive partner or former partner, thus further tying them to their abuser. (Deprez Decl., ¶¶ 78-79; Doc. 41-3, #399-400).

230.     The lengthy travel distances and limited appointment flexibility caused by the Physician-Only Law necessitate that many women seeking abortions in Maine take time off work in order to obtain an abortion. (Bates Decl., ¶ 11; Doc. 41-2, #368; Kieltyka Decl., ¶¶ 21, 23-24; Doc. 41-9, #505-07).

231.     Many abortion patients in Maine work in low-wage jobs without paid time off work, and thus their employer may require them to provide a reason for any leave—jeopardizing the confidentiality of the abortion, and potentially placing the woman at risk of retaliation. (Bates Decl., ¶ 11; Doc. 41-2, #368; Deprez Decl., ¶¶ 39, 41, 48-49, 80; Doc. 41-3, #387-88, 390, 400; Kieltyka Decl., ¶ 24; Doc. 41-9, #506-07).

232.     If not for the Physician-Only Law, MFP and PPNNE would be able to offer abortion services on a greatly increased number of days and at more flexible times, thus making it less likely that patients would need to take time off work for their abortion. (Bates Decl., ¶¶ 10-12; Doc. 41-2, #368-69; Kieltyka Decl., ¶¶ 24, 26, 28; Doc. 41-9, #506-09).

233.     Eliminating the Physician-Only Law would increase the likelihood that a woman in Maine is able to keep her abortion decision confidential. (Deprez Decl., ¶¶ 78-80; Doc. 41-3, #399-400).

234.     Studies show that women who are unable to obtain a desired abortion are more likely to live in poverty, more likely to be on public benefits, and more likely to experience violence than women who are able to obtain a desired abortion. (Deprez Decl., ¶¶ 82-85; Doc. 41-3, #400-01).

Date: November 14, 2018

Respectfully submitted,

Julia Kaye\*
Andrew D. Beck\*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2633
Email: jkaye@aclu.org
    abeck@aclu.org

*Counsel for Julie A. Jenkins and Family Planning Association of Maine d/b/a Maine Family Planning and Primary Care Services*

/s/ Emma E. Bond
Emma E. Bond
Zachary L. Heiden
American Civil Liberties Union of Maine Foundation
121 Middle Street, Suite 200
Portland, ME 04103
Telephone: (207) 619-6224
Email: ebond@aclumaine.org
    zheiden@aclumaine.org

*Counsel for Plaintiffs*

Jennifer Sandman\*
Planned Parenthood Federation of America
123 William Street, 9th Floor
New York, NY 10038
Telephone: (212) 261-4749
Email: jennifer.sandman@ppfa.org

Diana Salgado\*
Planned Parenthood Federation of America
1110 Vermont Ave., NW, Suite 300
Washington, DC 20005
Telephone: (212) 541-7800
Email: diana.salgado@ppfa.org

*Counsel for Katie Riley, Alison J.G. Bates, Stephanie L. Small, and Planned Parenthood of Northern New England*

*\* Admitted Pro Hac Vice*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this, the 14th day of November, 2018, I electronically filed the

above document with the Clerk of Court using the CM/ECF system, which will send notification

of such filing to the following:


    CHRISTOPHER C. TAUB
    Christopher.C.Taub@maine.gov

    HALLIDAY MONCURE
    Halliday.Moncure@maine.gov


To my knowledge, there are no non-registered parties or attorneys participating in this case.


          /s/ Emma E. Bond
          Emma E. Bond
          American Civil Liberties Union of
          Maine Foundation