**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

JULIE A. JENKINS, *et al.*,

                Plaintiffs,

v.

R. CHRISTOPHER ALMY, *et al.*,

                Defendants.

CIVIL NO. 2:17-cv-366-NT

## <u>PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................ 2

   I.   There Is No Medical Justification For The Physician-Only Law. ..................................... 2

      A.  *APRNs Play A Critical Role In Maine's Health Care System.* ..................................... 2

      B.  *The Physician-Only Law Carves Abortion Out Of APRNs' Broad Scope Of Practice.* ................................................................................................................... 3

      C.  *Evidence Confirms The Safety Of APRN Provision Of First-Trimester Abortions.* ....... 5

      D.  *Multiple Plaintiffs Are Already Qualified To Provide First-Trimester Abortion Care And Others Could Expand Their Practices To Do So.* ......................................... 5

      E.  *Maine Patients And Maine Law Trust APRNs To Provide Serious, Dignified Care, No Less So Than Physicians.* ..................................................................................... 6

   II.  The Physician-Only Law Burdens And Harms Patients. ..................................................... 7

      A.  *The Law Limits Where And When Abortion Care Is Available In Maine.* ...................... 7

          1.  The Physician-Only Law Severely Restricts The Locations, Days, And Times When Abortion Care Is Offered In Maine. ............................................... 7

          2.  Allowing APRNs To Perform First-Trimester Abortions Would Vastly Expand The Availability Of Abortion Care In Maine. ........................................ 8

      B.  *The Law Imposes Substantial Burdens On Maine Women Seeking Abortion Care.* ..... 10

          1.  For Poor And Low-Income Women, Who Comprise The Majority Of Abortion Patients, Raising Money And Making Arrangements For Unexpected, Costly Travel On A Limited, Inflexible Appointment Schedule, Is Difficult Or Impossible. ........................................................................................................ 10

          2.  The Physician-Only Law Delays Or Altogether Blocks Some Maine Women's Ability To Obtain Abortion Care. ...................................................... 12

          3.  The Physician-Only Law Prevents Women In Maine From Accessing The Abortion Method Appropriate For Them. ............................................................ 14

STANDARD OF REVIEW ................................................................................................ 15

ARGUMENT ................................................................................................................. 15

I.  The State Is Not Entitled To Judgment On Plaintiffs' Due Process Claim. ...................... 16

    A.  *The Physician-Only Law Cannot Be Upheld As A Matter of Law Because The Undue Burden Test Is Record-Specific, As The State's Own Citations Make Clear.* ... 16

    B.  Mazurek *And Its Predecessors Are Both Legally and Factually Distinguishable.* ........ 18

    C.  Whole Woman's Health *Is The "Applicable Legal Standard."* ................................... 20

    D.  *The Law Cannot Survive* Whole Woman's Health's *Balancing Test Because There Is No Evidence It Provides Any Benefits And Extensive Evidence It Harms Patients.* . 21

        1.  *Whole Woman's Health* Demands More Than A State's *Ipse Dixit* That An Abortion Law Furthers Its Interests, But The State Has Presented No Evidence ... 21

        2.  Plaintiffs Have Introduced Extensive Record Evidence Of The Burdens The Physician-Only Law Imposes. ............................................................................. 23

II. The State Is Not Entitled To Judgment On Plaintiffs' Equal Protection Claims. ............... 27

    A.  *The Physician-Only Law Implicates The Equal Protection Clause.* ............................. 27

    B.  *The Law Lacks Even A "Rational" Connection To Any Legitimate Interest.* .............. 28

        1.  If "Abortion Is Unique" Were Sufficient To Save The Act, No Abortion Restriction, No Matter How Absurd, Would Fail Rational Basis. ......................... 29

        2.  Blocking a Maine Woman From Receiving Abortion Services From A Trusted APRN In Her Own Community Bears No Rational Relationship To The State's Asserted Interest In Expressing "Respect" For Life. ............................................. 30

CONCLUSION ............................................................................................................ 30

CERTIFICATE OF SERVICE ....................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................ 15

*Armstrong v. Mazurek*,
94 F.3d 566 (9th Cir. 1996) ........................................................................... 28

*Bailey v. Maine Commission on Governmental Ethics & Election Practices*,
900 F. Supp. 2d 75 (D. Me. 2012) .................................................................. 15

*Berkovitz v. Home Box Office, Inc.*,
89 F.3d 24 (1st Cir. 1996) ......................................................................... 15, 22

*City of Cleburne v. Cleburne Living Center Inc.*,
473 U.S. 432 (1985) .................................................................................. 27, 30

*Connecticut v. Menillo*,
423 U.S. 9 (1975) ........................................................................................... 20

*Falls Church Medical Center, LLC v. Oliver*,
No. 3:18 Civ. 428, 2018 WL 4624818, (E.D. Va. Sept. 26, 2018) .................. 18

*Fargo Women's Health Organization v. Schafer*,
507 U.S. 1013 (1993) ..................................................................................... 17

*Gonzales v. Carhart*,
550 U.S. 124 (2007) ............................................................................ 22, 23, 30

*Greenville Women's Clinic v. Bryant*,
222 F.3d 157 (4th Cir. 2000) ..................................................................... 28, 29

*Harris v. McCrae*,
448 U.S. 297 (1980) .................................................................................. 28, 29

*Hopkins v. Jegley*,
267 F. Supp. 3d 1024 (E.D. Ark. 2017) .......................................................... 21

*Karlin v. Foust*,
188 F.3d 446 (7th Cir. 1999) ..................................................................... 17, 18

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ................................................................................. passim

*McGowan v. Maryland*,
366 U.S. 420 (1961) ....................................................................................... 27

*Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*,
632 F.3d 31 (1st Cir. 2011) ............................................................................ 15

*Planned Parenthood Arizona, Inc. v. Humble*,
753 F.3d 905 (9th Cir. 2014) ..................................................................... 18, 25

*Planned Parenthood of Greater Ohio v. Hodges*,
188 F. Supp. 3d 684 (S.D. Ohio 2016) ........................................................... 29

*Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner of Indiana State Department of Health*,
888 F.3d 300 (7th Cir. 2018) .......................................................................... 22

*Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner of Indiana State Department of Health*,
896 F.3d 809 (7th Cir. 2018) ....................................................... 21, 25, 26, 27

*Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner Indiana Department of Health,*
64 F. Supp. 3d 1235 (S.D. Ind. 2014) ........................................................................... 29

*Planned Parenthood of Southeastern Pennsylvania v. Casey,*
505 U.S. 833 (1992) ............................................................................................. passim

*Planned Parenthood of Southeastern Pennsylvania v. Casey,*
510 U.S. 1309 (1994) .......................................................................................... 17, 18

*Planned Parenthood of Wisconsin, Inc. v. Schimel,*
806 F.3d 908 (7th Cir. 2015) ...................................................................................... 25

*Planned Parenthood Southeast, Inc. v. Strange,*
33 F. Supp. 3d 1330 (M.D. Ala. 2014) ........................................................................ 26

*Plyler v. Doe,*
457 U.S. 202 (1982) .............................................................................................. 27, 30

*Roe v. Wade,*
410 U.S. 113 (1973) ..................................................................................................... 20

*Shapiro v. Thompson,*
394 U.S. 618 (1969) ..................................................................................................... 28

*Stefanoff v. Hays County,*
154 F.3d 523 (5th Cir. 1998) ...................................................................................... 27

*Tapalian v. Tusino,*
377 F.3d 1 (1st Cir. 2004) ........................................................................................... 28

*Tucson Woman's Clinic v. Eden,*
379 F.3d 531 (9th Cir. 2004) ...................................................................................... 25

*West Alabama Women's Center v. Williamson,*
900 F.3d 1310 (11th Cir. 2018) .................................................................................. 25

*Whole Woman's Health v. Hellerstedt,*
136 S. Ct. 2292 (2016) ......................................................................................... passim

*Whole Woman's Health v. Hellerstedt,*
231 F. Supp. 3d 218 (W.D. Tex. 2017) ................................................................ 21, 22

**Rules**
Fed. R. Civ. P. 56(a) .................................................................................................... 15

<u>**INTRODUCTION**</u>

Plaintiffs Maine Family Planning ("MFP") and Planned Parenthood of Northern New England ("PPNNE") are two of only three publicly available abortion providers in Maine. Their 22 health centers across the state, including in Maine's poorest, most rural, and most medically underserved counties, are all staffed by advanced practice registered nurses ("APRNs")—specifically, certified nurse practitioners ("NPs") and certified nurse-midwives ("CNMs"). With their advanced education and training and broad practice authority, Plaintiffs' APRNs are able to provide primary, family planning, and gynecological care to women[1] in these underserved Maine communities throughout their patients' reproductive years. Indeed, APRNs in Maine have authority to independently perform a vast array of medical functions, from delivering babies, to prescribing controlled substances, to completing a miscarriage using vacuum aspiration, to signing death certificates. The only medical procedure they are forbidden to perform, regardless of their competence to do so, is abortion. Defendants ("the State") admit there is no safety justification for this singular restriction, codified at 22 M.R.S. § 1598 (the "Physician-Only Law" or "the Law").

In fact, all of the record evidence shows that the Physician-Only Law harms Maine women's health and well-being by severely limiting where and when abortion services are available. While there are qualified APRNs standing at the ready to provide abortion care in numerous locations across Maine, on multiple days each week and at flexible times, the handful of physicians in Maine willing and able to perform abortions are limited in both geography and time. As a result, many women must travel lengthy distances—in some cases hundreds of miles—to Augusta, Bangor, or Portland for abortion care, and they must find a way to do so on the one day per week when each city has a physician available to perform abortions. This needless travel

---

[1] Plaintiffs use "women" in this memorandum as a short-hand for patients seeking abortions and other gynecological care, but note that gender non-conforming patients and men who are transgender may also utilize such services.

imposes significant burdens on Maine women, including causing delays that increase the medical risks of abortion; forcing women to sacrifice essentials, like heating or food, in order to raise travel funds; compromising the confidentiality of women's abortion decisions; and blocking some Maine women from obtaining an abortion at all.

Despite the conceded lack of any health justification for the Law, and the extensive burdens it imposes, the State asks this Court to rubber-stamp the Law without further analysis. In so doing, the States flouts a quarter-century of Supreme Court jurisprudence establishing that the constitutional "undue burden" test, which requires balancing the state interests an abortion restriction advances against the burdens it imposes, is fact-specific. Because the record evidence shows that the Law severely burdens access to abortion and imposes an array of other harms, and the State has failed to demonstrate that the Law furthers any valid state interest, the State's motion for summary judgment must be denied. Indeed, given the State's failure even to assert that the Law *in fact* furthers any interest—instead merely speculating that the Legislature "could rationally have concluded" that it might—the Law cannot survive the undue burden test, and this Court would be fully justified in granting judgment as a matter of law to Plaintiffs instead.

## FACTUAL BACKGROUND

### I. There Is No Medical Justification For The Physician-Only Law.

#### A. APRNs Play A Critical Role In Maine's Health Care System.

APRNs[2] are a category of registered professional nurses with advanced education and training and enhanced practice authority. PSMF ¶ 43. As states have both heightened the requirements for APRN licensure and expanded practice authority for licensed APRNs, and in the face of widespread physician shortages, NPs and CNMs have taken on an increasingly prominent

---

[2] Although there are two additional categories of APRNs in Maine, in this memorandum, "APRNs" refers only to NPs and CNMs, the two classes of APRNs involved in this litigation. PSMF ¶ 44.

role in the American health care system. *Id.* ¶¶ 46-48, 51, 95-99. APRNs are significantly more likely than physicians to practice in medically underserved and rural areas, and they serve a higher proportion of uninsured patients and other vulnerable populations. *Id.* ¶ 99. A large body of literature confirms the safety of, and patient satisfaction with, APRNs' services. *Id.* ¶¶ 67-68.

Maine exemplifies these national trends, both in its heightened standards for APRN licensure, *see id.* ¶¶ 46-47, and its concomitant expansion of APRN practice authority, under which APRNs in Maine may independently evaluate, diagnose, treat, and prescribe within their scope of practice (i.e., within their education, training, and competence), *id.* ¶¶ 49, 52. This broad and independent practice authority enables APRNs to meet an important need for health services in Maine, the most rural state in the country. *Id.* ¶¶ 99, 101, 103-06. Nearly one-third of the more than 1,500 currently licensed APRNs with a Maine address live in counties containing areas and populations federally designated as "medically underserved"—i.e., lacking sufficient access to primary care services—such as Aroostook, Washington, and Penobscot counties. *Id.* ¶¶ 98, 102, 104-105. At MFP and PPNNE health centers in medically underserved areas of the state, APRNs provide critical access to primary, family planning, and gynecological services. *Id.* ¶¶ 102, 106.

### B. The Physician-Only Law Carves Abortion Out Of APRNs' Broad Scope Of Practice.

The Physician-Only Law prohibits APRNs from providing abortion care under threat of criminal prosecution, regardless of their competence to do so. 22 M.R.S. § 1598. It is the only Maine law prohibiting APRNs from providing a health care service within their scope of practice. PSMF ¶ 53. For every service other than abortion, the Legislature sets APRNs' broad authority, the Maine State Board of Nursing issues regulations and guidance expanding upon the skills and functions within APRNs' competencies, and then individual APRNs are responsible for evaluating whether a particular act is within their scope of practice. *Id.* ¶¶ 49, 54-55.

The State admits there is no medical justification for singling out abortion, *id.* ¶ 42, and that "properly trained APRNs likely can perform abortions as capably as physicians," Defs' Mem. 27; *accord* PSMF ¶¶ 45, 79. Indeed, APRNs already safely provide medication and aspiration abortion in other states, including at PPNNE's New Hampshire and Vermont clinics. *Id.* ¶¶ 75-76.

A first-trimester abortion is performed using one of two methods: (1) medication, or (2) vacuum aspiration. PSMF ¶¶ 63-66. In a medication abortion, which is available up to 10 weeks of pregnancy, the patient swallows the first of two FDA-approved medications (mifepristone), which blocks a hormone necessary to maintain pregnancy, and then takes the second medication (misoprostol) approximately 6 to 48 hours later at home. *Id.* ¶ 64. The misoprostol causes the uterus to contract, initiating a process similar to a miscarriage. *Id.* In a first-trimester vacuum aspiration abortion ("aspiration abortion"), the clinician inserts a small tube through the patient's cervix into the uterus, and a manual or electric pump attached to the tube creates a gentle vacuum that evacuates the uterine contents. *Id.* ¶ 63. It takes approximately five minutes to complete. *Id.*

APRNs in Maine regularly perform other procedures that are comparable to, or exceed, first-trimester abortion care in complexity and risk. *Id.* ¶¶ 62, 77-78. Significantly, Maine law allows APRNs to use medications and/or vacuum aspiration to evacuate the contents of a patient's uterus in the context of a first-trimester miscarriage (also known as a "spontaneous abortion")— which involves identical skills and techniques as a first-trimester abortion. *Id.* ¶¶ 62, 66. APRNs in Maine also regularly perform other procedures that involve inserting instruments into a patient's cervix and/or uterus, such as endometrial biopsies or colposcopies, or inserting intrauterine contraceptive devices ("IUDs"). *Id.* ¶¶ 61, 77. Like all other states, Maine permits CNMs to deliver babies, notwithstanding that the risk of death associated with childbirth is 14 times greater than that of first-trimester abortion. *Id.* ¶¶ 77-78. And APRNs in Maine may also

independently prescribe and dispense drugs, including Schedule II and III controlled substances such as oxycodone, methadone, and fentanyl, and prescribe medical marijuana. *Id.* ¶¶ 56-57.

### C. Evidence Confirms The Safety Of APRN Provision Of First-Trimester Abortions.

A robust body of high-quality medical evidence unanimously supports the safety and efficacy of APRN provision of abortion care. *Id.* ¶¶ 71-74. Numerous studies confirm that APRNs provide first-trimester aspiration and medication abortion as safely and effectively as, or even *more* effectively than, physicians. *Id.* ¶¶ 71-72. Consistent with these findings, leading health authorities, including the American Congress of Obstetricians and Gynecologists, the American Public Health Association, and the World Health Organization, have endorsed the provision of first-trimester abortion care by APRNs. *Id.* ¶ 73. The U.S. Food and Drug Administration has confirmed that it is safe for APRNs to prescribe and dispense medication abortion. *Id.* ¶ 74. And in the Institute of Medicine's 2010 *Future of Nursing* report, the top recommendation was: "Remove scope-of-practice barriers" that "could greatly limit the ability of APRNs to fully utilize their education and training," such as laws prohibiting an APRN from performing first-trimester aspiration abortions. *Id.* ¶ 70.

### D. Multiple Plaintiffs Are Already Qualified To Provide First-Trimester Abortion Care And Others Could Expand Their Practices To Do So.

In addition to the extensive evidence confirming that APRNs can be trained to safely and effectively provide first-trimester abortion care, three of the individual plaintiffs and numerous other APRNs employed by the Plaintiff clinics already have the necessary training and could promptly begin independently performing abortions if not for the Law. For instance, Plaintiff Alison Bates is one of two PPNNE APRNs who currently performs aspiration for miscarriages, using identical skills and techniques as those involved in a first-trimester abortion. *Id.* ¶¶ 66, 92, 127. And Plaintiffs Katie Riley, who currently provides medication abortions at a PPNNE clinic in

New Hampshire, *id.* ¶ 92, and Julie Jenkins, who previously provided medication abortions in California, *id.*, are two of ten APRNs employed by the Plaintiff clinics who are fully trained in medication abortion, *id.* ¶ 127. MFP and PPNNE employ additional APRNs who wish to become trained in first-trimester abortion care, *id.* ¶¶ 125-126, and the Plaintiff clinics are equipped—and intend—to provide their staff with such training if the Law is struck down, *id.* ¶¶ 16, 93, 129.

### E. *Maine Patients And Maine Law Trust APRNs To Provide Serious, Dignified Care, No Less So Than Physicians.*

The core competencies and ethical obligations that are prerequisites to licensure as an APRN in Maine require a commitment to the dignity, worth, and individuality of every patient. *Id.* ¶ 81. Establishing a relationship "characterized by mutual respect, empathy, and collaboration" and creating a "climate of patient-centered care to include confidentiality, privacy, comfort, emotional support, mutual trust, and respect" are central principles embedded in nursing curricula and valued in the nursing profession. *Id.* ¶ 82; *see also id.* ¶ 83. Mainers respond well to this holistic, patient-centered care, *id.* ¶¶ 84, 90; for instance, Plaintiffs Alison Bates and Katie Riley recently received scores in the 99th percentile on a nationally-recognized measure of patient satisfaction, as compared with all other Planned Parenthood clinicians including physicians. *Id.* ¶ 91. And many of Plaintiffs' patients return to the same APRN time and again for family planning and gynecological services during their reproductive years. *Id.* ¶ 87; *see also id.* ¶ 89.

Maine patients trust APRNs to provide serious and deeply personal health services, including delivering their babies, completing their miscarriages, and providing end-of-life care. *Id.* ¶ 84. And Maine law reflects and validates APRNs' ability to provide solemn, dignified care by authorizing APRNs to perform a vast array of weighty medical functions, including issuing death certificates. *Id.* ¶ 86. APRNs are no less qualified than physicians to provide such sensitive services. *Id.* ¶ 80. Indeed, for the past 16 consecutive years, Americans have rated nurses as the

single most ethical and honest profession—above not only physicians, but also all other professions, including military officers, grade school teachers, police officers, and clergy. *Id.* ¶ 85.

## II.     The Physician-Only Law Burdens And Harms Patients.

### A.   *The Law Limits Where And When Abortion Care Is Available In Maine.*

#### 1.   The Physician-Only Law Severely Restricts The Locations, Days, And Times When Abortion Care Is Offered In Maine.

*First*, the Physician-Only Law dramatically reduces the locations where abortion care is available in Maine. Because of the Law, aspiration abortion is publicly available in only three cities: Augusta (at MFP), Portland (at PPNNE), and Bangor (at the Mabel Wadsworth Center).[3] *Id.* ¶¶ 108, 114, 116-118. While MFP employs APRNs across the state who are either already trained in abortion care or eager to become trained, *id.* ¶¶ 125-126, none of the physicians with whom MFP contracts for abortion services live north of Augusta; all have other full-time jobs; and all have confirmed that it is neither logistically nor financially feasible for them to regularly travel to MFP's remote clinics to provide abortion services, *id.* ¶¶ 143-151, 154-155. The one physician who indicated that they might be willing to consider traveling to one of MFP's less remote health centers outside of Augusta could only consider doing so for adequate compensation—which likely is not financially feasible for MFP—and, at best, only one day per month. *Id.* ¶¶ 148, 151.

Similarly, while PPNNE has multiple clinics in Maine staffed by APRNs who want to provide abortion care, because of the Law, PPNNE is able to provide abortion services (whether aspiration or medication) only in Portland. *Id.* ¶ 114. Even if PPNNE's physician contractors could travel to a different clinic to perform abortions, because none are able to add any additional days of abortion services in Maine, any care they would provide at another PPNNE clinic would

---

[3] The remaining providers of abortion care in Maine—Central Maine Medical Center in Lewiston and Maine Medical Center in Portland—do not advertise abortion services on their websites and generally treat only pre-existing patients, among other limitations. PSMF ¶¶ 34, 117.

have to be *in place* of services at the Portland clinic (where demand is higher). *Id.* ¶¶ 156-59.

As a result of the Physician-Only Law, nearly 60% of women in Maine live in a county without an aspiration abortion provider, *id.* ¶ 120, including Maine's poorest counties like Aroostook, Franklin, Somerset, and Washington, *see id.* ¶ 34, 119, 166. A woman in Maine who wants or needs an aspiration abortion, *see id.* ¶ 222, will generally need to travel to Augusta, Bangor, or Portland, *id.* ¶ 118. And while a patient in central or northern Maine can potentially obtain a medication abortion at one of MFP's other clinics via telehealth, *see infra*, women in southern Maine will generally have no choice but to travel to Portland, *see* PSMF ¶¶ 108, 114.

*Second*, the Law severely limits the days and times when abortion care is available in Maine, because appointments can be offered only around the physicians' limited schedules. *Id.* ¶¶ 26, 88. This holds true for MFP's telehealth abortion program, in which an APRN at one of MFP's clinics outside of Augusta performs all pre- and post-abortion services, but—because of the Law—still must find a physician to videoconference with the patient while she swallows the first abortion pill. *Id.* ¶¶ 88, 138-39. As a result, all of MFP's abortion services—whether in Augusta or via telehealth—are generally available only on Thursdays. *Id.* ¶¶ 109-110.[4] And, with exceedingly few exceptions, all of PPNNE's abortion services are available only on Fridays. *Id.* ¶¶ 29-30, 114.[5] Because of limited physician availability, some patients have to wait up to two to three weeks to schedule an abortion visit at PPNNE; same-week availability is rare. *Id.* ¶ 115.

2.  Allowing APRNs To Perform First-Trimester Abortions Would Vastly Expand The Availability Of Abortion Care In Maine.

Eliminating the Law would quickly and dramatically expand abortion services in Maine.

---

[4] MFP also offers medication abortion through its "meds-by-mail study," in which a physician videoconferences with the patient and then mails the medications to her at home. But the study requires the patient to have multiple interactions by telephone and videoconference, *and* to travel in-person to obtain an ultrasound and lab work at a health care center, and only a small number of patients have agreed to participate. PSMF ¶¶ 111-12.

[5] At the Mabel Wadsworth Center, abortion services are generally available only on Wednesdays. PSMF ¶ 116.

MFP has six APRNs already trained in medication abortion, who currently provide the bulk of services in a telehealth abortion. *See supra* at 8; *id.* ¶¶ 88, 127, 221. Allowing these APRNs to independently perform medication abortions would immediately make this service available multiple days per week at more than six clinics across Maine (since several APRNs "float" to different MFP clinics depending on patient need). *Id.* ¶ 128. Abortion would also be available on an increasingly "walk-in" basis. *Id.* Eventually, APRNs would be able to independently provide medication abortion at all MFP sites. *Id.* In addition, MFP would immediately begin investing in training and equipment to expand aspiration services across the state. *Id.* ¶ 129.

PPNNE has four APRNs already trained in medication abortion, and two APRNs already trained in aspiration, all of whom could promptly begin providing care. *Id.* ¶ 1127. PPNNE has additional APRNs on staff who wish to become trained in both medication and aspiration abortion. *Id.* ¶ 126. But for the Law, PPNNE could both expand abortion services beyond Portland, and quickly and substantially increase the availability of abortion services in Portland. *Id.* ¶¶ 130-131. Instead of offering services only on Fridays until 1:40 pm, PPNNE could offer abortion services in Portland six days each week, and add evening hours. *Id.* ¶¶ 131-132.[6]

In short, both MFP and PPNNE would be able to dramatically increase the days and locations for abortion services, and schedule appointments with less advanced notice. This flexibility is critical, given both the time-sensitive nature of abortion, *id.* ¶ 219, and the challenges patients face in arranging transportation, childcare, and time off work, *see infra*.

Even if Plaintiffs' physicians could, hypothetically, travel to locations outside of Portland and Augusta to perform abortions, this would have an exponentially smaller impact on access.

---

[6] The State's unsubstantiated assumption that PPNNE's decision to offer aspiration abortion in New Hampshire only one day per week means that PPNNE would only provide aspiration abortion one day per week in *Maine*, Defs.' Mem. 7 n.7, is simply wrong. PPNNE definitively intends to offer aspiration abortion services more than one day per week in Maine if the Law is struck down. PSMF ¶¶ 130-131. For instance, Plaintiff Bates could and would promptly begin offering aspiration abortion services on all three days when she is in PPNNE's Portland clinic. *Id.* ¶ 132.

First, having one or two physicians travel periodically would, at best, increase access to abortion care at one or two additional health centers, on one or two days each month. *Id.* ¶¶ 152-153; *see also id.* ¶ 156-157. It would do nothing to assist Plaintiffs' patients at other health centers, nor patients who come on a day other than the one when the physician happens to be there. *Id.* ¶¶ 152-153. Second, because the physicians' travel dates would have to be set long in advance, this would not allow for the flexible scheduling that patients seeking abortions need, and that authorizing Plaintiffs' APRNs to perform abortions would allow. *Id.* ¶¶ 21, 152-53, 155. Simply put, the only way to eliminate the burdens of the Physician-Only Law is to eliminate the Physician-Only Law.

### B. The Law Imposes Substantial Burdens On Maine Women Seeking Abortion Care.

The Law makes it difficult or impossible for many Maine women to access abortions, and to access this care without suffering needless, risky delay and other harms. This is especially true for women who are poor or low-income, have children, work low-wage jobs, lack reliable transportation, and/or live in rural areas—in short, for most women seeking abortions in Maine.

1. For Poor And Low-Income Women, Who Comprise The Majority Of Abortion Patients, Raising Money And Making Arrangements For Unexpected, Costly Travel On A Limited, Inflexible Appointment Schedule, Is Difficult Or Impossible.

A substantial proportion of women in Maine are poor or low-income, with particularly high rates of poverty among Maine women of color (for instance, 51.3% of African-American women and 27.8% of Latinas), and among people living in Maine's rural "Rim Counties" of Aroostook, Franklin, Oxford, Piscataquis, Somerset, and Washington Counties (17.8% overall poverty rate). *Id.* ¶¶ 162, 164-166. In Maine, as elsewhere in the nation, a majority of Plaintiffs' abortion patients are poor or low-income. *Id.* ¶¶ 160-161.

Most women seeking abortions have at least one child and are unmarried. *Id.* ¶ 172. Poor and low-income women, and particularly single mothers, are frequently unable to cover basic necessities like food, utilities, or housing. *Id.* ¶ 169. Leading economic authorities estimate that a

single mother with one child in Maine faces annual basic expenses of approximately $50,000 to $61,000 per year, whereas the median annual earnings for a woman in Maine was only $36,000 in 2015. *Id.* ¶¶ 170-171. Arranging and paying for unexpected travel to obtain an abortion, particularly where those services are available only on very limited days at very limited times, is difficult or impossible for many poor and low-income women, for multiple reasons:

*First*, many abortion patients work in low-wage jobs with no paid time off and inflexible, unpredictable working hours. *Id.* ¶¶174-176, 231. Even if a low-income woman is able to get time off on the day or days needed, she is likely to forgo much-needed wages. *Id.* ¶ 177. Taking time off may jeopardize her job, and may necessitate telling her employer about her abortion, thus compromising her confidentiality and risking retaliation. *Id.* ¶¶ 230-31.

*Second*, many abortion patients do not have access to a reliable car. *Id.* ¶ 180. One study found that nearly half of all respondents (comprised of Maine recipients of Temporary Assistance for Needy Families) did not own a vehicle, and 80% of those respondents said that it was hard to get a ride or find transportation when they needed it. *Id.* Even for a low-income woman who does own a car, that car may not be sufficiently safe and reliable for a long trip. *Id.* ¶ 181. And even for a low-income woman with a reliable car, the cost of gasoline may exceed her means. *Id.* ¶ 183.

These transportation challenges are particularly severe in Maine, where more than 60% of the population lives outside of urban areas. *Id.* ¶ 101. Because of the Law, some Maine residents have to travel more than 100 miles to obtain an abortion. *Id.* ¶ 121. Trips to abortion clinics from remote rural areas like Presque Isle or Machias, or island communities like Vinalhaven or Matinicus, are extremely long and costly—and sometimes simply impossible. *Id.* ¶¶ 121-123, 184-186. Maine's harsh winters makes such long-distance travel even more difficult. *Id.* ¶ 186. Finally, public transport is rarely an option; Maine does not have an interconnected transportation

system, and, outside the major cities, public transportation does not exist. *Id.* ¶ 182.

*Third*, forcing women to travel long distances to access abortion services presents childcare challenges for many women. *Id.* ¶ 187. Drop-in childcare is entirely unavailable in some cases, *id.* ¶¶ 189-190, and prohibitively expensive in others, *id.* ¶ 188.

*Fourth*, by increasing the expense, time, and logistics necessary to obtain an abortion, the Physician-Only Law makes it more difficult for a woman to keep her pregnancy and/or abortion decision secret from an abusive partner or parent, thus jeopardizing her safety. *Id.* ¶¶ 226-227.

*Finally*, even if a woman can scrape together the money and resources needed to cover all of the direct and indirect costs of travel, childcare, missed work, and the procedure itself, she may have to make devastating sacrifices to do so. For example, she may be forced to skip rent or utility payments; reduce food budgets; forego essentials, like shoes for her child; or borrow money using costly "payday" loans at high interest. *Id.* ¶ 179. Alternatively, she may be required to seek the help of friends, family, or others, which can jeopardize the confidentiality of her pregnancy or her abortion decision. *Id.* ¶ 227. Finally, some women will be forced to borrow money from an abusive partner or former partner, thus further tying them to their abuser, *id.* ¶ 229.

> 2.  <u>The Physician-Only Law Delays Or Altogether Blocks Some Maine Women's Ability To Obtain Abortion Care.</u>

A significant body of research shows that, when forced to travel longer distances to access abortion services, fewer women are able to do so. *Id.* ¶ 192. For example, a study published last year in the Journal of the American Medical Association on the impact of abortion facility closures in Texas concluded that, while counties experiencing no change in distance to an abortion facility between 2012 and 2014 saw only a 1.3% decline in abortions, the number of abortions decreased by 35.7% in counties where the change in travel distance was 50 to 99 miles, and by more than 50% when the change was 100 miles or more. *Id.* ¶ 193. Another study that examined abortion

rates in Georgia counties at various distances from Atlanta (where all of Georgia's major abortion providers were located at that time) found that for every 10 miles of distance from Atlanta, there was a decline of 6.7 abortions per 1,000 live births. *Id.* ¶ 195. A third study found that doubling the travel distance to a county with an abortion provider was associated with a 23% decline in the abortion rate for white women, a 27% decline for African American women, and a 50% decline for Hispanic women. *Id.* ¶ 197. And in Maine, too, the longer travel distances resulting from the Law prevent some women from obtaining a desired abortion. Indeed, approximately one in five MFP patients, and a similar proportion of PPNNE patients, cancel or do not show up for their scheduled abortion appointments—often after having previously communicated to staff that they were uncertain of their ability to raise funds and overcome the travel burdens. *Id.* ¶¶ 201-202.

In some cases, increased travel distances block patients from obtaining abortion care by delaying patients to the point that they exceed a clinic's gestational age limit. *Id.* ¶¶ 213, 221; *see also id.* ¶¶ 203-06. For instance, the landmark "Turnaway Study," which studied women who were turned away from abortion clinics for being beyond the clinic's gestational age limit, found that the most common reason for delay was travel and procedure costs. *Id.* ¶ 214. Multiple other studies have found that women who experience delays in obtaining abortions frequently cite "overcoming transportation-related hurdles" as among the factors that caused the delay. *Id.* ¶ 215. MFP has to refer patients elsewhere for abortion care on a monthly basis because the patient was delayed past MFP's gestational age limit. *Id.* ¶ 203. And PPNNE—the only publicly available provider in Maine that performs abortions past the first trimester—regularly sees patients who discover at their appointment that their abortion has been delayed past the clinic's limit. *Id.* ¶¶ 204-206. At a minimum, such referrals double the time and expense of obtaining an abortion, by necessitating an additional appointment. In most cases, they require far greater travel (including,

potentially, out of state) and thus exacerbate the challenges of accessing care. *See, e.g.*, *id.* ¶ 206.

Even a woman who is ultimately able to obtain her abortion is exposed to unnecessary medical risks if she is delayed. Although abortion is an extremely safe procedure, the risks increase as pregnancy advances. *Id.* ¶ 219. Both MFP and PPNNE patients report being delayed in obtaining an abortion because of the need to make arrangements and raise funds for transportation, childcare, and time off work to allow them to travel to Augusta or Portland. *Id.* ¶ 217. In one specific example, an MFP patient in Presque Isle was unable to obtain a medication abortion, even though Plaintiff Julie Jenkins was in Presque Isle with the medication in hand, because no physician was available by videoconference to watch the patient swallow the pill. *Id.* ¶ 221. As a result, the patient's abortion was delayed by two weeks—past the point at which she could obtain a medication abortion, her preferred method—and she was forced to travel hundreds of miles round-trip to Bangor to obtain an aspiration abortion instead. *Id.*

> 3. The Physician-Only Law Prevents Women In Maine From Accessing The Abortion Method Appropriate For Them.

There are some circumstances in which either a medication or an aspiration abortion is more appropriate or medically indicated for a particular patient. *Id.* ¶¶ 222-23. Yet, because of the Physician-Only Law, a woman who prefers an aspiration abortion but who is unable to travel to Portland, Augusta, or Bangor, may need to accept a medication abortion via telehealth instead. *Id.* ¶¶ 225. Likewise, because of the Law, some women who have a clinical need or strong preference for medication abortion are delayed past the point when that method is available. *Id.* ¶¶ 222, 224. The Law thus intrudes upon and compromises this significant medical decision.

In sum, if APRNs were permitted to perform abortions, as the State concedes they are qualified to do, women in Maine could access abortion closer to home and on additional days and

times, thus significantly reducing the burdens, and resulting lack of access, caused by the Physician-Only Law. *See, e.g.*, *id.* ¶¶ 210-12, 220, 232-33.

<h3 style="text-align:center"><u>STANDARD OF REVIEW</u></h3>

To prevail on summary judgment, the moving party must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Plaintiffs may successfully oppose summary judgment "by demonstrating to the Court specific facts in the record overlooked or ignored by the moving party that support the essential elements of the party's claim." *Bailey v. Me. Comm'n on Governmental Ethics & Election Practices*, 900 F. Supp. 2d 75, 81 (D. Me. 2012). "The court views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011).

Finally, if the Court finds that there are no material disputes and it is the *non*-moving party that is entitled to judgment, "[i]t is apodictic that district courts have the power to grant summary judgment sua sponte." *Berkovitz v. Home Box Office, Inc.,* 89 F.3d 24, 29 (1st Cir. 1996).

<h3 style="text-align:center"><u>ARGUMENT</u></h3>

The State asks this Court to ignore the extensive evidence that the Law harms Maine women and grant summary judgment on Plaintiffs' due process claim based on decades-old cases upholding similar restrictions over different legal claims, where it was "uncontested" that those laws did *not* burden patients. *See, e.g.*, *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). But the undue burden test is record-specific, as the State's own citations confirm, Defs.'

Mem. 14-15, and the "applicable legal standard" is *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), as the State elsewhere concedes, Defs.' Mem. 13. The State's failure to present either evidence or argument that the Physician-Only Law *in fact* furthers a legitimate state interest is dispositive, and would fully justify a determination by this Court to grant judgment *sua sponte* to Plaintiffs. At a minimum, there is a material dispute as to whether the Law's burdens outweigh its benefits, and thus the State is not entitled to summary judgment on this claim.

The State fares no better on equal protection. The State's theory that the Physician-Only Law does not even implicate equal protection is contradicted by decades of case law. And the State's argument that heightened scrutiny applies under equal protection only once a court has already found a due process violation defies both law and logic. Even under rational basis scrutiny, there is, at best, a material dispute as to whether the Law can survive; the State has failed to explain how the Law bears a reasonable connection to any valid state interest. Accordingly, the State's summary judgment motion must be denied.

## I. The State Is Not Entitled To Judgment On Plaintiffs' Due Process Claim.

### A. *The Physician-Only Law Cannot Be Upheld As A Matter of Law Because The Undue Burden Test Is Record-Specific, As The State's Own Citations Make Clear.*

The State concedes that the central legal question in this case is whether the Physician-Only Law imposes an undue burden on the right to abortion. Defs.' Mem. 11-13. It acknowledges that *Whole Woman's Health* is the "[a]pplicable [l]egal [s]tandard," and that *Whole Woman's Health* requires courts applying the undue burden test to weigh the burdens a law imposes against any benefits the law confers. *Id.* at 11, 13. The State also admits that the older cases upholding similar laws did so only after finding "no evidence" or "'insufficient evidence' in the record" that the restrictions imposed a substantial obstacle to abortion access. *Id.* at 14 (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884-85 (1992)); *id.* at 15 (quoting *Mazurek*, 520

U.S. 968, 972 (1997) (per curiam)). Nevertheless, the State now asks this Court to ignore the significant record evidence that the Law imposes substantial burdens on patient access and hold that a physician-only law, unlike any other type of abortion restriction, is always and automatically valid—no matter how much it burdens patients, and no matter how meager the state's justifications. *Id.* at 16 ("[T]here is no need for the Court to assess the extent to which the Physician-Only Law imposes obstacles on access to abortion.")

The State's theory that physician-only laws should be rubber-stamped without any evidentiary analysis would turn three decades of abortion jurisprudence on its head. As *Casey*'s joint authors explained, under the undue burden test, "litigants are free to challenge similar restrictions in other jurisdictions." *Planned Parenthood of Se. Pa. v. Casey*, 510 U.S. 1309, 1313 (1994) (Souter, J., Circuit J.); *see also Fargo Women's Health Org. v. Schafer*, 507 U.S. 1013 (1993) (O'Connor, J., concurring in denial of stay and injunction pending appeal) ("[T]he joint opinion [in *Casey*] specifically examined the record developed in the district court in determining that Pennsylvania's informed-consent provision did not create an undue burden . . . . I believe the lower courts should have undertaken the same analysis."). The Seventh Circuit has similarly observed that "*Casey* does not foreclose plaintiffs from bringing facial challenges to abortion regulations in other states that are similar to those found constitutional in *Casey*." *Karlin v. Foust*, 188 F.3d 446, 485 (7th Cir. 1999). It explained:

> [This] conclusion . . . is the only one which affords Wisconsin women a fair shake because, as the district court aptly recognized, not all states are like Pennsylvania. States differ in the number of physicians who perform abortions, the number of abortion facilities, the distances women must travel in order to reach an abortion facility, and the average income of women seeking abortions. While a twenty-four hour waiting period that requires two trips to an abortion provider has been found not to impose an undue burden on Pennsylvania women based on the circumstances of that state at the time the Court decided *Casey*, a similar provision in another state's

> abortion statute could well be found to impose an undue burden on women in that state depending on the interplay of factors such as those identified above.

*Id.* (internal citations omitted); *accord Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 916 (9th Cir. 2014) ("[T]he undue burden test is context-specific . . . both the severity of a burden and the strength of the state's justification can vary depending on the circumstances."). There is no reason why physician-only laws, unlike any other abortion restriction, should be subject to a one-size-fits-all undue burden analysis. To the contrary, the U.S. District Court for the Eastern District of Virginia recently denied a motion to dismiss a challenge to Virginia's physician-only law based on precisely this argument. *Falls Church Med. Ctr., LLC v. Oliver*, No. 3:18 Civ. 428, 2018 WL 4624818, at *9-10 (E.D. Va. Sept. 26, 2018).

If the State's *novel* theory were true, *every* challenge to an abortion restriction similar to those upheld in *Casey* would automatically be upheld.[7] That is not how the undue burden standard operates. *See, e.g.*, *Casey*, 510 U.S. at 1313 (Souter, J., Circuit J.); *Karlin*, 188 F.3d at 485.

### B. Mazurek *And Its Predecessors Are Both Legally and Factually Distinguishable.*

The State's "Cases Upholding Physician-Only Laws," Defs. Mem. 13-14, are distinguishable as a matter of both law and fact. Each differs from the instant case in at least one critical respect—(1) the legal question presented, (2) the law's effect (or lack thereof) on patient access, and/or (3) the existence of any safety benefit—and thus is immaterial to this challenge.

*First*, an undue burden exists if a law "has the *purpose or effect* of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877

---

[7] Moreover, if the State were correct that there is a *per se* constitutional rule that physician-only laws are always valid regardless of the burden they impose, then there would have been no reason for the Supreme Court in *Mazurek v. Armstrong* to discuss the lower court's determination that Montana's physician-only law did not amount "in practical terms" to a substantial obstacle on access; to note that this finding was "uncontested" in the Ninth Circuit; or to quote *Casey*'s language upholding a physician-only counseling requirement based "on the evidence in this record." 520 U.S. at 971-72 (quoting *Casey*, 505 U.S. at 884-85).

(emphasis added). While Plaintiffs argue that Maine's Physician-Only Law has an unconstitutional *effect* on women's access to abortion, Compl. ¶ 152, *Mazurek* considered only whether the "purpose" of Montana's law "may have been to create a substantial obstacle to women seeking abortions," 520 U.S. at 972. The plaintiffs in *Mazurek* asserted that, because the evidence did not show that prohibiting physician assistants ("PAs") from performing abortions provided any safety benefit, the Legislature must have instead passed the law to block patients from accessing abortion—even though it was "uncontested" that Montana's law did not *in fact* burden patients. *Id.* at 972-73. But the Court declined to "assume" such an improper purpose, explaining that there was "no evidence that the legislature intended the law to do what it plainly did not do." *Id.* at 974. Plaintiffs do not raise a purpose claim here, so *Mazurek* is inapposite.

*Second*, unlike *Mazurek*, where it was "uncontested" that the law was "harmless" and did not pose a substantial obstacle for women seeking abortions, *id.* at 972, or *Casey*, where there was "no evidence on this record that requiring a doctor to give the [counseling] information . . . would amount in practical terms to a substantial obstacle," 505 U.S. at 884, it cannot be genuinely disputed that the Law burdens Maine women—the dispute is only to what extent. While in *Mazurek*, "no woman seeking an abortion would be required by the [physician-only] law to travel to a different facility than was previously available," 520 U.S. at 974, because of the Physician-Only Law, there are only three cities in Maine where an aspiration abortion—or any abortion care after 10 weeks—is publicly available, PSMF ¶ 118. If the Law were eliminated, aspiration abortion services would expand to numerous additional locations, including in the state's poorest and most rural counties. *Id.* ¶¶ 119, 129-130, 166. Even if this were the sole burden evidence Plaintiffs had proffered (which it is not), *Mazurek* and *Casey* are distinguishable.

*Third*, the State has disclaimed any safety interest here, acknowledging that "properly

trained APRNs likely can perform abortions as capably as physicians." Defs.' Mem. 27; *accord* PSMF ¶ 42. By contrast, the plaintiff in *Connecticut v. Menillo* had "never had any medical training." 423 U.S. 9, 9 (1975) (per curiam). And *Roe v. Wade*, 410 U.S. 113 (1973)—in which the Court's brief language regarding the State's authority to limit the provision of abortion to physicians "was not necessary to [its] holding," *Mazurek*, 520 U.S. at 974—was decided long before APRNs held the broad practice authority they do now or a global body of evidence uniformly confirmed the safety of APRN provision of abortion care, PSMF ¶¶ 48, 52, 58, 67, 71-72, 95. Even in *Mazurek*, the last of this line of cases, the plaintiffs' argument that the Court should assume an unlawful purpose was based on "the only extant study" at that time on the safety of PA provision of abortions. 520 U.S. at 973. Moreover, *Mazurek* was decided three years *before* medication abortion was approved for use in the United States in 2000. *See* PSMF ¶ 65. Finally, in stark contrast to these earlier decisions, the unrebutted evidence shows that the Physician-Only Law actually harms Maine women's health and well-being. *See supra* 10-15. For this reason, too, the older case law is irrelevant.

### C. **Whole Woman's Health** *Is The "Applicable Legal Standard."*

*Whole Woman's Health*, which the State correctly labels as the "[a]pplicable [l]egal [s]tandard[]," Defs.' Mem. 11, 13, requires that a court balance "the burdens a law imposes on abortion access together with the benefits those laws confer," 136 S. Ct. at 2309. To the extent the State suggests that this balancing test applies only to "regulations intended to provide a medical benefit," Def. Mem. 13, the State is mistaken. In *Casey*, the Court described a unitary "undue burden" standard that applies regardless of the state's asserted interest. *See* 505 U.S. at 877 ("[A] statute which, while furthering *the interest in potential life or some other valid state interest*, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a

permissible means of serving its legitimate ends." (emphasis added)). And although *Whole Woman's Health* concerned a purported interest in patient health, the Court in no way limited its recitation of the undue burden standard to that interest. *See* 136 S. Ct. at 2309 (noting *Casey* "perform[ed] this balancing with respect to a spousal notification provision," which the State had defended as furthering its interest in life). Indeed, no court has accepted the invitation to ignore what Supreme Court precedent makes clear: The undue burden test applies regardless of a state's asserted interests. *See, e.g.*, *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health (PPINK)*, 896 F.3d 809, 817 (7th Cir. 2018) ("The State is incorrect that the standard for evaluating abortion regulations differs depending on the State's asserted interest . . . ."); *Hopkins v. Jegley*, 267 F. Supp. 3d 1024, 1055 (E.D. Ark. 2017) (same), *appeal docketed*, No. 17-2879 (8th Cir. Aug. 28, 2017); *Whole Woman's Health v. Hellerstedt*, 231 F. Supp. 3d 218, 228 (W.D. Tex. 2017) (same), *appeal dismissed*, No. 17-50154 (5th Cir. Dec. 6, 2017).

### D. *The Law Cannot Survive* Whole Woman's Health's *Balancing Test Because There Is No Evidence It Provides Any Benefits And Extensive Evidence It Harms Patients.*

1. *Whole Woman's Health* Demands More Than A State's *Ipse Dixit* That An Abortion Law Furthers Its Interests, But The State Has Presented No Evidence.

The State admits that the Law does not in any way protect women's health. PSMF ¶ 42 (Defendants "are not presently aware of any medical justification" the Law); *accord* Defs.' Mem. 27. To the contrary, there is unrebutted record evidence that the Law endangers women's health and well-being—for instance, by delaying women's access to time-sensitive health care; preventing women from obtaining the abortion method that is clinically indicated; forcing some women to sacrifice essentials like food and heating in order to raise funds; and exposing some women seeking abortions to the far greater risks of childbirth instead. *See supra* 10-15.

Indeed, the State nowhere asserts that the Law *in fact* furthers any state interest. Only in

the rational basis section of its brief does the State speculate that "the Legislature *could rationally have concluded* that allowing only physicians to perform abortions provides a 'structural mechanism' to 'express profound respect for the life of the unborn' and the 'dignity of human life,' and to signal the 'unique' nature of the abortion procedure." Defs.' Mem. 27 (emphasis added) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 146, 157 (2007)).

As a matter of law, this speculation fails *Whole Woman's Health*'s test. There, the Supreme Court expressly held that the "benefits" side of the balancing test requires more than some conceivable rationale: the undue burden analysis cannot be "equate[d] . . . with the less strict review applicable where, for example, economic legislation is at issue." 136 S. Ct. at 2309. The Court emphasized that "when determining the constitutionality of laws regulating abortion procedures," courts must "place considerable weight upon evidence and arguments presented in judicial proceedings" rather than deferring to the State's *ipse dixit. Id.* at 2310. In short, the undue burden test is not rational basis, so what the Legislature "could rationally have" intended is irrelevant. Having failed to "present[]" *either* "evidence [or] arguments" in support of any interest, *id.* at 2309-10, the Law necessarily fails the undue burden test, and the State cannot prevail on its motion. If anything, it is Plaintiffs who are entitled to judgment as a matter of law—and "district courts have the power to grant summary judgment sua sponte." *Berkovitz,* 89 F.3d at 29.

Even assuming *arguendo* that the State is asserting that the Act in fact advances any of the hypothetical state interests above, and even assuming *arguendo* that such interests are constitutionally legitimate,[8] the State has introduced zero evidence in support of this assertion—

---

[8] The Supreme Court has never held that a state interest in "express[ing] . . . respect" for the "dignity of human life," Defs.' Mem. 27, standing alone, is sufficient to justify an abortion restriction. The State relies on *Gonzales v. Carhart*, *see* Defs.' Mem. 12, 27, but "*Gonzales* involved a 'ban on abortions that involved partial delivery of a *living* fetus,'" and thus "did not extend the State's interest beyond protecting potential fetal life." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 888 F.3d 300, 308 (7th Cir. 2018) (emphasis in original) (quoting *Gonzales*, 550 U.S. at 158, 163) (subsequent history granting and then vacating grant of rehearing *en banc* omitted); *see also Whole Woman's Health v. Hellerstedt*, 231 F. Supp. 3d 218, 229-30 (W.D. Tex. 2017) ("[T]he Court is not

22

and there is substantial record evidence contradicting it.[9] For instance, APRNs in Maine are authorized to perform, and do perform, a vast array of procedures that implicate and express profound respect for the life of the unborn, such as delivering babies or completing a miscarriage, as well as solemn medical functions, such as end-of-life care and signing death certificates. *See supra* 6-7; PSMF ¶¶ 84, 86. At the very least, there is a material dispute of fact as to whether the Physician-Only Law in fact furthers any state interest, and whether any such benefits outweigh the Law's substantial burdens.

2. <u>Plaintiffs Have Introduced Extensive Record Evidence Of The Burdens The Physician-Only Law Imposes.</u>

The State's assertion that "there is no evidence that the Law imposes an obstacle to abortion access, much less a substantial one," Defs' Mem. 2; *accord id.* at 11, reflects a deep misapprehension of both the law and the facts. Plaintiffs have introduced ample evidence showing both that the Physician-Only Law causes some Maine women to be "unable to access abortion services" altogether—which the State mistakenly suggests is the only type of harm material to the undue burden test, *see* Defs.' Mem. 13 (citing *Casey*, 505 U.S. at 895)—and that it causes a wide variety of other burdens that courts have recognized as material to this analysis.[10] And Plaintiffs

_____

persuaded [the State's] alleged interest in protecting the dignity of the unborn is a legitimate state interest," since it "potentially undermin[es] the constitutional protection . . . reserving to individuals the right to define one's own concept of the mystery of human life" (citing *Casey*, 505 U.S. at 846)). Moreover, even if *Gonzales* were understood to recognize an interest distinct from protecting potential life (which it should not be), the Court's determination that banning the "partial-birth abortion" procedure advanced such an interest was based on its conclusion that the proscribed procedure "implicates additional ethical and moral concerns that justify a special prohibition," 550 U.S. at 158; *see also id.* at 157 (relying on Congressional findings that the procedure was so "brutal and inhumane" that failing to prohibit it risked "coarsen[ing] society" to human life). Here, there can be no remotely similar argument that permitting licensed healthcare professionals—who the State agrees can safely perform abortions, and whom the public has repeatedly identified as the single most ethical profession, *see supra* 6-7—to provide abortions "implicates . . . additional ethical and moral concerns" justifying this "special prohibition."

[9] Moreover, having failed to designate a single expert witness, it is unclear how the State could possibly present any supporting evidence on this point at trial.

[10] Defying common sense, the State also asserts that "[i]f as many as nearly 4,800 abortions could be performed in [1987] despite the Law, it is hard to see how the Law imposes a significant obstacle now that demand for abortions is less than half that number." Defs.' Mem. 18. This facile analysis ignores the numerous factual predicates necessary to

have shown that eliminating the Law would eliminate or significantly reduce these burdens by dramatically increasing abortion access. *See supra* 8-10.

*First*, Plaintiffs have introduced substantial evidence that the Law severely limits where and when abortion services are available in Maine, *see supra* 7-8; that, as a result, some patients have to travel hundreds of miles to obtain an abortion and/or are forced to try to obtain care on extremely limited dates and times; and that such travel and scheduling constraints create substantial challenges relating to transportation, childcare, time off work, confidentiality, and other factors, which some poor and low-income women simply cannot surmount, *see supra* 10-15. This reality is evidenced by the high number of patients who do not make it to their abortion appointment after communicating to Plaintiffs their fear that they will not be able to overcome the burdens of travel. PSMF ¶¶ 201-202. And this reality is further supported by (1) unrebutted expert testimony detailing why such lengthy travel is impossible for some poor and low-income women in Maine, and (2) unrebutted expert testimony summarizing more than 40 years of social science confirming that travel distances of an even lesser amount than those faced by many women in Maine reduce abortion access. *Id.* ¶¶ 180-186, 192-198. The State points to the fact that Plaintiffs do not possess information on *specific* Maine women who have been unable to obtain a desired abortion, Defs.' Mem. 21—ignoring that Plaintiffs would not, of course, possess information on those women who never contact the clinic because they see where it is located and know it is hopeless, and that Plaintiffs do not, of course, have a constitutional obligation to track down patients who do not show for their appointments (if doing so were even possible, *see* PSMF ¶ 208). This evidence defeats the State's motion for summary judgment.

*Second*, Plaintiffs have presented evidence that the Law imposes a wide variety of other

---

draw conclusions from these data—such as the population of Maine 30 years ago, the number of physicians performing abortions in Maine 30 years ago, when and where abortion services were available in Maine 30 years ago, and data comparing the number of *desired* abortions in 1987 with the number of abortions *actually* obtained.

burdens material to this constitutional analysis. For instance, in *Whole Woman's Health*, the Court noted that patients would face "increased driving distances" to access abortion, and that the remaining abortion clinics in Texas would have "fewer doctors, longer waiting times, and increased crowding," with patients "less likely to get the kind of individualized attention, serious conversation, and emotional support that doctors at less taxed facilities may have offered." 136 S. Ct. at 2313, 2318. The Court considered significant the district court's findings that these burdens would "erect a particularly high barrier for poor, rural, or disadvantaged women." *Id*. at 2302.

Circuit courts, too, have recognized a wide variety of burdens as constitutionally material. For example, the Seventh Circuit recently blocked a requirement that women have an ultrasound performed 18 hours before they may obtain an abortion based on "the lengthy travel that [the law] required" and the strain this imposed on the "realm of finances, employment, child care, and domestic safety," particularly for low-income patients, as well as "concerns about confidentiality in employment situations and abusive spouses." *PPINK*, 896 F.3d at 819; *see Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 918 (7th Cir. 2015) (affirming injunction of Wisconsin law that would delay women in obtaining abortions, causing some "to forgo first-trimester abortions and instead get second-trimester ones, which are more expensive and present greater health risks"); *Humble*, 753 F.3d at 915 (relevant factors include whether the restriction would increase the cost of the abortion, delay access to abortion, and stigmatize abortion, and courts may "consider the ways in which an abortion regulation interacts with women's lived experience, socioeconomic factors, and other abortion regulations." (citing *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 541-43 (9th Cir. 2004)); *see also, e.g.*, *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1326-27 (11th Cir. 2018) (affirming injunction where law would increase patients' medical risk and "increase the costs of travel and lodging for women who do not live near the

plaintiff clinics," which "would be especially burdensome for low-income women, who comprise a large proportion of the plaintiffs' patients").

Plaintiffs have, at a minimum, raised a genuine material dispute as to whether the Law causes an array of cognizable harms in addition to outright prevention, including: (1) delaying patients' abortions and thereby increasing the medical risks, PSMF ¶¶ 213-21; (2) preventing patients from obtaining the appropriate abortion method, *id.* ¶¶ 222-25 (3) imposing costs that force women to sacrifice other essential needs, such as food or heating, *id.* ¶¶ 169-71, 179; (4) jeopardizing women's jobs and economic security, *id.* ¶¶ 230-32; (5) compromising women's confidentiality, *id.* ¶¶ 202, 226-27, 231, 233; and (6) exposing women to a heightened risk of violence, *id.* ¶¶ 226, 229, 234. *See supra* 7-8, 10-15. Individually and collectively, these harms outweigh the State's non-existent interest and defeat summary judgment.

Citing no authority, the State suggests that MFP and PPNNE could mitigate the Law's burdens by increasing efforts to recruit new physicians or asking their existing contractors to travel or relocate. *See* Defs.' Mem. 22. This fails as a matter of law. The court must look to the "real-world context" in which the restriction operates. *E.g.*, *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1337 (M.D. Ala. 2014). As the Seventh Circuit recently explained in affirming a preliminary injunction of an ultrasound requirement for abortion patients,

> it [is not] appropriate for an opposing party or a court to dictate the best use of resources for a business, provided its choices are within the range of reasonableness—but particularly in the case of a non-profit agency with limited funding seeking to provide the most efficient health care services to a mostly poor population.

*PPINK*¸ 896 F, 3d. at 823. The Seventh Circuit noted further that it "would be reasonable for PPINK to make decisions . . . based not only on economic concerns, but also on its ability to provide the best medical care for its patients, to attract certain medical professionals, . . . or for

any number of other legitimate reasons." *Id.* Here, Plaintiffs' determination—based on decades of experience—that word-of-mouth is the most effective method of physician recruitment, PSMF ¶¶ 140-142, and Plaintiffs' evidence—based on conversations with its physician contractors—that it is neither logistically nor financially feasible for its physicians to travel to remote health centers and/or add additional abortion service days, *id.* ¶¶ 143-159, are both well "within the range of reasonableness," and thus immaterial to the undue burden analysis, *PPINK*, 896 F.3d at 823.

## II. The State Is Not Entitled To Judgment On Plaintiffs' Equal Protection Claims.

### A. The Physician-Only Law Implicates The Equal Protection Clause.

The Equal Protection Clause "commands that . . . all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr. Inc.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). The Physician-Only Law clearly implicates (and defies) this command in at least two ways: (1) by singling out APRNs who seek to perform abortions, and prohibiting them from doing so notwithstanding that APRNs with identical education and training are permitted to provide comparable or more complex procedures; and (2) by singling out patients seeking abortions, and prohibiting them from obtaining this service from qualified clinicians, notwithstanding that patients seeking comparable medical procedures from the same APRNs are permitted to obtain them. Unlike the State's analogies, the Physician-Only Law does not "ban[]" *everyone* from engaging in "a specific act," such as setting off fireworks. Defs.' Mem. 24.[11] A more apt comparison would be if a State permitted ordained ministers to perform opposite-sex marriages, but allowed only a federal judge to perform a same-sex marriage. This would clearly

---

[11] Moreover, as a general matter, that the Act's classifications are based on the *activities* in which these groups seek to engage rather than an immutable *trait* does not shield them from scrutiny, *see* Defs.' Mem. 24; this is standard fare in the equal protection context, *see, e.g.*, *McGowan v. Maryland*, 366 U.S. 420, 425-27 (1961) (considering whether a law prohibiting the sale of certain retail goods on Sundays while excepting the sale of other merchandise violated equal protection); *Stefanoff v. Hays Cnty.*, 154 F.3d 523, 525-26 (5th Cir. 1998) (reviewing under equal protection a policy that classified inmates who elected to be sentenced by a jury differently than inmates sentenced by a judge).

implicate equal protection—both for the ministers who sought to perform same-sex marriages and for same-sex couples seeking to be married by a minister—just as the Law does here.

The State's alternative theory that abortion care is so vastly different from any other health service (including, e.g., contraceptive care, miscarriage care, delivering babies, or signing death certificates) that singling out APRNs who seek to perform abortions and patients who seek these services from APRNs does not even implicate equal protection, finds no support in even the State's own citations. Defs.' Mem. 25-26;[12] *see also Tapalian v. Tusino*, 377 F.3d 1, 6 (1st Cir. 2004) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners."). Moreover, under this theory, no abortion restriction could *ever* implicate equal protection, which is plainly wrong. *See infra* 29 (citing case law striking abortion laws under equal protection).

## B. The Law Lacks Even A "Rational" Connection To Any Legitimate Interest.

Because the Law burdens the fundamental right to abortion, *see supra*, it is subject to strict scrutiny. *See Shapiro v. Thompson*, 394 U.S. 618, 638 (1969) (classification that "touches on" a fundamental right is subject to strict scrutiny), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974). The State's argument that strict scrutiny under the Equal Protection Clause is triggered only once a court has *already found* that an abortion law *violates* the Due Process Clause, Defs.' Mem. 26, defies both law and logic. If that were so, then the fundamental rights component of the equal protection analysis would be meaningless, as it could be triggered only after a discrete constitutional violation had already been found.

But even assuming *arguendo* that the Law is subject only to rational basis scrutiny, the

---

[12] *Mazurek* is completely inapposite because the plaintiff's equal protection claim was not even before the Court. *See* Brief of Appellee, *Armstrong v. Mazurek*, 94 F.3d 566 (9th Cir. 1996), 1995 WL 17014049, at *5 n.1 ("Appellants have not appealed the district court's ruling on their equal protection claim"). And in *Harris v. McCrae*, 448 U.S. 297, 324 (1980), and *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 174 (4th Cir. 2000), neither court ended their analysis after characterizing abortion as "different"—to the contrary, both went on to scrutinize the challenged classifications to determine whether they were, at the very least, rationally related to a legitimate government interest.

State cannot identify any rational connection to a legitimate state interest after conceding that the Law offers no safety benefit, *supra* 4—the only once-plausible justification for such a restriction. The State's arguments do not counsel otherwise:

1. If "Abortion Is Unique" Were Sufficient To Save The Act, No Abortion Restriction, No Matter How Absurd, Would Fail Rational Basis.

The State argues that it is always rational to single out abortion because abortion is "unique." Defs.' Mem. 25. This is without merit. Numerous courts have struck down laws that single out abortion under equal protection rational basis. *See, e.g., Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. Dep't of Health*, 64 F. Supp. 3d 1235, 1254-60 (S.D. Ind. 2014); *Planned Parenthood of Greater Ohio v. Hodges*, 188 F. Supp. 3d 684, 693-94 (S.D. Ohio 2016). While the cases from which the State selectively quotes, Defs.' Mem. 26-27, characterized abortion as "different" in some ways, those findings did not suffice to sanction the challenged laws. Rather, the courts still required that the law was rationally related to a state interest in either (1) "promoting and protecting the health of women visiting abortion clinics," *Greenville*, 222 F.3d at 174-175—an interest the State has expressly disclaimed here, *see* PSMF ¶ 42; or (2) "encouraging childbirth," *see Harris*, 448 U.S. at 324-35—an interest the State nowhere asserts.

Accepting the State's argument that singling out abortion is *per se* rational would render the rational basis test entirely toothless. Under this reasoning, every law singling out abortion, no matter how baseless, would be shielded from judicial scrutiny. For example, the guarantee of equal protection would not prevent states from taxing only abortion clinics in order to pay for a new public library, or requiring that only abortion providers repay their medical school loans on a condensed time-frame. The Constitution will not tolerate such targeting without, at the bare minimum, a rational basis.

2. Blocking a Maine Woman From Receiving Abortion Services From A Trusted APRN In Her Own Community Bears No Rational Relationship To The State's Asserted Interest In Expressing "Respect" For Life.

The State's argument that blocking qualified APRNs from performing abortions bears any rational relationship to an interest in expressing respect for "the life of the unborn" and the "dignity of human life," Defs.' Mem. 27 (quoting *Carhart*, 550 U.S. at 146, 157), is equally meritless. The State makes no attempt to explain this counter-intuitive proposition, which is supported neither by common sense nor a shred of evidence (and, to the contrary, which all evidence in the record contradicts, *see supra* 6-7). *See generally Plyler*, 457 U.S. at 228 (asserted interest in preserving state resources by prohibiting undocumented children from attending public school irrational because "the available evidence suggests that illegal aliens underutilize public services, while contributing their labor to the local economy and tax money to the state fisc"); *Cleburne*, 473 U.S. at 449-50 ("The question is whether it is rational to treat the mentally [disabled] differently. It is true that they suffer disability not shared by others; but why this difference warrants a density regulation that others need not observe is not at all apparent.").

At the very least, a material dispute exists as to whether the Law bears any rational relationship to an interest in expressing "respect for the dignity of life," when it allows an unfamiliar physician to perform a patient's abortion via telehealth, but bars the patient's trusted APRN from providing such care in-person. This, too, is sufficient to defeat the State's motion.

## CONCLUSION

For the reasons discussed above, the State's motion for summary judgment should be denied in its entirety. Plaintiffs respectfully request that the Court schedule oral argument on this motion.

Date: November 14, 2018

Respectfully submitted,

/s/ Emma E. Bond
Emma E. Bond
Zachary L. Heiden
American Civil Liberties Union of Maine
Foundation
121 Middle Street, Suite 200
Portland, ME 04103
Telephone: (207) 619-6224
Email: ebond@aclumaine.org
       zheiden@aclumaine.org

*Counsel for Plaintiffs*

Jennifer Sandman*
Planned Parenthood Federation of America
123 William Street, 9th Floor
New York, NY 10038
Telephone: (212) 261-4749
Email: jennifer.sandman@ppfa.org

Diana Salgado*
Planned Parenthood Federation of America
1110 Vermont Ave., NW, Suite 300
Washington, DC 20005
Telephone: (212) 541-7800
Email: diana.salgado@ppfa.org

*Counsel for Katie Riley, Alison J.G. Bates,
Stephanie L. Small, and Planned
Parenthood of Northern New England*

* Admitted Pro Hac Vice

Julia Kaye*
Andrew D. Beck*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2633
Email: jkaye@aclu.org
       abeck@aclu.org

*Counsel for Julie A. Jenkins and Family Planning
Association of Maine d/b/a Maine Family
Planning and Primary Care Services*

**CERTIFICATE OF SERVICE**

I hereby certify that on this, the 14th day of November, 2018, I electronically filed the

above document with the Clerk of Court using the CM/ECF system, which will send notification

of such filing to the following:

        CHRISTOPHER C. TAUB
        Christopher.C.Taub@maine.gov

        HALLIDAY MONCURE
        Halliday.Moncure@maine.gov

To my knowledge, there are no non-registered parties or attorneys participating in this case.

          /s/ Emma E. Bond
          Emma E. Bond
          American Civil Liberties Union of
          Maine Foundation